# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **EMILY JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:07cv315-MEF** |
| | ) | |
| **EASTER SEALS CENTRAL** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## EVIDENTIARY SUBMISSION IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Easter Seals Central Alabama, and respectfully submits the following in support of its motion for summary judgment:

1. Excerpts from the sworn deposition of Plaintiff, Emily C. Jackson;

2. Exhibits 2, 6, and 7 from the deposition of Plaintiff, Emily C. Jackson;

3. Excerpts from the sworn deposition of Cassandra Cooper;

4. Sworn declaration of Debbie Lynn, with exhibits;

5. Sworn declaration of Susan McKim, with exhibits.

*/s/ Robin A. Adams*
Stephen E. Brown
Robin A. Adams
Attorneys for Defendant

OF COUNSEL:
Maynard, Cooper & Gale, PC
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203
(205) 254-1000
(205) 254-1999 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic filing and by U.S. Mail, postage prepaid and properly addressed, on this 29th day of February, 2008, to:

Emily C. Jackson
605 Wesley Drive
Montgomery, Al. 36111

/s/ Robin A. Adams
OF COUNSEL

# American Court Reporting
## toll-free (877) 320-1050

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:07-cv315-MEF

EMILY JACKSON,
 Plaintiff,

vs.

EASTER SEALS CENTRAL ALABAMA,
 Defendant.

DEPOSITION TESTIMONY OF:
EMILY JACKSON

November 13, 2007
9:10 a.m.

COURT REPORTER:
Gwendolyn P. Timbie, CCR

Page 3

1    the parties may make objections and assign
2    grounds at the time of trial or at the
3    time said deposition is offered in
4    evidence, or prior thereto.
5         Please be advised that this is the
6    same and not retained by the Court
7    Reporter, nor filed with the Court.

Page 2

S T I P U L A T I O N S

 IT IS STIPULATED AND AGREED by and
between the parties through their
respective counsel that the deposition of
EMILY JACKSON, may be taken before
Gwendolyn P. Timbie, Certified Court
Reporter and Notary Public, State at
Large, at the law offices of Maynard,
Cooper & Gale, Montgomery, Alabama, on
November 13, 2007, commencing at
approximately 9:10 a.m.

 IT IS FURTHER STIPULATED AND
AGREED that the signature to and the
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions.

 IT IS FURTHER STIPULATED AND
AGREED that it shall not be necessary for
any objections to be made by counsel to
any questions, except as to form or
leading questions, and that counsel for

Page 4

INDEX

| EXAMINATION BY: | PAGE NO: |
| --- | --- |
| Ms. Adams | 7 |
| Certificate | 434 |

LIST OF EXHIBITS

| EXHIBITS: | PAGE NO: |
| --- | --- |
| Defendant's 1 | 149 |
| Defendant's 2 | 261 |
| Defendant's 3 | 261 |
| Defendant's 4 | 298 |
| Defendant's 5 | 310 |
| Defendant's 6 | 312 |
| Defendant's 7 | 323 |
| Defendant's 8 | 403 |

1 (Pages 1 to 4)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1    Q.   During your conversation with
2  Ed, did he explain to you or did you come
3  to understand that the micro enterprise
4  program was a grant-based program?
5    A.   Mr. Johnson told me that it
6  was a grant program.
7    Q.   Did he explain to you what a
8  grant program was, or did you just know
9  what that meant? A grant-based program.
10   A.   Well, he just explained that
11 it was a grant program. Was funded by --
12 by a grant. So...
13   Q.   Did you understand where the
14 grant money was coming from?
15   A.   Yes, I did.
16   Q.   Where was that?
17   A.   It came from the office of
18 disability employment program, ODEP.
19   Q.   Now, is that something you
20 came to understand through your employment
21 with Easter Seals, or was it something
22 that was discussed in your initial
23 learn-about-the-position meeting with Ed

Page 126

1  Collier?
2    A.   Well, I don't believe that Ed
3  told me about ODEP. I believe Mr. Johnson
4  may have mentioned it. But it was in the
5  grant. I had a copy of the grant. And
6  that was explained in the grant, where it
7  came from.
8    Q.   So prior to having this
9  meeting with Ed Collier and with
10 Mr. Johnson, you had a copy of the grant?
11   A.   I have a copy of the grant.
12   Q.   I know you have --
13   A.   I had one and I have one now.
14   Q.   So you already knew, prior to
15 meeting with anybody at Easter Seals, that
16 this micro enterprise program that had a
17 position open that you were interested in
18 discussing was a grant-based program, and
19 it received its funding from a grant -- a
20 government grant, right?
21   A.   No, ma'am. Not prior to
22 meeting with him. I found out after. I
23 found out when I met with Mr. Johnson that

Page 127

1  it was a grant. But prior to meeting with
2  him, I didn't know.
3    Q.   And then, after meeting with
4  him, did you locate a copy of the grant?
5    A.   It was in the micro enterprise
6  office.
7    Q.   So after getting the job --
8    A.   After getting the job --
9    Q.   -- you saw the grant itself,
10 but not prior to getting the position?
11   A.   No, ma'am.
12   Q.   Mr. Collier introduced you to
13 Mr. Johnson. Did he introduce you to
14 anyone else at Easter Seals?
15   A.   He introduced me --
16 Mr. Johnson introduced me to Cassandra
17 Cooper.
18   Q.   And who is Cassandra Cooper?
19   A.   She was one of the micro
20 enterprise specialists at Easter Seals.
21   Q.   So she was performing the job
22 that you were meeting with Mr. Collier to
23 learn more about and to possibly apply

Page 128

1  for?
2    A.   She was one of the micro
3  enterprise specialists in the program.
4    Q.   Were there others other than
5  Cassandra Cooper?
6    A.   Just Cassandra.
7    Q.   So she was the micro
8  enterprise specialist at the time?
9    A.   Absolutely.
10   Q.   And Ms. Cooper, she's a black
11 female, correct?
12   A.   Correct.
13   Q.   Mr. Johnson is a male,
14 obviously. Is he white or black?
15   A.   He's white.
16   Q.   Mr. Collier is a male. Is he
17 white or black?
18   A.   He's white.
19   Q.   Before Mr. Johnson introduced
20 you to Ms. Cooper, had you ever met her
21 before?
22   A.   No, I hadn't.
23   Q.   Did you and Ms. Cooper discuss

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1  there when you came to meet with him?
2  Anyone else in your meeting?
3      A.   No one else was in the
4  meeting.
5      Q.   And Mr. Johnson offered you
6  the job?
7      A.   Yes, he did.
8      Q.   What did he say when he
9  offered you the job?
10     A.   I don't know his -- remember
11  his exact words, but he told me that I --
12  that I -- that he made a decision, and he
13  selected me for the job. But I'm not sure
14  if those were his exact words.
15     Q.   And what was your response?
16     A.   And I thanked him for hiring
17  me -- for accepting me at Easter Seals.
18  And I just don't remember what -- what
19  else I said.
20     Q.   Do you remember anything else
21  said in this meeting?
22     A.   Nothing other than I got the
23  job and that I would need to do a -- take

Page 142

1  a physical and that Eileen would give me
2  the forms to fill out. And I went to
3  Eileen's desk, and she gave me the forms.
4      Q.   You say "forms to fill out."
5  Was this both for the physical and for the
6  employee kind of paperwork?
7      A.   Yes, ma'am. And then I know I
8  declined the health insurance because I
9  already had health insurance through OPM
10  and through Social Security. So I filled
11  out a waiver.
12     Q.   So in the packet of
13  information that Eileen gave you, there
14  was information about the different
15  benefits that were available to Easter
16  Seals' employees, correct?
17     A.   Correct.
18     Q.   One of those benefits that was
19  available was health insurance, but you
20  didn't need that because you already had
21  that, correct?
22     A.   Correct.
23     Q.   So you told Easter Seals that

Page 143

1  you declined that benefit?
2      A.   I declined it.
3      Q.   But you were eligible for and
4  did receive other benefits through your
5  employment with Easter Seals, right?
6      A.   I believe it was annual leave,
7  sick leave. Is that what you're talking
8  about?
9      Q.   Right. You got annual -- you
10  got paid annual leave and paid sick
11  leave?
12     A.   Correct.
13     Q.   Paid vacation leave? You got
14  long-term disability coverage, right?
15  Insurance coverage.
16     A.   I don't know if I got that.
17     Q.   Do you have any information
18  one way or the other -- Easter Seals'
19  employee records show that you got LTD
20  coverage. Do you have anything to dispute
21  that?
22     A.   No, I don't.
23     Q.   And you got life insurance; is

Page 144

1  that correct?
2      A.   I believe I did.
3      Q.   And Easter Seals made
4  contributions to your retirement fund; is
5  that correct?
6      A.   I believe they did.
7      Q.   And as an Easter Seals
8  employee, you'd be covered by their
9  workers' compensation insurance; is that
10  correct?
11     A.   I think so.
12     Q.   I have your start date at
13  Easter Seals as September 14, 2004. Does
14  that sound correct to you?
15     A.   That's correct.
16     Q.   And as a micro enterprise
17  specialist -- that was the position you
18  were hired for, right?
19     A.   Yes, ma'am.
20     Q.   As a micro enterprise
21  specialist, where did you work each day?
22     A.   I worked in the micro
23  enterprise office.

36  (Pages 141 to 144)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 261

1  of what has been filed as your complaint
2  in this case and see if you recognize it
3  as the same.
4      A.  Okay.  This is my original
5  complaint.
6      Q.  And this original complaint
7  consists of your application under Section
8  706 with the Civil Rights Act for the
9  appointment of attorney and to file an
10 action without the prepayment of fees and
11 costs.
12     A.  That's correct.
13     Q.  It also contains a March 30,
14 2007 letter to the judge and a copy of
15 your charge of discrimination that you
16 filed with the EEOC on November 10, 2006;
17 is that correct?
18     A.  That's correct.
19         MS. ADAMS:  Let's mark that as
20 Defendant's Exhibit Number 2.
21         (WHEREUPON, documents were
22 marked as Defendant's Exhibit Numbers 2
23 and 3 and are attached to the original

Page 262

1  transcript.)
2      Q.  All right.  Now I'm going to
3  hand you what I'm going to mark as
4  Defendant's Exhibit Number 3, which is a
5  pleading that you filed with the court
6  titled Motion to Amend Complaint.
7      Do you recognize that pleading?
8      A.  Yes, I do.
9      Q.  Is that a copy of the pleading
10 that you filed with the court amending
11 your complaint in this action?
12     A.  It appears to be.  Yes.
13     Q.  Did you -- we're looking at
14 Defendant's Exhibit Number 2, which is the
15 original complaint.  Did you prepare this
16 complaint, Ms. Jackson?
17     A.  Yes, I do.
18     Q.  And did you review it before
19 you filed it?
20     A.  I prepared it.
21     Q.  I understand that.  But before
22 you submitted it, did you review it and
23 make sure that everything contained in the

Page 263

1  complaint was accurate and correct to the
2  best of your understanding?
3      A.  I believe I did.
4      Q.  Is there anything that's
5  contained in your complaint that you need
6  to amend or change as we sit here today?
7  Anything that's not accurate or correct as
8  far as you know?
9      A.  Well, here, after I had filed
10 it, I realized that I put, I am filing a
11 racial and discrimination claim, and I
12 meant to write, I am filing a racial and
13 gender discrimination claim.
14     Q.  And you're talking about the
15 bottom of -- the bottom of page --
16     A.  It's no page number at the
17 bottom.
18     Q.  Bottom of page four, under
19 Nature of Alleged Discrimination?
20     A.  Yes.
21     Q.  So that should say racial and
22 gender discrimination claim?
23     A.  Yes.

Page 264

1      Q.  Is that your change?
2      A.  Yes.
3      Q.  Anything else that's
4  inaccurate about this complaint?
5      A.  No.  I don't see anything that
6  needs to be corrected.
7      Q.  Same question goes for what we
8  marked as Defendant's Exhibit 3.  Did you
9  prepare this motion to amend complaint?
10     A.  Yes, I did.
11     Q.  And did you check it to make
12 sure that everything in here was accurate
13 and correct?
14     A.  Yes, I did.
15     Q.  Does this accurately and
16 correctly state your allegations in this
17 case, accepting the ones that have been
18 dismissed by the court?
19     A.  Yes.
20     Q.  And this is your signature on
21 the back of the service -- certificate of
22 service, right?
23     A.  Yes, it is.

66 (Pages 261 to 264)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 265

1    Q.   Ms. Jackson, please tell me
2  what is the basis of your complaint that
3  you've been discriminated against on the
4  basis of your race.
5    A.   Well, Easter Seals -- I was
6  working for Easter Seals when they were
7  notified that the grant was ending. And
8  instead of Easter Seals offering a
9  position to retain me after Cassandra
10 Cooper resigned, they hired a white male.
11 And the only reason why the program was
12 continued was because of my performance --
13 my performance and Cassandra Cooper's
14 performance of the program. And they gave
15 Mr. Hanes the position based on my
16 performance, and I feel that they should
17 have offered it to me.
18    Q.   Any other event or incident
19 that you're claiming in this lawsuit
20 that's related to your race?
21    A.   I'm claiming discrimination
22 because he's a white male and I'm a black
23 female.

Page 266

1    Q.   And that has to do with your
2  employment in that position as micro
3  enterprise specialist, right?
4    A.   My what?
5    Q.   The fact that you weren't
6  retained in that position as micro
7  enterprise specialist. That's your claim,
8  right?
9    A.   My claim is racial and gender
10 discrimination.
11    Q.   And my question is, for race
12 discrimination, are we talking about
13 anything other than the fact that your
14 employment with the micro enterprise
15 program at Easter Seals ended? Is that
16 all we're talking about? Is that all that
17 your claim is?
18    A.   We're talking about my
19 position -- my employment ending with
20 Easter Seals. That's what we're talking
21 about.
22    Q.   Other than that, is there
23 anything else you're claiming in this

Page 267

1  lawsuit with regard to race
2  discrimination?
3    A.   I don't understand what you
4  mean. Other than they hired a white male
5  in my place. That's race.
6    Q.   We've got that.
7    A.   Okay.
8    Q.   We've got that.
9    A.   Okay.
10    Q.   Other than that, are we going
11 to be talking about anything else?
12    A.   Gender discrimination.
13    Q.   Just focus on race for me
14 right now. I just want to talk about what
15 your claim is regarding how you were
16 discriminated against on the basis of your
17 race. And I understand that your claim --
18 part of your claim is that Mr. Hanes got a
19 job because he was a white male and you
20 feel like you should have been retained in
21 that job. I got that down.
22    A.   Okay.
23    Q.   Are we going to be talking

Page 268

1  about -- are you claiming anything about
2  anything other than that in this lawsuit?
3    A.   Other than --
4    Q.   For race --
5    A.   For race?
6    Q.   -- discrimination.
7    A.   I believe that's all I'm
8  claiming, is discrimination based on race.
9    Q.   Was that decision -- that
10 employment decision, right?
11    A.   That employment decision.
12    Q.   Nothing else?
13    A.   No.
14    Q.   We've also got a claim in here
15 for gender discrimination. Are we going
16 to be talking about that same employment
17 decision, that micro enterprise specialist
18 position, that you had? Your employment
19 came to an end and, ultimately, Mr. Hanes
20 fills the position. Are we talking about
21 anything else other than that event?
22    A.   No.
23    Q.   So your race and your gender

67  (Pages 265 to 268)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 301

1    A.    This is my full response to
2  question Number 4.
3    Q.    And did you prepare this
4  document?
5    A.    Yes, I did.
6    Q.    And did you review this
7  document carefully?
8    A.    Yes, I did.
9    Q.    And did you sign this
10  document?
11    A.    Yes, I did.
12    Q.    And in signing this document,
13  you were swearing that the answers and
14  information contained herein were
15  accurate?
16    A.    Correct.  To my understanding
17  and to my ability.
18    I need to take a washroom break.
19    Q.    Absolutely.
20        3:16 p.m.
21        (Recess taken.)
22        3:23 p.m.
23    Q.    Previously we were discussing

Page 302

1  something else which -- you made reference
2  to a meeting on April 26, 2006 that you
3  had with Mr. Lewis regarding the micro
4  enterprise's program.
5    Do you remember referencing that?
6    A.    Yes.
7    Q.    And there was a meeting on
8  April 26th where this was discussed,
9  correct?
10    A.    Correct.  On or approximately
11  April 26th.
12    Q.    Who was in that meeting other
13  than you and Mr. Lewis?
14    A.    Dr. McKim, as I have here on
15  the report, and Cassandra Cooper.
16    Q.    So it was you, Cassandra
17  Cooper, Susan McKim, Larry Lewis.
18    Anyone else?
19    A.    No.
20    Q.    And what was discussed during
21  that meeting?
22    A.    That the ACE micro enterprise
23  program would be ending on September 29th.

Page 303

1    Q.    And did they discuss why the
2  program was coming to an end?
3    A.    All I know is that Mr. Lewis
4  was saying that due to budget cuts that
5  the program was going to end on September
6  29, 2006.
7    Q.    And was there discussion about
8  the fact that an extension had been
9  applied for?
10    A.    That -- yes.  That they were
11  seeking a no-cost extension.
12    Q.    And they were seeking a
13  no-cost extension for one year?
14    A.    Well, I don't know how long it
15  was.  It may have been one year, but I'm
16  not sure how long the extension was going
17  to be.
18    Q.    Do you remember what was
19  discussed in that meeting?
20    A.    Yes.  Dr. McKim was in the
21  meeting, and I believe it was Dr. McKim
22  that stated that there would be a
23  no-cost -- that they would be seeking a

Page 304

1  no-cost extension to sustain the grant.
2  And, yes, I do believe it was for a year.
3    Q.    I'm looking at your complaint,
4  which is marked as Defendant's Exhibit
5  Number 2.  And in paragraph three, you
6  stated --
7    A.    What page?
8    Q.    It's page four of ten.  I
9  don't know if it's labeled at the top of
10  yours.  Paragraph three.
11    A.    All right.
12    Q.    This was the complaint that
13  you initiated the lawsuit with and
14  submitted to the court, right?
15    A.    Yes.
16    Q.    In paragraph three, the last
17  sentence says that they would be seeking a
18  no-cost extension to sustain the program
19  for one year.
20    Is that what that says?
21    A.    Yes.
22    Q.    So I'm just trying to figure
23  out what was said -- what your testimony

76  (Pages 301 to 304)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 305

1  is that was said at that meeting, whether
2  it was one year or six months or what.
3      A.   It was one year. I forgot.
4  It was one year.
5      Q.   So on Exhibit 4, which are
6  your responses to the interrogatories, on
7  page one where you're talking about that
8  same meeting, the part where it says they
9  were going to seek a no-cost extension to
10 keep the program going until March 2007,
11 that's incorrect, right?
12     A.   Yes. That would be
13 incorrect.
14     Q.   So that part of your statement
15 is wrong for Exhibit Number 4?
16     A.   Yeah. That should be -- it
17 was a year. Now that I remember, it was
18 for a year. They would be seeking it for
19 a year.
20     And what I got that confused with,
21 it was extended until March of '07. But
22 it -- when we had the meeting, they
23 requested a year.

Page 306

1      Q.   But they didn't know whether
2  or not they'd get it --
3      A.   Right.
4      Q.   -- on April 26, 2006, right?
5      A.   Right.
6      Q.   So the end of the meeting on
7  April 26, you and Cassandra Cooper
8  knew that there was -- the program was
9  going to end at the end of September
10 unless an extension was granted, correct?
11     A.   Correct.
12     Q.   And a no-cost extension means
13 they're not getting additional money, but
14 they're using leftover money from other
15 resources to extend the program?
16     A.   Using leftover money from the
17 grant.
18     Q.   From the grant?
19     A.   Not from other resources, but
20 specifically from the grant.
21     Q.   And you understand that Easter
22 Seals is one of three grant recipients for
23 the same grant, correct?

Page 307

1      A.   Correct.
2      Q.   And so leftover grant money
3  wouldn't necessarily just have been what
4  was left over from the Easter Seals
5  program, but could have been left over
6  from one of the other two programs as
7  well, correct? Or do you know one way or
8  the other?
9      A.   I'm not sure about that.
10     Q.   You just don't know?
11     A.   No.
12     Q.   What did you say in response
13 to learning that the program could come to
14 an end at the end of September?
15     A.   I didn't say anything.
16     Q.   What did Cassandra say?
17     A.   I don't remember her saying
18 anything either. Other than -- Cassandra
19 may have asked a question, but I can't
20 remember what it was that she asked, what
21 she said. I do believe that she asked a
22 question, but I don't remember what.
23     Q.   So you believe she might have

Page 308

1  said something, but you don't remember
2  what it was?
3      A.   I can't remember what it was.
4      Q.   Why do you believe she asked a
5  question?
6      A.   I remember at that meeting her
7  asking me something, but I don't remember
8  what it was that she asked.
9      Q.   Have you and Cassandra
10 discussed that meeting since you filed the
11 lawsuit?
12     A.   Yes. Because I asked her for
13 a copy of the letter.
14     Q.   Did you discuss, when you
15 asked her for a copy of the letter, what
16 had gone on -- her memories of what had
17 gone on during this meeting?
18     A.   No.
19     Q.   Prior to this meeting on April
20 26, 2006, had you ever heard anything
21 about possibilities that the funding --
22 the grant could be cut short or the
23 funding could be limited going forward?

77  (Pages 305 to 308)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 309

1    A.    No.
2    Q.    So this was the first you had
3  ever heard of it; is that correct?
4    A.    This is the first. Well,
5  there was rumor, but -- you know, there
6  was, like, rumor around the workplace that
7  they were -- well, actually, they were
8  shutting down programs. So that was
9  evident that programs were being shut
10  down.
11    Q.    Grant-based programs?
12    A.    No. The cafeteria, their
13  physical therapy. I don't know if that
14  was grant based or not.
15    Q.    But you knew that your program
16  was strictly funded by a grant, right?
17    A.    Correct.
18    Q.    And so other programs might
19  have been ending for other reasons, but
20  they weren't funded through the same grant
21  that your program was funded through,
22  right?
23    A.    Correct.

Page 310

1        (WHEREUPON, a document was
2  marked as Defendant's Exhibit Number 5 and
3  is attached to the original transcript.)
4    Q.    I'm going to mark Defendant's
5  Number 5, a letter from the State of
6  Alabama dated August 11, 2006.
7        Have you seen that letter before?
8    A.    I don't remember seeing this
9  letter. I remember seeing the August 15th
10  letter from Mr. Lewis I believe he gave
11  me. I don't remember seeing this one. I
12  may have, but I don't remember seeing it.
13  I don't -- I don't remember reading this.
14  Huh-uh.
15    Q.    Is it your testimony that
16  you've never seen it before or you didn't
17  see it on or about the day it was offered?
18    A.    I don't ever remember seeing
19  this letter.
20    Q.    Well --
21    A.    The letter I received was
22  August 15th, because I -- I would remember
23  that date.

Page 311

1    Q.    If I told you that this letter
2  has most recently been produced to you as
3  an exhibit to defendant's answer and
4  motion to dismiss, which was filed on May
5  8, 2007, would that jog your memory as to
6  whether you've ever seen the letter
7  before?
8    A.    What I would have to do is go
9  to -- and get my documents and see if
10  that's attached in there. Maybe I
11  overlooked it. But I don't recall seeing
12  that letter. I'd have to go in my file
13  and get that -- what did you say? May
14  8th?
15    Q.    Yes.
16    A.    And see if that's attached to
17  it, because I don't remember seeing that
18  letter.
19    Q.    Now, you said that there was a
20  letter you saw dated August 15, 2006; is
21  that correct?
22    A.    Correct.
23        (WHEREUPON, a document was

Page 312

1  marked as Defendant's Exhibit Number 6 and
2  is attached to the original transcript.)
3    Q.    I'm going to mark as
4  Defendant's Exhibit 6 a letter to Emily
5  Jackson from Larry Lewis, dated August 15,
6  2006. Tell me if that's the letter you
7  were referencing earlier.
8    A.    This is the letter that I
9  received.
10    Q.    And in this letter, Mr. Lewis
11  is notifying you that he's received word
12  from ADECA that the grant which funded the
13  micro enterprise's program would be ending
14  at the end of September; is that correct?
15    A.    That's correct.
16    Q.    And that to date their efforts
17  to get an extension had not been
18  successful, correct?
19    A.    Correct.
20    Q.    Now, tell me how you received
21  this letter.
22    A.    The letter was on my desk. I
23  went on funeral leave. My uncle passed.

78  (Pages 309 to 312)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 321

1   the program would end if an extension
2   wasn't granted?
3       A.  I'm not sure if I told my mom
4   about it, because I didn't want to worry
5   her about -- I didn't want to worry her
6   about that.  So I don't remember telling
7   her.  Sometimes things that I know are
8   going to upset her I may not tell her the
9   time I find out about it, but eventually I
10  do tell her.  I don't remember whether I
11  told her about the April 26th letter, but
12  I believe -- I know I told her about this
13  letter.
14      Q.  And whether you told your
15  mother or not, you knew that it was a real
16  possibility, ever since April 26th, that
17  the extension wouldn't be granted; that
18  the program would come to an end at the
19  end of September, right?
20      A.  I knew that there was a
21  possibility, and that's why I started
22  applying for jobs other places.
23      Q.  But you had already started

Page 322

1   your business prior to understanding that
2   there was a possibility that the program
3   would be ending, right?  Because you
4   started that at the beginning of April?
5       A.  It was April 19th.
6       Q.  Right.  Which was prior to
7   April 26th, correct?
8       A.  Correct.
9       Q.  After you received that August
10  15th letter, prior to giving any written
11  notification to Easter Seals, were there
12  any conversations about what would happen
13  with the micro enterprise's program between
14  you and Cassandra Cooper?
15      A.  Prior to this letter?
16      Q.  You get that letter, that
17  April -- pardon me -- the August 15th
18  letter.  After that, after you got the
19  letter and you talked about the letter, do
20  you and Cassandra Cooper, after that, talk
21  about what will happen to the program?
22      A.  Yes.  After that letter, we
23  found out that they extended the program.

Page 323

1       Q.  And we're getting there.
2           (WHEREUPON, a document was
3   marked as Defendant's Exhibit Number 7 and
4   is attached to the original transcript.)
5       Q.  What I'm going to mark as
6   Defendant's Exhibit 7 is a letter dated
7   September 11, 2006 from you to Ms. Lynn.
8   Do you recognize that letter?
9       A.  I recognize it.
10      Q.  Did you author that letter?
11      A.  I wrote this letter and
12  submitted this letter to Ms. Lynn.
13      Q.  And did you do that on
14  September the 11th of 2006?
15      A.  Yes, I did.
16      Q.  How did you submit the letter
17  to Ms. Lynn?
18      A.  I believe I either put it
19  under her door or in her box -- in her
20  mailbox.  Because I'm not sure if she was
21  in the office at the time when I walked
22  around to give it to her.  So I either put
23  it in the mailbox or might have put it up

Page 324

1   under the door.  One of the two.
2       Q.  But you didn't hand it to her
3   personally; is that correct?
4       A.  That's correct.
5       Q.  And you didn't have a
6   discussion with her when you submitted it;
7   is that correct?
8       A.  I had a discussion with her
9   after submitting it.
10      Q.  My question is, at the time
11  you submitted it, you didn't have a
12  discussion with her; is that correct?
13      A.  I didn't see her.  No.
14      Q.  Did you tell Cassandra Cooper
15  that you were going to be submitting this
16  letter prior to doing it?
17      A.  No, I didn't.
18      Q.  Did you discuss your plans
19  with Ms. Cooper prior to submitting this
20  letter?
21      A.  No.
22      Q.  Well, why not?  Y'all were
23  friends.

81  (Pages 321 to 324)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 341

1   I also handed her a copy of my resume, and
2   I gave her one of my business cards. And
3   she said, if there's anything else that I
4   can do for you, that I can do to help, I
5   will. I will help.
6       Q.   Did you say anything else
7   during that meeting?
8       A.   I asked her -- I said, will
9   the program allow me to work part time?
10  If I can't work full time, will it allow
11  me to work part time? And if so, I would
12  like to work Monday, Wednesday, and
13  Friday, four hours a day. And she said
14  she'd have to check with Susan McKim to
15  see if the grant would allow that.
16      Q.   Anything else said during that
17  meeting?
18      A.   I believe that was it.
19      Q.   Did Cassandra Cooper say
20  anything during that meeting?
21      A.   And then she asked Cassandra
22  what was she going to do. And Cassandra
23  said, similar to Ms. Jackson. I'm going

Page 342

1   to -- or I've started -- or I'm going to
2   start a management consulting business.
3   I'm going to do management consulting.
4       Q.   Did Cassandra Cooper say
5   anything else?
6       A.   Not that I remember.
7       Q.   Did Cassandra Cooper ask about
8   working part time?
9       A.   No, she didn't.
10      Q.   So it's your testimony that
11  during the September 12th meeting Ms. Lynn
12  did not tell you that there would be a
13  no-cost extension period for the micro
14  enterprise's program?
15      A.   No, she did not.
16      Q.   And you're certain about that?
17      A.   She -- it was still up in the
18  air. That's what she told us. So she may
19  not have used those words. But a final
20  decision hadn't been made. In fact, I do
21  remember her saying all she had received
22  were e-mail messages.
23      Q.   And what -- do you remember

Page 343

1   her saying what the e-mail messages were
2   about?
3       A.   She didn't say. She just said
4   --
5       Q.   She didn't give you any
6   indication what the e-mail messages were
7   about?
8       A.   All she said was that she
9   didn't have anything official; that she
10  had only received e-mail messages. And I
11  think they were from Tammy Farmer. I
12  believe she said that.
13      Q.   And why would -- I mean,
14  e-mail messages from Tammy Farmer, what
15  importance was that? What did that mean
16  to you?
17      A.   About the program. About the
18  micro enterprise program. So she didn't
19  have to just come out and say the e-mail
20  messages were about -- that's the
21  conversation we were talking about. So
22  that's what she was referring to, the ACE
23  micro enterprise program, which ADECA

Page 344

1   administered.
2       So every -- all the decisions came
3   from ADECA. That's who would let us know
4   whether it was going to continue and
5   whether they would allow two micro
6   enterprise specialists to stay or -- and
7   that's what she had stated. She had to
8   check with Susan to see if it will allow
9   for two micro enterprise specialists, but
10  she didn't have anything final.
11      Q.   If what would allow for two
12  enterprise specialists?
13      A.   The grant.
14      Q.   The grant extension that you
15  just told me she hadn't told you that
16  she'd received yet?
17      A.   No. She said if the grant
18  would allow -- we were talking about the
19  program -- what if the program continued
20  and what if it did not. What are you
21  going to do? So she said, if it
22  continues, then she'll have to check with
23  Susan to see. Because at that point, we

86 (Pages 341 to 344)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 349

1    A.    Okay.
2    Q.    I want to get something
3 straight.
4    A.    Okay.
5    Q.    When you filed your
6 complaint -- well, first of all, this was
7 -- your complaint was the same thing as
8 your charge to the EEOC.  You filed that
9 charge on November 10, 2006, right?
10    A.    Right.
11    Q.    And we already went over
12 that.  You saw -- at the time you saw this
13 that -- everything was accurate and
14 complete, right?
15    A.    Right.
16    Q.    And then later you filed it
17 with the court, on April 30, 2007.  And we
18 went over that.
19    A.    Correct.
20    Q.    You thought that was accurate
21 at the time and complete, right?
22    A.    Right.
23    Q.    We also talked about your

Page 350

1 interrogatory responses which were served
2 on September 18, 2007, correct?
3    A.    Correct.
4    Q.    And the responses that you
5 provided in here, you told me at the time
6 you believed they were accurate and
7 complete, right?
8    A.    Right.
9    Q.    And as we're sitting here
10 today, under oath, you're giving me
11 answers to the best of your ability that
12 are accurate and complete, right?
13    A.    But I made an error.  I
14 made --
15    Q.    You made several errors,
16 right?
17    A.    I made an error on the meeting
18 because this refreshed my memory.  Because
19 so many things happened, you know, about
20 them saying that the program was going to
21 keep going and extending and it was going
22 to -- they were going to seek a no-cost
23 extension.  But I can make a correction,

Page 351

1 and I did make an error today about that.
2 I thought I was sure about it.
3    But when I made this statement, it's
4 refreshing my memory now that I see that
5 Debbie Lynn did say she did not have
6 anything in writing, but she did say that
7 the program was going to be extended for
8 six months.  So that is true.  So I
9 correct what I just previously said about
10 she -- saying that she didn't know whether
11 it was going to be.  Because with the
12 program, it was, like, up and down, you
13 know.  I went through four different
14 administrators and received information
15 from different ones about the program
16 ending and --
17    Q.    All we're talking about is
18 this one meeting.
19    A.    This meeting.  Okay.
20    Q.    I want to be very clear on
21 that.
22    A.    Okay.  Well --
23    Q.    And your testimony is here,

Page 352

1 under oath --
2    A.    Yes.
3    Q.    -- that even though you've
4 given one, two, and a minute ago three
5 different responses as to what happened in
6 the September 12th meeting --
7    A.    Yes.
8    Q.    -- your final response is that
9 on September 12th Ms. Lynn did tell you
10 that the program would be extended for a
11 six-month period, right?
12    A.    Yes, that is correct.
13    Q.    Now, I understand that there
14 were other parts.  She also told you that
15 the details of the program hadn't been
16 sorted out yet, right?
17    A.    Correct.
18    Q.    Did Ms. Lynn also tell you
19 that the money was for -- they got less
20 money for the extension budget than they
21 had expected to get?
22    A.    She may have.  She did talk
23 about the money, but I don't remember

**www.AmericanCourtReporting.com**
**November 13, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 353

1 exactly how much it was. But she may have
2 mentioned that it was less. It is
3 possible that she mentioned that.
4     Q.    And Ms. Lynn never said
5 anything about whether or not there would
6 be one or two positions definitively going
7 forward, correct, for micro enterprise
8 specialist?
9     A.    During this meeting --
10     Q.    During the September 12th
11 meeting, Ms. Lynn never said definitively
12 whether there would be one or two micro
13 enterprise specialists going forward; is
14 that correct?
15     A.    Right. That's correct.
16     Q.    And during this meeting, you
17 told Ms. Lynn that you would be interested
18 in working part time if the program was
19 extended -- since the program was being
20 extended, right?
21     A.    Right.
22     Q.    And you suggested at this
23 meeting possibly a schedule of Wednesday,

Page 354

1 Thursday, Friday, half days?
2     A.    Monday, Wednesday, Friday.
3     Q.    Pardon me. Monday, Wednesday,
4 Friday?
5     A.    Four hours a day.
6     Q.    Four hours a day?
7     A.    Correct.
8     Q.    And that was the proposal you
9 put to her; is that correct?
10     A.    That's what I asked, if I
11 could work part time.
12     Q.    Did you ask anything about
13 working full time?
14     A.    No.
15     Q.    Did Ms. Cooper -- you already
16 told me Ms. Cooper didn't say anything
17 about working part time, right?
18     A.    Right.
19     Q.    All right.
20     A.    But I do remember her saying
21 she does not know if the program would
22 allow two full-time micro enterprise
23 specialists; that she would have to check

Page 355

1 with Dr. McKim and see.
2     And so I apologize for getting those
3 confused. I'm not trying to deceive
4 anyone.
5     Q.    I understand.
6     A.    It's just -- but I want to --
7 I don't want to tell any lies on
8 Ms. Lynn --
9     Q.    I understand.
10     A.    -- about what she said. So
11 I'm not making things up. It's just that
12 with so much information that happened,
13 it's -- sometimes, you know, what was
14 said, what time gets confusing.
15     Q.    So sometimes you get confused
16 about --
17     A.    Sometimes.
18     Q.    -- what was said and the
19 chronology of how it happened, right?
20     A.    Sometimes. Sometimes I know
21 exactly what was said, and then with --
22 sometimes, you know, with the timing and
23 what time it was, you know, I --

Page 356

1     Q.    But you were certain when we
2 started that you were correct on both of
3 these things, right?
4     A.    Right.
5     Q.    It wasn't until I pointed it
6 out that you realized you were confused?
7     A.    I realized that I made an
8 error.
9     Q.    So it isn't until somebody can
10 show you otherwise that you realize you're
11 confused, right?
12     A.    No. If I -- if I realize I
13 make a mistake, I'll admit to that.
14         4:14 p.m.
15         (Recess taken.)
16         4:22 p.m.
17     Q.    Ms. Jackson, before we took a
18 quick break, we were talking about the
19 September 12th meeting. Have you told me
20 everything now that you can clearly
21 remember about the September 12th meeting?
22     A.    Yes. And for the record, I
23 was getting the meeting I had with Susan

89 (Pages 353 to 356)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 361

1  yes, it's going to.
2      Q.   And your memory of this
3  meeting has been clearer at some times
4  than at others, right?
5      A.   Well, it's -- of course, when
6  it occurred, it was very clear. All
7  right. But when there -- there was more
8  than one meeting. So I had gotten
9  confused about which meeting we're talking
10  about or what occurred at which meeting.
11     Q.   Do you think that a fair
12  interpretation of what Ms. Lynn was asking
13  you at the September 12th meeting when she
14  said -- after she told you the program was
15  going to be extended and then she said
16  what are you going to do to you and -- and
17  then said -- Ms. Lynn first said -- let's
18  just stop that question and start over.
19     Do you think it would be a fair
20  understanding of what Ms. Lynn said after
21  she told you that there was going to be
22  extension money for the program, but that
23  some of the details they were still

Page 362

1  waiting on from ADECA, and then asked you
2  what you were going to do -- do you think
3  it's fair to believe that she meant what
4  you were going to do if the program was
5  extended?
6      A.   No. What was I going to do if
7  the program was going to end. I believe
8  she meant that because -- I think what she
9  meant was that --
10     Q.   Did she say it, or do you
11  believe that she meant that?
12     A.   No. She said it. She said
13  it, what are you going to do? Because she
14  asked both of us.
15     Q.   Those were her exact words,
16  what are you going to do? Period?
17     A.   If the program does not
18  continue or if the program is -- if the
19  program ended.
20     Q.   So that's your testimony that
21  she said what are you going to do if the
22  program ends, right after she told you
23  that the program had been extended and she

Page 363

1  had notice from ADECA that it had been?
2      A.   Right.
3      Q.   Okay.
4      A.   She said that she had received
5  e-mail messages from -- I believe it was
6  Tammy Farmer that they were going to
7  continue, but she still didn't have
8  anything official.
9      Q.   All right. So after this
10  meeting on September 12th, what's the next
11  conversation you have with Debbie Lynn?
12     A.   And that was on September
13  18th.
14     Q.   And when do you have a
15  conversation with Debbie Lynn on September
16  18th?
17     A.   September 18th -- I'm not sure
18  if I asked to meet with her or if she
19  called me in. I believe she called me in
20  to the meeting.
21     Q.   Was that in the morning or in
22  the afternoon?
23     A.   I believe we met in the

Page 364

1  afternoon, but I'm not sure whether it was
2  late morning or afternoon. I think it was
3  afternoon.
4      Q.   Was anyone else in this
5  meeting?
6      A.   No. Just Ms. Lynn and I.
7      Q.   And what did Ms. Lynn tell you
8  in this meeting?
9      A.   Ms. Lynn said while the
10  program was going to be extended that it
11  only allowed for one full-time micro
12  enterprise specialist, and that my
13  position would end on September 29th.
14     Q.   Did she say anything else?
15     A.   And then she had an envelope,
16  and she said -- and she handed me the
17  envelope. She said, and we've accepted
18  your resignation. And I said, I did not
19  resign. I said, my position was
20  eliminated. She said, oh, that's right.
21  And she went and got Eileen Bennett.
22     Q.   I want to slow you down.
23     A.   Okay.

91  (Pages 361 to 364)

## American Court Reporting
## toll-free (877) 320-1050

Page 365

1  Q.  Is that all that was said?
2  A.  During that meeting?
3  Q.  Yes.
4  A.  I believe that was all that
5  was said.
6  Q.  You didn't take this
7  opportunity to explain to Ms. Lynn that if
8  your position had been -- if you resign
9  from your position that you wouldn't be
10  eligible for certain unemployment
11  insurance?
12  A.  Yes, yes, yes.  I forgot about
13  that.  I said -- right.  I said, I have --
14  thanks for reminding me.  I said, I have
15  insurance with City Financial.  I have a
16  loan with them, and they're going to -- I
17  have -- I purchased unemployment insurance
18  or something like that with them in the
19  event that I lost my job and it wasn't my
20  fault.  I said, if you put on my records
21  that I resigned, I said, they're not going
22  to pay for that.
23  And she went and got Eileen Bennett

Page 366

1  and said, Eileen, retype this letter.
2  Emily didn't resign.  Her position was
3  eliminated.  And then Eileen got to the
4  typewriter, and she was kind of fumbling a
5  little.  And so Debbie helped her.
6  Ms. Lynn assisted her.  I don't know if
7  she sat down.  I think she may have sat
8  down in her seat and assisted her with
9  typing it correctly.
10  Q.  And Ms. Lynn helped make sure
11  that letter was properly worded at your
12  request to make sure that you would be
13  entitled to any benefits that you could
14  get under an insurance policy you had on
15  one of your loans?
16  A.  Ms. Lynn made sure it was
17  typed correctly, not just so that I could
18  get that.  Because I had not resigned.
19  She made sure that it was worded correctly
20  because ADECA had cut -- my position was
21  eliminated.  So she had her write that
22  letter to ensure that it said that my
23  position was eliminated due to ADECA's

Page 367

1  budget cuts, because that's what -- why my
2  position was eliminated.
3  Q.  Anything else at all said
4  during that meeting?
5  A.  Not that I remember.  I'd have
6  to look at some notes.
7  Q.  What notes do you have that
8  talk about this meeting?
9  A.  Other than what I wrote about
10  what happened in the meeting.
11  Q.  I want to know your memory, as
12  you sit here today, as to what happened in
13  that meeting.
14  A.  Well, that's all I remember.
15  And then I had the absent forms.  I don't
16  know if I submitted them in that meeting
17  or not or at a later time.  I don't
18  remember whether I gave them to her at
19  that time or at the end of that day.  I
20  think it was the end of that day.  We had
21  a staff meeting, and I believe I submitted
22  those forms that day.
23  Q.  So the staff meeting was after

Page 368

1  your one-on-one meeting with Ms. Lynn?
2  A.  Correct.
3  Q.  During the meeting with just
4  you and Ms. Lynn on September 18th, when
5  she told you allegedly that there would
6  only be one micro enterprise specialist,
7  did you ask why you weren't selected?
8  A.  No.
9  Q.  Did you ask whether or not the
10  position would allow for part-time work?
11  A.  No.
12  Q.  Or the program would allow for
13  part-time work?
14  A.  I asked about part-time work
15  in a previous meeting, and I believe in
16  that meeting she said that -- I may have
17  mentioned -- did I mention part time?  I
18  don't think I mentioned it, but I had
19  mentioned it at the September 12th
20  meeting.  And she said --
21  Q.  At the September 18th
22  meeting -- that's all we're talking about
23  right now -- you didn't say a thing about

92  (Pages 365 to 368)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 369

1  working part time, right?
2      A.    Well --
3      Q.    At the September 18th
4  meeting --
5      A.    At the September 18th meeting
6  --
7      Q.    -- you didn't say anything to
8  Ms. Lynn about whether or not you could
9  work part time, right?
10     A.    She said something to me about
11 it. She said --
12     Q.    What did she say?
13     A.    -- the grant would not allow
14 part time as you wanted -- as you had
15 requested. It won't allow you to work
16 part time, and it won't allow -- it only
17 allowed for one micro enterprise
18 specialist. And then she said it wouldn't
19 even allow for you to work part time
20 because the grant called for a full-time
21 micro enterprise specialist. So I think
22 she was just making a comment on my
23 request at the previous meeting in that

Page 370

1  meeting.
2      Q.    Did you ever try to talk to
3  Debbie Lynn or anyone at Easter Seals
4  about why you weren't chosen as the
5  full-time micro enterprise specialist?
6      A.    No.
7      Q.    Why is that?
8      A.    Well, I didn't ask because
9  Cassandra had more seniority, and I
10 understand seniority. If anyone would be
11 leaving, it would be the junior. I
12 understand that from work experience. So
13 I wouldn't ask that question, why they
14 chose her over me.
15     Q.    Do you have any information as
16 to why Cassandra was chosen for the
17 position, other than your belief that it
18 was seniority?
19     A.    I believe that it was
20 seniority.
21     Q.    But do you have any
22 information or evidence as to why
23 Cassandra was chosen for that position?

Page 371

1      A.    Nothing except I know that she
2  had seniority. She worked there longer
3  than I did.
4      Q.    And do you have any
5  information or knowledge as to who made
6  the decision to keep Cassandra Cooper
7  versus you for the alleged one full-time
8  position?
9      A.    I don't know who made the
10 decision.
11     Q.    Do you have any information or
12 evidence as to what process was used for
13 making this decision?
14     A.    No.
15     Q.    Did you ever ask anyone?
16     A.    No.
17     Q.    So as far as you know,
18 Cassandra could have been chosen as the
19 full-time specialist because the decision
20 maker at Easter Seals believed that she
21 was the only one of the two of you that
22 were willing to work full time?
23     A.    No. I believe that the

Page 372

1  decision was made to keep Cassandra
2  Cooper -- you asked me what did I believe.
3      Q.    No, I did not. I asked you --
4      A.    What did you ask me?
5      Q.    -- what did you know, not what
6  did you believe.
7      A.    All I --
8      Q.    As far as you know.
9      A.    As far as I know, they kept
10 Cassandra Cooper in the position. She
11 kept the senior person.
12     Q.    As far as you know, the
13 decision maker could have chosen Cassandra
14 Cooper because they believed she was the
15 only micro enterprise specialist that was
16 willing to work full time for the
17 six-month extension period, right?
18     A.    I don't know what their
19 decision was, why they kept her. I don't
20 know.
21     Q.    Okay.
22     A.    And there was something else
23 that I remember that happened on that

93  (Pages 369 to 372)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 373

1  September 12th meeting, but we'll have to
2  go back to that, I guess, when you --
3      Q.   You can tell me that.  What
4  else happened?
5      A.   Cassandra had mentioned being
6  a management consultant, would she still
7  be able to work -- the subject was about
8  her working at Easter Seals and running
9  her micro -- and her management consulting
10 business.  And Debbie Lynn had said that
11 she could not do both, because if they
12 conflicted -- if she was doing the same --
13 providing the same services that we were
14 providing at Easter Seals to people with
15 disabilities, that she couldn't do both.
16 And they had to --
17     Q.   And that's in line with the
18 policy, right?
19     A.   That was in -- that was in
20 that conversation.  That's in line with
21 the policy only because of people with
22 disabilities.  So she had said if you are
23 servicing the same clients.  That's people

Page 374

1  with disabilities.  Okay?
2      Q.   And that's what Debbie Lynn
3  said?
4      A.   Yeah, that's what she said.
5      Q.   And that's in line with the
6  policy, right?
7      A.   That's in line with the
8  policy.
9      Q.   Okay.
10     A.   And I want to make one other
11 comment.
12     Q.   Does it have to do with the
13 September 12th meeting?
14     A.   It has something to do with
15 what she said about the policy.
16     Q.   Was it said during the
17 September 12th meeting?  Whatever your
18 comment is going to be.
19     A.   It was said to Cassandra
20 Cooper, but it refers to me.  But we can
21 talk about that later, if you will allow
22 me to.
23     Q.   All I want to know is what

Page 375

1  happened in the September 12th meeting for
2  right now.
3      A.   September 12th?  Okay.
4      Q.   You went back and told me
5  something else that you remember that
6  Cassandra Cooper had said and that
7  Ms. Lynn had responded to, right?
8      A.   Correct.
9      Q.   We were talking about the
10 September 18th meeting with you and Debbie
11 Lynn.  Have we discussed everything that
12 you remember about that meeting and
13 everything that was said at that meeting?
14     A.   I believe we have discussed
15 everything that I can remember at that
16 meeting.
17     Q.   At the September 12th meeting,
18 did you ask about working full time?
19     A.   At the September 12th meeting,
20 I asked if I could work part time if I
21 couldn't work full time.
22     Q.   And you said there was a staff
23 meeting on the afternoon of September

Page 376

1  18th?
2      A.   Correct.
3      Q.   What was discussed regarding
4  the micro enterprise program at the staff
5  meeting?
6      A.   Well, one of the things that
7  was discussed was the micro enterprise
8  program.
9      Q.   What was said about it?
10     A.   Debbie Lynn told the employees
11 that the program was going to continue for
12 six months and that they were keeping
13 Cassandra Cooper and that I would be
14 leaving.
15     Q.   Anything else?
16     A.   I'm not sure, unless she
17 explained -- let's see.  I believe she --
18 if I remember, she said the grant only
19 allowed for one micro enterprise
20 specialist and that Cassandra Cooper would
21 be staying.
22     Q.   Do you know, as we sit here
23 today, for certain whether Ms. Lynn said

94  (Pages 373 to 376)

# American Court Reporting
## toll-free (877) 320-1050

Page 377

1 that or not?
2     A.  Yes, she said that.  I had to
3 think about what happened.  And that's
4 what she said.
5     Q.  And if there's testimony to
6 the contrary, do you have any evidence to
7 support your belief that she said that?
8     A.  Well, I have -- Cassandra
9 Cooper was there.  I'll have her testimony
10 about what was said.
11     Q.  And did you speak with
12 Cassandra Cooper and talk about what was
13 said at that September 18th meeting in
14 preparation for your case?
15     A.  I asked her to testify for me,
16 but I haven't questioned her about it yet.
17     Q.  Was anything else said about
18 either Cassandra Cooper staying, you
19 leaving, or the micro enterprise program
20 during the September 18th staff meeting?
21     A.  I believe that was it.
22     Q.  Didn't Ms. Lynn also announce
23 that there would be a going away party for

Page 378

1 you --
2     A.  Yes.
3     Q.  -- the next week?
4     A.  Yes.
5     Q.  Did y'all always have going
6 away parties for people?
7     A.  When people left we did.
8     Q.  And you had one too, right?
9     A.  I did.
10     Q.  Did you say anything at the
11 staff meeting?
12     A.  Did I say anything to anybody
13 at the staff meeting?  I don't remember
14 what I said.  I may have said I enjoyed
15 working with everyone.  I believe I did
16 say that.  I enjoyed working with everyone
17 at Easter Seals.
18     Q.  Anything else?
19     A.  That's all I can remember
20 right now.
21     Q.  Did anybody say anything to
22 you at the staff meeting?
23     A.  Not directly.

Page 379

1     Q.  Other than --
2     A.  Not that I recall.
3     Q.  Other than the things that
4 Ms. Lynn announced at the staff meeting.
5     A.  Right.
6     Q.  No one else said anything to
7 you?
8     A.  I don't recall anyone saying
9 anything during the meeting.  Afterwards
10 I --
11     Q.  On September 25th -- that was
12 your last day of work, right?
13     A.  Correct.
14     Q.  And that was a Monday, right?
15     A.  Right.
16     Q.  It was also the day that
17 Cassandra Cooper turned in her
18 resignation, right?
19     A.  Right.
20     Q.  Did you know Cassandra Cooper
21 was going to resign before she resigned?
22     A.  She had talked to me about it.
23     Q.  When did she talk to you about

Page 380

1 it?
2     A.  I believe after -- I can't
3 remember.  I believe it was after we met
4 with Debbie Lynn, and Debbie Lynn told us
5 she couldn't work both her job and -- her
6 business and at Easter Seals.
7     Q.  And that was on the 8th -- I
8 mean, that was on the 12th, right?
9 September 12th?
10     A.  That was the 12th, yes.
11     Q.  So how soon after that meeting
12 did Cassandra Cooper tell you that she was
13 going to resign?
14     A.  It was after the meeting.  I
15 don't remember.  It was between -- that
16 time between the 12th and that.  So
17 maybe -- I don't remember exactly.
18     Q.  Was it a day or a week?
19     A.  I don't remember.
20     Q.  Well, was it before your
21 meeting with Debbie Lynn on the 18th?
22     A.  No.
23     Q.  So it was sometime between the

95 (Pages 377 to 380)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 381

1  18th and the 25th?
2      A.  Correct.
3      Q.  Do you remember how many days
4  it was before Ms. Cooper actually turned
5  in her resignation?
6      A.  I don't remember when she
7  turned it in.  I think she turned it in
8  that Monday -- that same day, I believe it
9  was.
10     Q.  I know -- I realize that,
11 but --
12     A.  I don't know for sure when she
13 turned it in.  No.  I don't know when she
14 turned it in.
15     Q.  When Cassandra told you she
16 was thinking about resigning because of
17 the potential that her personal business
18 might conflict with Easter Seals' clients
19 that they were -- that the program was
20 serving, what did you say in response to
21 that?
22     A.  I don't remember.
23     Q.  I mean, this was the same --

Page 382

1  you were in the same boat, right?  You had
2  a personal business set up.
3      A.  Right.  But I don't
4  remember -- I don't remember what my
5  response was.  I remember her telling me
6  that, but I don't remember what my
7  response was.
8      Q.  Did you encourage her to stay
9  with Easter Seals?
10     A.  I don't remember encouraging
11 her to stay.
12     Q.  Did you encourage her to go
13 out and start her business?
14     A.  No.
15     Q.  You just didn't say anything
16 one way or the other?
17     A.  No.
18     Q.  Did she say anything else to
19 you about her resignation?
20     A.  She had told me that she was
21 going to resign because she wanted -- she
22 didn't want -- she didn't want to not be
23 able to work her business.  And so she

Page 383

1  said she was going to resign.
2      Q.  And she did resign, right?
3      A.  She did.
4      Q.  You knew she was going to
5  resign and she did resign?
6      A.  Well, she told me that she was
7  going to resign and then she resigned.
8  She submitted her letter to, I guess,
9  Ms. Lynn.
10     Q.  So at that point, you knew
11 that there was a full-time micro
12 enterprise position available, right?
13     A.  Well, I was gone then.  But
14 that was my last day.
15     Q.  You knew that she was going to
16 resign before she did it, right, and there
17 would be a full-time micro enterprise
18 position, right?
19     A.  Well, she had said she was
20 going to resign, but I didn't know that
21 she was going to do it until after she did
22 it.
23     Q.  And then she did it on --

Page 384

1      A.  And then she did it.
2      Q.  -- the same day that was your
3  last day, right?
4      A.  Right.
5      Q.  So you were there when she
6  submitted her resignation, right?
7      A.  I don't know when she
8  submitted it.  I mean, Monday was my last
9  day in -- at Easter Seals.
10     Q.  Right.
11     A.  So what time she submitted it
12 during that day before -- I don't know
13 when she submitted it.
14     Q.  All right.
15     A.  So I couldn't say.
16     Q.  But you know she submitted it
17 on the 25th?
18     A.  Right.
19     Q.  Which was your last day?
20     A.  Right.
21     Q.  After she submitted it, did
22 you ask anyone at Easter Seals -- like
23 Debbie Lynn.  Go in and say, I know

**www.AmericanCourtReporting.com**
**November 13, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 385

1 there's a full-time position open, I'd
2 like to be considered for it?
3     A.   When I came to pick my check
4 up that Friday --
5     Q.   Right.
6     A.   -- I went into the office, and
7 Eileen Bennett was in there.  And
8 Eileen -- I asked -- Eileen asked me
9 did -- Eileen said that Cassandra was
10 resigning or had resigned.
11     Q.   You didn't know that prior to
12 Eileen telling you?
13     A.   I knew it prior to.
14     Q.   So Eileen telling you that
15 wasn't any big deal?  You already knew
16 that, right?
17     A.   No.  I knew.  I knew.  Because
18 Cassandra had told me that she was going
19 to resign.  So when she told me, I said,
20 well, you know, I knew that.  That wasn't
21 news to me.
22     Q.   So you knew prior to going in
23 to pick up your last check on the 29th

Page 386

1 that Easter Seals had a full-time micro
2 enterprise position available, right?
3     A.   I knew that Cassandra had
4 resigned, and I knew that Debbie had --
5 Ms. Lynn had told us that the program was
6 going to be extended until --
7     Q.   And you knew --
8     A.   -- until that Friday.  I
9 picked me check up, and I saw Eileen.  And
10 I said, well, Eileen --
11     Q.   Ms. Jackson, this will go so
12 much faster, I promise, if you'll let me
13 ask you the question.  I'll ask you
14 another one to follow up on it.  I
15 promise.  But if you'll let me ask you the
16 question and then you answer it, I'll ask
17 you another question.  And what -- we can
18 walk through it that way.
19     A.   Well, what I was trying to do
20 was answer the question of did I know that
21 there was a full-time position.  And the
22 answer would be no, based on what Eileen
23 told me.

Page 387

1     Q.   Stop for a second.
2     A.   Okay.
3     Q.   You knew prior to Ms. Cooper
4 submitting her resignation that she was
5 likely going to resign her position,
6 right?
7     A.   Correct.
8     Q.   And you don't know what time
9 it happened on the 25th, but you know that
10 she submitted her resignation on the 25th,
11 right?
12     A.   Correct.
13     Q.   And that was your last day at
14 work, right?
15     A.   Correct.
16     Q.   And so from the day she
17 submitted it on the 25th, you knew that,
18 one, the program had been extended for six
19 months?
20     A.   Correct.
21     Q.   Two, there was funding for at
22 least one micro-enterprise position?
23     A.   Correct.

Page 388

1     Q.   And, three, the person who had
2 the position was no longer going to fill
3 it, right?
4     A.   Correct.
5     Q.   Now, on the 25th forward, did
6 you ever contact Debbie Lynn about filling
7 that position as the full-time micro
8 enterprise specialist?
9     A.   No.
10     Q.   When you got to Easter Seals
11 to pick up your paycheck on the 29th and
12 Eileen Bennett told you that Cassandra
13 Cooper had resigned, you already knew
14 that, right?
15     A.   Right.
16     Q.   And Eileen Bennett is the
17 secretary, right?
18     A.   Right.
19     Q.   And you asked her a question
20 about the program continuing, right?
21     A.   Right.
22     Q.   Did you ever ask to talk to
23 Ms. Lynn when you were there?

97  (Pages 385 to 388)

## www.AmericanCourtReporting.com
## November 13, 2007

# American Court Reporting
## toll-free (877) 320-1050

Page 389

1    A.   No.
2    Q.   But you were there, and you
3  needed Ms. Lynn to sign something for you,
4  right?
5    A.   Correct.
6    Q.   Was Ms. Lynn there that day?
7    A.   I'm not sure.
8    Q.   Well, did you get your
9  paperwork signed that day?
10    A.   I'm not -- I think I -- I
11  don't know if I left it and came back and
12  picked it up or if I got it that day. Let
13  me think. I think Ms. Lynn was in a
14  meeting that day. Yes, she was there.
15  And Eileen Bennett took it -- took it in
16  the meeting, and I believe she signed it
17  in the meeting and then Eileen gave it to
18  me. That's what I recall.
19    Q.   So Ms. Lynn was busy when you
20  got there?
21    A.   Right.
22    Q.   And she signed paperwork that
23  you had filled out for her to sign?

Page 390

1    A.   Correct.
2    Q.   And signed it at your request
3  and gave it back to you, but she was still
4  in the meeting while this was all going
5  on, based on your understanding?
6    A.   She gave it to Eileen. Eileen
7  gave it to me.
8    Q.   Did you ever ask to talk to
9  Debbie Lynn about the micro enterprise
10  position --
11    A.   No.
12    Q.   -- after -- at any time after
13  September 25th?
14    A.   No.
15    Q.   Do you have any information or
16  knowledge about the process by which
17  Easter Seals decided to contract with Bill
18  Hanes to provide services as a micro
19  enterprise specialist for the remaining
20  six months of the extension?
21    A.   No, I don't.
22    Q.   Do you have any information or
23  knowledge as to who made the decision to

Page 391

1  contract with Bill Hanes for this period?
2    A.   No, I don't. Oh, I do have
3  information based on what you gave me.
4    Q.   Okay.
5    A.   The contract that was signed
6  by Bill Hanes, and I believe Ms. Lynn's
7  signature is on there.
8    Q.   So you had a contract that was
9  executed, because you don't have any
10  information or knowledge as to how the
11  decision was made to execute -- or to
12  enter into that agreement, correct?
13    A.   No, I don't.
14    Q.   Do you have any knowledge of
15  the decision maker's understanding of the
16  facts at the time the decision was made to
17  contract with Bill Hanes?
18    A.   Do I have knowledge of who?
19    Q.   Of the decision maker's
20  understanding of the facts.
21    A.   I don't know who you're
22  referring to as the decision maker.
23    Q.   So you couldn't possibly know

Page 392

1  what facts the decision maker had in front
2  of them because you don't even know who
3  the decision maker was; is that correct?
4    A.   Correct.
5    Q.   When did you learn that Easter
6  Seals had contracted with Bill Hanes for
7  the extension period?
8    A.   I believe it was in October.
9  I called Easter Seals.
10    Q.   What did you call Easter Seals
11  for?
12    A.   I called -- I believe I may
13  have called to speak to Cassandra Gray.
14  No. I called to speak to Danita Rivers,
15  just to say hi and see how she was doing.
16  And Cassandra Gray, who was the
17  receptionist, answered the phone, and she
18  told me that Bill Hanes was working in the
19  micro enterprise office.
20    Q.   What else?
21    A.   That was it.
22    Q.   Did you say anything in
23  response to that?

98   (Pages 389 to 392)

## www.AmericanCourtReporting.com
## November 13, 2007

**American Court Reporting**
**toll-free (877) 320-1050**

Page 393

1  A. I said, what? And she said,
2  yes. He's working in the micro enterprise
3  office.
4  Q. Did she say anything else?
5  A. That was it.
6  Q. Did you ask her any follow-up
7  questions?
8  A. No, I didn't.
9  Q. What did you do after you
10  found out that Bill Hanes was working in
11  the micro enterprise office?
12  A. When I found out he was
13  working in the micro enterprise office --
14  you said what did I do?
15  Q. Uh-huh.
16  A. I didn't do anything at
17  first. I didn't do anything. But I was
18  hurt and I was disappointed, but I didn't
19  do anything at that -- when I first found
20  out.
21  Q. And then what did you do?
22  A. Then I filed an EEOC
23  complaint.

Page 394

1  Q. And in that complaint, one of
2  your allegations was that Mr. Hanes was
3  less qualified than you.
4  I think we've already covered this.
5  But other than your assessment of his two
6  business plans for his blind clients in
7  Talladega while he was working with Easter
8  Seals, did you base your assessment of his
9  qualifications on anything else?
10  A. Just on how he prepared his
11  business plans.
12  Q. So that and nothing else,
13  right?
14  A. That's it.
15  Q. As we sit here today, do you
16  know why Easter Seals hired Bill Hanes to
17  provide -- to the micro enterprise program
18  after Cassandra Cooper resigned?
19  A. No, I don't.
20  Q. Did you ever call or attempt
21  to speak with anyone at Easter Seals at
22  any time after you left regarding their
23  decision to contract with Bill Hanes?

Page 395

1  A. No, I didn't.
2  Q. Did you ever file a grievance
3  with the personnel committee as provided
4  for in the employee handbook with regard
5  to your separation from Easter Seals?
6  A. No, I didn't.
7  Q. Why didn't you do that?
8  A. I didn't know -- I didn't know
9  about that.
10  Q. But if it was a provision
11  provided for in the handbook -- we've
12  already gone over the fact that you had a
13  copy of the handbook, right?
14  A. I did. I had a copy of it.
15  Q. Other than Cassandra Cooper,
16  who have you discussed this case with?
17  A. My mother.
18  Q. What have you and your mother
19  discussed?
20  A. We've discussed the case,
21  about me filing a case against Easter
22  Seals for them discriminating against me.
23  Q. Anything else?

Page 396

1  A. Just the decisions -- after I
2  get the decisions, I tell her about it. I
3  didn't really give her all the details
4  because a lot of things upset her. So I
5  just -- so I would tell her, well, today
6  the judge made this decision. So whatever
7  the decisions were from the judge, I would
8  let her know about them.
9  Q. Does your mom have any
10  evidence or information supporting your
11  claims in this lawsuit?
12  A. She doesn't have any of my
13  paperwork or anything like that.
14  Q. Does she have any information
15  or knowledge or evidence regarding why
16  Bill Hanes was hired to provide services
17  for the micro enterprise program after
18  Cassandra Cooper resigned?
19  A. No, she doesn't.
20  I need to get some water.
21  Q. Sure.
22  (Brief recess taken.)
23  Q. Other than Cassandra Cooper

99 (Pages 393 to 396)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 397

1  and your mother and the one conversation
2  you told me between you and Cassandra
3  Gray, have you spoken with anyone else
4  regarding your case?
5      A.  Yes.
6      Q.  Who?
7      A.  Danita Rivers.
8      Q.  When did you speak with Danita
9  Rivers?
10     A.  I don't remember the date, but
11 I believe Danita -- Danita called me
12 because I hadn't told -- given her any
13 details.  She called me about that
14 meeting -- that board meeting.
15     But prior to that, I believe she
16 called me.  She called me after Easter
17 Seals had received -- or after the judge
18 had made the order that -- denying Easter
19 Seals' motion to dismiss my claim against
20 -- rumor came on the job, and she called
21 me and told me.
22     Q.  And who had she heard that
23 from?

Page 398

1      A.  I don't remember who she said
2  she heard it from.
3      Q.  What did she say about it to
4  you?
5      A.  She said that she heard that I
6  had proven my case against Easter Seals or
7  something like that.  I had proven my case
8  of wrongful termination against Easter
9  Seals.
10     Q.  Anything else?
11     A.  That was it.
12     Q.  Does Danita Rivers have any
13 information supporting your claims?
14     A.  No.
15     Q.  Who else besides Danita Rivers
16 have you talked to regarding this case?
17     A.  My sister.
18     Q.  Who is your sister?
19     A.  Connie Jackson.
20     Q.  Where does Connie Jackson
21 live?
22     A.  In Southfield, Michigan.
23     Q.  What have you told Connie

Page 399

1  Jackson about this case?
2      A.  I just told her I filed a
3  claim against Easter Seals for
4  discrimination -- for racial and gender
5  discrimination, and that was it.  I
6  haven't gone into any details with her,
7  other than what has happened at the end of
8  a motion or what the judge has decided on
9  a motion.
10     Q.  Does Connie Jackson have any
11 information or evidence regarding your
12 claims in this case?
13     A.  No, she doesn't.
14     Q.  Who else have you spoken with
15 regarding your claims in this case?
16     A.  Okay.  Who did I say?  My mom,
17 Danita, Cassandra Cooper, and Cassandra
18 Gray, and my therapist.
19     Q.  What therapist is that?
20     A.  Dr. Voncile Smith.
21     Q.  Have you told me every piece
22 of evidence that you have to support your
23 allegation that the decision to contract

Page 400

1  with Bill Hanes after Cassandra Cooper
2  resigned was based on race and sex?
3      A.  That was it.
4      Q.  So we've talked here today
5  about any and all evidence that you have
6  that that particular decision was made
7  based on your race and sex?
8      A.  Correct.  Other than -- I
9  don't know if I mentioned this in my
10 filing, but that I eliminated all other
11 reasons why I felt that I didn't get the
12 job, like if I wasn't qualified or if my
13 performance wasn't good or if I was
14 disciplined for any reason.  So I
15 eliminated all the reasons why a person
16 would be terminated.
17     Q.  You personally --
18     A.  I personally.
19     Q.  Your personal assessment, and
20 you decided that none of these other
21 reasons could have been a reason?
22     A.  Correct.
23     Q.  So it must have only been race

100  (Pages 397 to 400)

**www.AmericanCourtReporting.com**
**November 13, 2007**

Page 401

Page 403

1  or sex?
2      A.   Correct.
3      Q.   But you don't have any
4  evidence that it was motivated by race or
5  sex?  It's just what you were left with at
6  the end of your analysis?
7      A.   Correct.
8      Q.   So there could be other
9  information out there that you didn't have
10 while you were making your analysis that
11 would have changed your decision as to
12 whether -- why the decision was made to
13 contract with Bill Hanes?
14     A.   I don't know.
15     Q.   But there could be, right?
16     A.   I don't know.
17     Q.   I realize you don't know
18 whether there is.  My question is, there
19 could be other information, right?
20     A.   I don't know.
21     Q.   And you don't know one way or
22 the other because you don't know what the
23 information that the people at Easter

1      A.   No.  I've never had any
2  complaints with Debbie Lynn.
3      Q.   And we've gone over your
4  complaints or concerns with Susan McKim
5  and Larry Lewis today, right?
6      A.   Correct.
7      Q.   And neither one of -- none of
8  your complaints against any of your
9  supervisors in the past have been based on
10 your gender, right?
11     A.   Not that I know of.
12     Q.   Certainly not that you told
13 them, right?
14     A.   Right.
15     Q.   And none of your complaints in
16 the past have been based on your race,
17 right?
18     A.   Right.
19          (WHEREUPON, a document was
20 marked as Defendant's Exhibit Number 8 and
21 is attached to the original transcript.)
22     Q.   What I'm going to mark as
23 Defendant's Exhibit 8 is a response to

Page 402

Page 404

1  Seals made their decision based on, right?
2      A.   I don't know.
3      Q.   Have you ever heard Debbie
4  Lynn make any derogatory remarks regarding
5  females?
6      A.   No.
7      Q.   Have you ever heard Debbie
8  Lynn make any derogatory remarks regarding
9  African-Americans?
10     A.   No.
11     Q.   Have you ever heard anyone at
12 Easter Seals make any derogatory remarks
13 regarding females?
14     A.   No.
15     Q.   Have you ever heard anyone at
16 Easter Seals make any derogatory remarks
17 regarding African-Americans?
18     A.   No.
19     Q.   Prior to learning that Easter
20 Seals had contracted with Bill Hanes for
21 the period of the extension, did you have
22 any complaints or concerns with Debbie
23 Lynn?

1  Interrogatory Number 5 regarding medical
2  providers, office locations, and
3  conditions.
4      Did you prepare that response?
5      A.   Yes, I did.
6      Q.   And it's one-page long; is
7  that correct?
8      A.   That's correct.
9      Q.   And are these all the medical
10 providers that treated you for any
11 condition within the last eight years?
12     A.   There is one -- Dr. Roland
13 Hester.  After I had the hip replacement,
14 I went to therapy at HealthSouth
15 Rehabilitation Hospital.  And I omitted
16 that one.
17     Q.   So you went to physical
18 therapy --
19     A.   Physical therapy.
20     Q.   -- for strengthening of your
21 hip?
22     A.   Right.
23     Q.   And then --

101  (Pages 401 to 404)

RECEIVED

RECEIVED

07 MAR 30 PM 1:27

U.S. DISTRICT COURT
N.D. OF ALABAMA

APR 1 1 2007

CLERK

2:07CV 315-F

CV-07-BE-0005-S

*ce*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

**APPLICATION UNDER SECTION 706 (f)
OF CIVIL RIGHTS ACT OF 1964**

Declaring that the information I have given below is true and correct, I apply to this court

for:

(✓) **appointment of an attorney.**

(✓) **authority to commence an action without prepayment of fees, costs, or security.**

**l. Personal and Financial Data**

Your full name and present mailing address:

Emily C. Jackson

Montgomery, AL 36111

Telephone (if any): (334)

Are you presently employed?   Yes ___   No ✓

If the answer is "yes", give the name and address of your employer and the amount of your

usual weekly salary or wages.

_____

_____

Weekly earnings: $ _____

If you are not presently employed, give the name and address of your last employer, when

you last worked, and the amount of weekly salary or wages you were receiving.

DEFENDANT'S
EXHIBIT

2   Emily
Jackson

Date last worked: _09-29-06_

Weekly earnings: $ _591.20_

**Approximately how much money have you received in the past twelve months:**

**as wages, salary, commissions, or earned income of any kind?**

$1,992.00

**as interest, dividends, rents, or investment income of any kind?**

$12.00

**as gifts or inheritance?**

0

**from social security, unemployment compensation, or any form of state or federal welfare payments or benefits?**

$19,974 + $2,910 = $22,884    Total

**from pensions, annuities, workmen's compensation, disability or other insurance policies?**

$6,918 Gross Annual Annuities

**from all other sources?**

0

**How much money do you own or have in any checking or saving accounts?** $300.00

**Do you own any real estate, stocks, bonds, notes, automobiles, boats, or other valuable property (excluding ordinary household items and clothing)?** _NO_

**If the answer is "yes", describe the property and state its approximate value:** _____

**How much money do you owe to others?**

_$98,000_

**As to each debt over $100, state the name of the creditor and the approximate amount owed:**

Bank of America $7,200; Max Mastercard $7,500
ASECU Visa $6,900; ASECU Loan $2,000; Asecu Loan $3,000
W.Amu Visa $2,000; Montgomery Credit Corp $5,000
Citifinancial $5,000 American Educational Service $27,000;
Montgomery Cancer Center $12,000    Office of Personnel
Management $18,000

**List the persons who are dependent upon you for support, stating your relationship to them and how much you contribute each year toward their support.**

Glennie J. Jackson, mother, $10,800 for her
Mortgage and utilities

**Are there any other persons regularly residing in your household who are over the age of 18 and who are presently employed?.......** Yes _✓_  No ___

If the answer is "yes", give the following information for each such person:

Name *Glennie J. Jackson*

Relationship *Mother*

Employer *Easter Seals Day Care*

Weekly earnings $ *330.00*

Name _____

Relationship _____

Employer _____

Weekly earnings $ _____

Any other information which you believe supports your claim that you cannot financially

afford to employ an attorney or to make payment of court fees, costs, or security.

_____

_____

_____

_____

_____

(Attach additional sheets as needed)

### Nature of Alleged Discrimination

Describe in your own words the employment practices about which you are complaining,

identifying the persons, firms, companies, unions, agencies or bodies you say have engaged

in such practices. *I am filing a racial and discrimination claim*
*under Title XII of the Civil Rights Act.*
*I was employed by Easter Seals Central Alabama*
*located at 2125 E South Blvd, Montgomery, Alabama 36116*

See Attached Letter Dated 03-30-07

from September 14, 2004 to September 29, 2006.
~~I was a full-time Micro Enterprise Specialist.~~
I was replaced by a White, male, after being told
that federal funds were available to pay for one
full-time Micro Enterprise Specialist. Easter Seals
Administrators eliminated my position on Friday,
September 29, 2006 and hired Bill Hanes, a
White, male, on Monday, October 2, 2006 after
being notified that federal grant funding was
approved for its Micro Enterprise Program and
for one full-time Micro Enterprise Specialist.

**Have you filed with the Equal Employment Opportunity Commission (EEOC) a Charge**

**relating to such practices?........ Yes** ✓ **No _____**

**If "yes", attach a copy of each such Charge.**

**Have you received from the EEOC a letter notifying you of your right-to-sue respecting such**

**Charges? ........... Yes** ✓ **No _____**

**If "yes", attach a copy of such letter and notice, and state when you received the same.**

**Date Received:** 02-15-07

**Have you received from the EEOC a copy of its Determination with regard to your Charges?**

**Yes** ✓ **No ___**

**If "yes", attach a copy of such Determination. Also, if you disagree with any of the EEOC's**

**findings or conclusions, state why.**

I disagree with the EEOC's findings because
Easter Seals Central Alabama breached the federal
grant contract for its Micro Enterprise program
which required a full-time Micro Enterprise Specialist.
Easter Seals also knowingly and willingly displaced me,
a full-time employee with an independent contractor.

After being notified that federal grant funding was approved, Easter Seals Administrator could have retained me as an employee instead of eliminating my position

Any other informational you desire to disclose which supports your claim of discriminatory employment practices.

_____

_____

_____

_____

(Attach additional sheets as needed)

**Efforts to Obtain Attorney**

(To be completed if requesting appointment of an attorney)

Have you talked with any attorney about handling your claim? Yes ✓ No ___

If "Yes", give the following informational about each attorney with whom you talked:

Attorney: David R. Arendall, Arendall & Associates

When: 10-25-06

Where: 2018 Morris Ave Birmingham, AL 35203

How (by telephone, in person, etc): In Person

Attorney: expressed concern about the amount of money and time he would have to give. He also expressed concern about my case going before a jury. He expressed these concerns after reassuring me that I had a good case and after I submitted

_Substantial documentation supporting my claim_
_of racial and gender discrimination._

_____

_____

**Where:** _____ **How (by telephone, in person, etc)**

**Why attorney was not employed to handle your claim:**

**Attorney:**

_____

_____

_____

_____

**When:** _____

**Where:** _____

**How:** _____

**Why attorney was not employed to handle your claim:** _____

_____

_____

**Explain any other efforts you have made to contact an attorney to handle your claim.**

_I contacted Attorney Deneau in Pelham_
_and left a message for him to call me._
_His secretary's name was Kitty._

**Any other information which supports your application for the court to appoint an attorney**

**for you:** I am receiving disability income. I am also in an enormous amount of financial debt and cannot afford to pay for filing fees, court costs, and attorney fees.

**Name and address of each attorney who has represented you in the last 10 years for any purpose:** None

_____

_____

_____

_____

(Attach additional sheets as needed)

Attestation and Signature

Under penalty of perjury I declare that the information given on the preceding ___ pages is true and correct.

Dated: 03-30-07    _Emily C Jackson_

SIGNATURE

WITNESSES:

_____

EEOC Form 161 (3/98)

U.S. ~UAL EMPLOYMENT OPPORTUNITY COMM~ ~ION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | **Emily Jackson** | From: | **Birmingham District Office** |
|---|---|---|---|
| | ~~999 Wesley Drive~~ | | **Ridge Park Place** |
| | **Montgomery, AL 36111** | | **1130 22nd Street, South, Suite 2000** |
| | | | **Birmingham, AL 35205-1130** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **420 2007 00698** | **Devoralyn J. McGhee, Investigator** | **(205) 212-2070** |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this Notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Delner Franklin-Thomas*                                    1 3 FEB 2007

Enclosure(s)

Delner Franklin-Thomas, District Director                    *(Date Mailed)*

cc:    **David R. Arendall, Attorney**
       **Randy Thomas, Chairman**

March 30, 2007

U.S. District Court Judge
1729 Fifth Avenue N, Room 140
Birmingham, AL 35203-2022

To The Honorable Judge of the U.S. District Court in Birmingham, Alabama:

Thank you for allowing me to file my lawsuit and complaint in the U.S. District Court of Birmingham, Alabama. In order to proceed with my complaint, I will provide a brief description of the facts in my case.

I am filing a racial and gender discrimination in employment case under Title VII of the Civil Rights Act against Easter Seals Central Alabama, located at 2125 E. South Boulevard, Montgomery, Alabama 36116. The particulars of the case begin with the fact that I was employed by Easter Seals Central Alabama in the Alabama Customized Employment (ACE) Micro Enterprise Program, as a full-time Micro Enterprise Specialist between September 14, 2004 and September 29, 2006.

I was notified in writing by Easter Seals Administrators that federal funds for the ACE Micro Enterprise Program were ending. As a result, my employment with Easter Seals would end and my position as a Micro Enterprise Specialist would be eliminated. As notified by Easter Seals Administrators, my employment ended on Friday, September 29, 2006.

On Monday, October 2, 2006, Easter Seals Central Alabama hired Bill Hanes, a White male, as an independent contractor for the ACE Micro Enterprise Program. The hiring of Mr. Hanes displaced me as a full-time employee. It also breached the federal grant agreement which required a full-time Micro Enterprise Specialist in order to operate the Micro Enterprise Program.

I strongly believe that I was discriminated against based on my race, Black, and my gender, female, because Easter Seals **knowingly and willingly** hired a White male in my place after being notified that federal grant funding was approved for the Micro Enterprise Program and for the salary of one full-time Micro Enterprise Specialist.

My discrimination case was filed with the U.S. Equal Employment Opportunity Commission by David R. Arendall, Attorney. **I submitted substantial documentation to Mr. Arendall to support my case** and he reassured me that I had a good case, and, that it was proceeding as scheduled. After Mr. Arendall initially agreed to represent me on a contingency basis, and after he received my **Right to Sue Notice**, he contacted me and expressed concerns about the amount of money and time that he would have to invest in my case: Right to Sue Notice is attached. He also expressed concern about my case going before a jury.

Your Honor, I sincerely believed that Mr. Arendall was going to represent me in my case because I signed a written agreement for him to represent me on a contingency basis. At this time, I do not want him to represent me. Additionally, **I am receiving disability income and cannot afford an attorney.** Would you please waive my filing fee of $350.00 plus court costs, and appoint an attorney to represent my discrimination case?

Sincerely,

*Emily C. Jackson*

Emily C. Jackson

Enclosures

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY |
|---|---|
| | FEPA |
| | X EEOC |

*State or local Agency, if any* _____ and EEOC

| | |
|---|---|
| **NAME** *(Indicate Mr., Ms., Mrs.)*<br>Ms. Emily Jackson | **HOME TELEPHONE** *(Include Area Code)*<br>(334) ▆▆▆ |
| **STREET ADDRESS**        **CITY, STATE AND ZIP CODE**<br>▆▆▆ ▆▆▆▆▆, Montgomery, AL 36111 | **DATE OF BIRTH**<br>▆▆▆▆ |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** *(If more than one list below)*

| NAME<br>Easter Seals Central Alabama | NUMBER OF EMPLOYEES, MEMBERS<br>**Over 15** | TELEPHONE *(Include Area Code)*<br>(334) 288-0240 |
|---|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>2125 E. South Blvd., Montgomery, AL 36116 | | COUNTY<br>Montgomery |
| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE FIRST or CONTINUING DISCRIMINATION TOOK PLACE AND DATE LAST DISCRIMINATION TOOK PLACE *(Month/Day/Year)*: |
|---|---|
| **RACE XX**     COLOR        SEX  HARASSMENT<br><br>RELIGION     NATIONAL ORIGIN     RETALIATION<br><br>AGE        DISABILITY<br><br>OTHER *(Specify)* **GENDER XX** | FIRST: 9-14-04<br><br>LAST: *9-29-06* |

**THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):**
**Please see following page for particulars.**

SSN:                    Sex:    **Female**        Race:  **African American**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | **NOTARY** - *(When necessary for State and Local Requirements)*<br><br>*Rhonda A. Sizemore*<br>Notary signature |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Emily Jackson*<br>Emily Jackson<br>Charging Party *(Signature)*<br><br>Date:  *11-10-06* | *Emily Jackson*<br>Emily Jackson<br>SIGNATURE OF COMPLAINANT<br><br>**SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)**<br><br>Date:  *11-10-06* |

EEOC FORM 5 (Rev. 06/92)

Page 2
**EEOC Charge of Emily Jackson**
Social Security Number:

1. I began work with Respondent on September 14, 2004 as a Micro Enterprise Specialist. My job duties included assessing entrepreneur opportunities for individuals with disabilities in order to start a business. I would provide counseling and guidance. I would conduct management training seminars, provide technical assistance in the development of a feasible business plan. I would operate and maintain electronic and manual data bases and prepare written business and administrative reports. At all times, I performed my job duties in at least a competent manner.

2. Respondent funds the program in which I was employed through federal grants. The grant is based upon salaries paid to employees in the program by Respondent. I, along with my co-worker, Cassandra Cooper (black) were the two full-time Micro Enterprise Specialists in the program by September, 2006.

3. On or about April 26, 2006 Larry Lewis, interim administrator, and Dr. Susan McKim met with us to inform us that the Micro Enterprise Program was going to end in September, 2006, but that they would be seeking a no cost extension to sustain the program for one more year, as originally scheduled.

4. On August 15, 2006, while I was out on funeral leave, Mr. Lewis left a letter on my desk that said that my position would be ending on September 29, 2006 and that efforts to extend the program had failed.

5. On September 12, 2006, Ms. Debbie Lynn, Administrator, called a meeting with me and Ms. Cooper and said the program was going to be extended for six months, but there was a problem with funding the full time positions. I asked to work part-time.

6. On September 18, 2006, Ms. Lynn told me that while the program was going to be extended for six more months, that my position had been eliminated and that the grant would only allow for one full time Micro Enterprise Specialist so that Ms. Cooper would be retained.

7. On Monday, September 25, 2006, Ms. Cooper submitted her letter of resignation, the same day as my last day at work. I used four vacation days; therefore, my last day was officially September 29, 2006. On this day, when I picked up my paycheck, I asked the Administrative Assistant, Eileen Bennett, if the program was going to continue since Ms. Cooper was leaving, and she told me that the program was going to end.

8. On Monday, October 2, 2006, Bill Hanes (wm) was hired as a full time Micro Enterprise Specialist, taking my position. He had been employed with Respondent in Talladega. He was allowed to assume my position when his own was eliminated.

9. Upon information and belief Mr. Hanes is being paid more money than I was. I believe the difference in pay is because it is based on the fact that he is a white male, and I am a black female.

Page 3
EEOC Charge of Emily Jackson
Social Security Number:

10. I believe I have been discriminated against because of my gender, female, and my race, black, in violation of
Title VII of the Civil Rights Act of 1964. Hanes' position was eliminated, not mine, yet he was allowed to
take my position while my employment was terminated.

Emily Jackson

The foregoing instrument was acknowledged before me on ___11-10-06___ by Emily Jackson.

Notary Public

My commission expires:



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2148
TTY (205) 212-2112
FAX (205) 211-2105

*David R. Arendall, Attorney*
*Arendall & Associates*
*2018 Morris Avenue*
*Birmingham, AL 35203*

*Reference: Emily Jackson v Easter Seals Central Alabama*
*Charge No. 420 2007 00698*

*Dear Mr. Arendall:*

*The above-referenced charge has been assigned to me for investigation. This correspondence is submitted in reference to your client's charge of employment discrimination filed on the basis of her race, Black, gender, female.*

*Based upon my analysis of the material and testimony which your client presented and information obtained from other sources, I have concluded that it is unlikely that further investigation of your client's charge would result in a finding that the law was violated, as alleged.*

*Your client alleged that she was discriminated against because of her race, Black, and gender. She specifically alleged that she was terminated from her position of employment as a Micro Enterprise Specialist and a White male took her position. Evidence indicates that management made a decision to out-source their program to an "independent contractor" due to funding and current staffing needs. Evidence further indicates that your client's comparator was never an employee of the Respondent. Finally, Respondent contends that your client was kept abreast of the funding issues as it relates to her continued employment.*

*If you have additional information or evidence which was not submitted previously, please provide to me by January 29, 2007. You can send the information to me at the address above, fax (205) 212-2105 or contact me at (205) 212-2070. If you come to the office without making an appointment, I may or may not be able to see you.*

In the event that I do not hear from you, I will recommend that the charge be dismissed, that your client be issued a Notice of Right to Sue and that the Commission consider this matter closed.

Sincerely,

January 18, 2007
Date

Devoralyn J. McGhee
Investigator

*Exhibit B*



**Larry Lewis**
CBO

*Creating solutions, changing lives*

*Services for children and adults*
*with disabilities in Central Alabama*

**Easter Seals**

**Central Alabama**
2125 East South Boulevard
Montgomery, Alabama 36116-2454
334-288-0240
FAX 334-288-7171

## M E M O

TO: Emily Jackson

FROM: Larry F. Lewis

DATE: 8/15/06

RE: Customized Employment grant

I received notification today from ADECA that the Customized Employment Grant will end at the end of September. Their efforts to get an extension funded has failed. Please be advised that your employment with Ester Seals Central Alabama will end on Friday, September 29, 2006. I regret that this grant could not be continued.

Thank you for being a part of our program and for the many things you have done for the clients you have been able to help.

Sincerely,

Larry F. Lewis
CEO

---

Autauga ● Barbour ● Bullock ● Butler ● Conecuh ● Coosa ● Crenshaw ● Elmore ● Lowndes ● Macon ● Montgomery ● Pike

**DEFENDANT'S EXHIBIT**

6   Emily Jackson

Exhibit A

September 11, 2006

Mrs. Debbie Wallace-Lynn, Administrator
Easter Seals Central Alabama
2125 East South Boulevard
Montgomery, AL 36116-2454

Dear Mrs. Lynn:

On Monday, August 21, 2006, upon my return from funeral leave, a letter noted, "Confidential," was left on my desk informing me that the ACE Micro Enterprise Program was ending effective Friday, September 29, 2006, and that efforts to obtain a "no-cost extension" were not granted.

First and foremost, I want to express my appreciation and gratitude to Easter Seals for implementing the ACE Micro Enterprise Program and for hiring me as a Micro Enterprise Specialist. During my two-year tenure, I was blessed and honored to help and work with some extraordinary people. I also had the opportunity to build some trustworthy relationships both on and off the job, and nothing could ever replace those relationships.

What was most rewarding was the time that I had working with clients and helping them achieve their self-employment goals. Despite their disabilities, they were willing to learn and to take on the responsibilities of business ownership. The excitement in their eyes, once their business plans were completed, gave me internal satisfaction that is priceless.

Since I have not been notified that there are any employment opportunities for me here at Easter Seals, I will need time to transition to a new career. Therefore, my last day will be Monday, September 25, 2006. I have enclosed a leave request slip for four hours of annual leave to cover my time from September 26th through September 29th. Therefore, my employment with Easter Seals will officially end, as noted in the letter that I received, on September 29, 2006.

Congratulations on your new position as Easter Seals Central Alabama Administrator. My prayers and thoughts will be with you as you take on new challenges ahead. Also, I admire your courage and your autonomous leadership style, and I wish I could have had the opportunity to work with you.

Take care and God Bless.

Sincerely,

Emily C. Jackson
Emily C. Jackson

Cc: Larry F. Lewis, Interim Administrator

DEFENDANT'S EXHIBIT

7 Emily Jackson

# FREEDOM COURT REPORTING

1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-CV-315-MEF
6    EMILY JACKSON,
7          Plaintiff,
8          vs.
9    EASTER SEALS CENTRAL ALABAMA,
10         Defendant.
11
12         S T I P U L A T I O N
13         IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel, that the deposition of Cassandra
16   Cooper may be taken before Sara Mahler, CCR,
17   at the offices of Maynard, Cooper & Gale, at
18   100 North Union Street, Suite 650,
19   Montgomery, Alabama 36104, on the 29th day
20   of January, 2008.
21
22         DEPOSITION OF CASSANDRA COOPER
23

2

1          IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8          IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17         IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21         * * * * * * * * * * * *
22
23

3

1         * * * * * * * * * * * *
2              I N D E X
3            EXAMINATION
4                          PAGE
5    By Mr. Brown ........................ 9
6    By Ms. Emily Jackson ............... 82
7         EXAMINATION CONTINUED
8                          PAGE
9    By Mr. Brown ...................... 120
10   By Ms. Emily Jackson .............. 125
11   By Mr. Brown ...................... 126
12        PLAINTIFF'S EXHIBITS
13                         PAGE
14   Exhibit 1 - 3/23/06 letter ......... 88
15   Exhibit 2 - 8/15/06 memo ........... 90
16   Exhibit 3 - 9/18/06 letter ........ 92
17   Exhibit 4 - Page 9 of Answers to
18        Interrogatories .......... 93
19   Exhibit 5 - Certificate of
20        Service from Robin
21        Adams ................... 93
22   Exhibit 6 - Letter given to
23        Ms. Lynn by plaintiff ... 97

4

1    Exhibit 7 - Personnel Absentee
2        Request and Approval
3        slip ................... 97
4    Exhibit 8 - Involuntary
5        unemployment claim form   101
6    Exhibit 9 - Involuntary
7        unemployment
8        certificate of
9        insurance .............. 101
10   Exhibit 11 - Budget form ......... 104
11   Exhibit 10 - E-mail from Susan
12        McKim to Tammy Farmer
13        on 9/11/06 ............. 108
14   Exhibit 12 - E-mail from
15        Plaintiff to Larry
16        Lewis on 6/16/06 ....... 118
17   Exhibits 13-17 - Office of Disability
18        Employment Policy documents
19        pages 1, 2, 3, 4, 13
20        of 23 ................. 126
21
22         * * * * * * * * * * * *
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

37

1   starting my own consulting business.
2       Q.    Okay.  And between -- After
3   hearing this news in April that the grant,
4   at least at that point, had not been
5   extended and the program might be ending,
6   what did you do as far as making
7   preparations for either starting up or
8   further developing your own consulting
9   business?
10      A.    The only thing I mainly did
11  was knowing that the program was going to
12  end in September, I mean, I just simply was
13  making efforts to start my own business.
14  One of the things that I did -- I mean, I
15  just made efforts to start my own business.
16      Q.    Do you recall what those
17  efforts -- when you say efforts, what you
18  actually did?
19      A.    Let's see.  Everything from
20  working on getting a business license,
21  employer identification number, you know,
22  buying equipment, things of that nature.
23      Q.    I know you can't -- I'm not

38

1   asking you to recall specific dates, but
2   about when did you get your business
3   license?
4       A.    It was probably around about
5   sometime in September, I would say.
6       Q.    Okay.  What about like your
7   employer ID number?
8       A.    Probably sometime in
9   September.
10      Q.    You said you had to go out and
11  look for equipment and furniture and that
12  sort of thing?
13      A.    Uh-huh.
14      Q.    When did you make those
15  purchases?
16      A.    I began purchasing some
17  equipment in -- I'd say probably around
18  about September.  All those things, all
19  those initiatives, from my recollection,
20  occurred in September.  I was under the
21  assumption that when the 29th came, that we
22  weren't going to have a job, so it was in
23  September.

39

1       Q.    Okay.  Now, again, I want to
2   jump ahead a little bit and just to come
3   back to give us a date -- a point of
4   reference from the date standpoint.
5           There was a meeting on
6   September 12, 2006, I believe, between you
7   and Ms. Jackson and Debbie Lynn, who's
8   sitting here in the deposition with us;
9   correct?
10      A.    Uh-huh.  Right.
11      Q.    And in that meeting you were
12  informed that an extension had been
13  approved; correct?
14          MS. EMILY JACKSON:  Objection.
15      Q.    Let me do this.  In her
16  deposition, Ms. Jackson testified that
17  Ms. Lynn did tell y'all in the September 12
18  meeting that the micro enterprise program
19  was going to be extended for six months.  Is
20  that consistent with your recollection?
21      A.    Yes.
22      Q.    So as of September 12, you
23  knew that the program had been extended?

40

1       A.    Yes.
2       Q.    Okay.  The only reason I
3   wanted to get that date down is does that
4   then mean that as far as you getting your
5   business license and your employer ID number
6   and starting to purchase furniture, that had
7   already happened before September 12, when
8   you still thought the program was going
9   away?
10      A.    It was around that.  And the
11  reason why I say that is in the meeting we
12  discussed things that we would do, you know.
13  And let me see -- Let me get this right --
14      Q.    In the September 12 meeting or
15  which one?
16      A.    I think that was in the
17  previous meeting where we was -- How did it
18  go?
19          I'm kind of confused, okay.
20  But I do remember one of the meetings that
21  we had, I do remember a question asked about
22  what we plan on doing in the future, what
23  are we doing, et cetera.  And during that

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

41

1  particular meeting I did state that I was
2  interested in doing my own business, and
3  et cetera, and I do recall something in
4  reference in speaking with Ms. Debbie Lynn,
5  you know I, had mentioned that being that
6  the program was ending, I would like to do
7  some consulting on the side, or et cetera,
8  and I remember her stating something in
9  reference to maybe a conflict of interest
10 due to the grant, which is very
11 understandable. And from that standpoint, I
12 think the question was whether or not we
13 worked with clients who had disabilities or
14 not, or et cetera. They said it would kind
15 of like be a conflict of interest.
16     Q.    Ms. Jackson testified that
17 that was in the September 12 meeting that
18 Ms. Lynn expressed some concern about doing
19 both Easter Seals work and then consulting
20 work for the same clients?
21     A.    Right.
22     Q.    Is that your recollection,
23 that that happened in that meeting?

42

1      A.    Right.
2      Q.    Okay. But by September 12 --
3  All I'm trying to make sure I understand is
4  before September 12th you were already
5  underway in your efforts to start up your
6  own consulting business?
7      A.    Right. I was working on that.
8      Q.    Okay. Prior to that September
9  12 meeting and going all the way back to
10 April of '06, had you and Ms. Jackson had
11 any discussions about starting up a business
12 jointly or going out together or anything
13 along those lines?
14     MS. EMILY JACKSON: Objection.
15     Q.    You can answer that's entirely
16 relevant.
17     MS. EMILY JACKSON: Objection.
18 You're leading her. I mean, if you ask her
19 what did you discuss, but you're asking her
20 specifically did she discuss, did we
21 discuss.
22     MR. BROWN: No, ma'am,
23 Ms. Jackson. I'm asking her did she have

43

1  any discussions on that subject, that's a
2  perfectly good question.
3      Furthermore, since you've
4  identified Ms. Jackson as your witness, I
5  can lead her, as far as it's the same as
6  cross-examination. But you can object, but
7  she still needs to answer the question.
8      MS. EMILY JACKSON: Okay.
9      Q.    (BY MR. BROWN:) Okay.
10 Between April of '06 and up to September 12,
11 when you know the program was going to be
12 extended, my question is, did you and
13 Ms. Jackson have any discussions about
14 possibly jointly forming a business or going
15 into business together or setting up your
16 joint consult -- private joint consulting
17 business on anything like that?
18     A.    I don't recall that.
19     Q.    Okay. Was Ms. Jackson also --
20 did she talk to you about starting up her
21 own business during that time frame, in
22 other words, between April when you first
23 learned the program might be gone and up to

44

1  September 12, when you knew that the program
2  had been extended?
3      A.    She did -- I do recall her at
4  some point in time expressing an interest in
5  starting her own business, but I don't know
6  exactly when. But I do recall her
7  expressing that she wanted to do her own
8  business as well.
9      Q.    Okay. Do you recall hearing
10 her comment about that or mention that on
11 more than one occasion?
12     A.    Yes. She did mention that she
13 was interested in starting her own business.
14     Q.    Am I correct that in the
15 September 12 meeting when it was discussed
16 that the program was going to be extended,
17 that she mentioned that? In other words,
18 that she was in the process of doing her own
19 business or starting her own business?
20     A.    I do remember -- I think so.
21 I'm not a hundred percent sure, but I think
22 she did. I think she did because -- I don't
23 know -- I think she did.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

49

1 She says in April, April 26th,
2 that there was a meeting with you and her
3 and Larry Lewis and Susan McKim. And in
4 that meeting, Mr. Lewis informed y'all that
5 the program was going to be ending due to
6 budget cuts; in other words, the funding --
7 the grant had not been extended, but that
8 they were in the process of trying to get an
9 extension.
10 A. Right. I recall that.
11 Q. But I gather that was all the
12 information they had at that time.
13 A. Right.
14 Q. And then the September 12
15 meeting was the meeting where -- with
16 Ms. Lynn and you and Ms. Jackson where
17 Ms. Lynn informed you and Ms. Jackson that a
18 six-month extension had been granted.
19 A. Right.
20 Q. Okay. I'm assuming that when
21 you came into that September 12 meeting,
22 since you had both been in this prior
23 meeting about the program not being extended

50

1 and then a couple of communications in
2 between about it not been being extended, I
3 assume when you came into the meeting with
4 Ms. Lynn on September 12, Ms. Lynn sort of
5 presented this as good news, I've got good
6 news for you, the program is going be
7 extended for six months or something like
8 that?
9 A. Right.
10 Q. Do you recall after Ms. Lynn
11 informed you the program was going to be
12 extended, do you recall any further
13 discussion by any of the three of you, any
14 discussion, any questions, anything else
15 that was talked about in that meeting?
16 A. Let's see. One of the
17 things -- Because I don't want to say
18 anything inappropriate that didn't occur.
19 I'm trying to try my best to remember, okay?
20 Q. Just tell us to the best --
21 A. To the best of my knowledge.
22 Q. If you think something did,
23 but you're not absolutely sure, it's okay to

51

1 say I think this was said but I'm not
2 absolutely sure.
3 A. Okay. And I apologize for
4 this.
5 Q. None of us have got that good
6 a memory, Ms. Cooper. Don't worry about it,
7 you're doing just fine.
8 A. I've been through a lot of
9 stuff.
10 One thing I think that
11 occurred was they said that there was an
12 extension for six months; and that there was
13 only enough funding, I think, for one
14 person, for one micro enterprise specialist;
15 and that she was -- that they would keep me
16 on because I had been there the longest, and
17 et cetera. And I think that was it. I
18 don't know if there was -- I don't
19 remember -- I mean, that's all I pretty much
20 right now remember.
21 Q. The discussion about the
22 amount of funding and the -- there being one
23 position, do you think that happened in that

52

1 meeting or do you think that happened a few
2 days later after Ms. Lynn had looked into
3 what funding was available for the program,
4 or do you remember one way or the other?
5 A. I mean, I do remember -- I do
6 distinctly remember. I don't remember the
7 exact dates, I mean, between the two days or
8 three days or so. But I do distinctly
9 remember Ms. Lynn explaining to us that the
10 program had been extended, and I do recall
11 her discussing with us that it was only
12 enough funds available for one micro
13 enterprise specialist, and that it would be
14 a full-time position.
15 Q. What I'm asking is, as far as
16 that discussion about the program being
17 extended and the discussion about there only
18 being enough funding for one micro
19 enterprise specialist, do you recall whether
20 that was all in the same meeting or that was
21 in two separate meetings?
22 A. To be honest with you, I'm not
23 a hundred percent sure. But I do remember

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

53

1  having that conversation.
2      Q.    At some point that discussion
3  was had?
4      A.    Right.  I do remember that.
5      Q.    Okay.
6      A.    My days are kind of clashing,
7  but I do remember the discussion.
8      Q.    Do you recall anything that
9  Ms. Jackson had to say in that September
10  12th meeting?
11      A.    I think I do remember -- Like
12  I say, I don't know which -- I know we had
13  like you know two sets of discussions,
14  et cetera, but I do remember something being
15  mentioned in one of our meetings about her
16  working part time, I do remember that.  And
17  with her working part time, I think it was
18  told that being that the position was a full
19  time, or something like that, that it
20  would -- that you couldn't work part time,
21  it had to be full time.  I think that was
22  discussed in one of those meetings, it had
23  to be full time.

54

1          Yeah.  And it was something
2  about -- I remember I kind of sort
3  mentioned -- I think I remember mentioning
4  that I would be interested possibly in doing
5  my business and working part time as, you
6  know, as a consultant, I asked could I do
7  that.  And Emily asked too about working
8  part time, and they said it was a full-time
9  position at that point, and I was like,
10  okay, that's fine.
11      Q.    And that's also the same
12  meeting where Ms. Lynn expressed concern
13  about having your own business, your private
14  business and working for Easter Seals as a
15  possible conflict?
16      A.    I think so, yeah.  I think
17  that was the same meeting.
18      Q.    Okay.  And I'm looking at what
19  Ms. Jackson testified to.  Do you recall
20  Ms. Jackson indicating that she was only
21  interested in working part time because she
22  was already starting her own business?
23      A.    I do remember -- Yes, I

55

1  remember her mentioning that.
2      Q.    Do you recall, did
3  Ms. Jackson -- What do you recall about the
4  hours Ms. Jackson indicated she was
5  interested in working or willing to work on
6  a part-time basis?
7      A.    I'm not sure of that.  I don't
8  know the hours.  But I do remember the part
9  time being mentioned.
10      Q.    Do you recall Ms. Jackson
11  indicating -- or testifying in her
12  deposition what she proposed was working
13  half days?  Do you recall that?
14      A.    Yes, I remember half days.
15      Q.    Do you recall -- Do you recall
16  how many days a week half days she proposed
17  to work?
18      A.    I don't remember the exact
19  days, but I do remember half days.  I think
20  I remember that.
21      Q.    Now, let me go back and --
22  Ms. Jackson testified in her deposition that
23  you never mentioned anything about working

56

1  part time.  Did you -- I'm not trying to
2  change your testimony, I just want you to
3  reflect.  Did you indicate to Ms. Lynn in
4  the meeting that you might be interested in
5  part time so you could do your own business
6  on the side, or did you indicate to her that
7  -- just that you might be interested in
8  continuing your own work on the side while
9  you worked full time?
10      A.    Let me make sure I recollect
11  that correctly.  One of the things that I do
12  remember is that I did mention to Ms. Lynn
13  that I would be interested in working as an
14  independent consultant, and I did want to do
15  my business and wanted to know would it be
16  okay if I could work with the clients, and I
17  could have said, you know, part time, I
18  could have said -- I'm not a hundred percent
19  sure.  But I do know that I did present the
20  question of having my own business working
21  as an independent consultant with the
22  clients.  I did mention that.
23      Q.    And that's when Ms. Lynn

14  (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

57

1  indicated she had some concern with that
2  from a conflict standpoint?
3      A.    Right.  Right.  I do recall
4  that.
5      Q.    Is it your understanding that
6  you were selected to stay on with the micro
7  enterprise program because you were the -- I
8  think you said you'd been there the longest?
9      A.    Yes.  And I assisted with
10 implementing the program, yes.
11     Q.    The decision to -- for you to
12 fill the position after the end of
13 September, wasn't that made after the
14 September 12 meeting as opposed to in that
15 meeting?
16         MS. EMILY JACKSON:  Objection.
17     Q.    You can go ahead and answer.
18     A.    I'm not a hundred percent
19 sure.  I'm not a hundred percent sure.  But
20 I know that the decision was made, but I'm
21 not a hundred percent sure as to the exact
22 time.  But it was around about that time or
23 a little bit after, but I'm not a hundred

58

1  percent sure.  It very well could have been,
2  but I'm not sure.
3      Q.    As far as the funding was
4  concerned, Ms. Jackson testified in her
5  deposition that in that September 12 meeting
6  Ms. Lynn said that the program had been
7  extended, but at that time they didn't have
8  all the details worked out about the
9  funding.  Do you recall that?
10     A.    That sounds right.
11     Q.    That's why I was asking you
12 about wasn't it later that the decision was
13 made to select you, because I think even
14 Ms. Jackson says that there was still some
15 questions about the funding as of September
16 12.  Is that your recollection?
17     A.    That sounds about right.
18     Q.    Did you find out -- Did
19 Ms. Lynn come to you and tell you that you
20 were going to be the person staying in that
21 position?
22     A.    I'm almost positive that she
23 had to have done that for -- I'm sure that

59

1  she did.  We had to have some type of
2  communication, because there's no way that I
3  would have known that I would have stayed
4  and Ms. Jackson would have -- So some type
5  of communication had to have occurred, yes.
6      Q.    I think there was a staff
7  meeting on September 28th -- excuse me,
8  September 18.  Do you recall that?
9      A.    Yes.
10     Q.    And in that staff meeting
11 Ms. Lynn announced that the program had been
12 extended and you would be staying on but
13 that Ms. Jackson was leaving?
14     A.    That's right.
15     Q.    And there was going to be a
16 going-away party for Ms. Jackson the
17 following Monday or something like that?
18     A.    Yes.  That's right.
19     Q.    Was the decision to keep you
20 on communicated to you sometime between
21 September 12th and prior to that September
22 18 staff meeting?
23     A.    I'm not a hundred percent

60

1  sure.  I don't know.
2      Q.    You know somebody had to tell
3  you, you just don't remember who told you or
4  when?
5      A.    I mean, I'm sure that I had to
6  communicate that with probably -- had to be
7  with Ms. Lynn because she was like my direct
8  supervisor.  The only thing that -- I know
9  that we had to have some type of
10 communication, it very well could have been
11 in that September 18th meeting.  I'm not a
12 hundred percent sure.  I just don't know.  I
13 just know that I would be there, I was
14 chosen to stay.
15     Q.    Ms. Jackson had a discussion
16 or meeting with Ms. Lynn, just the two of
17 them.
18     A.    Okay.
19     Q.    I shouldn't say just the two
20 of them, you weren't in the meeting on the
21 morning of September 18th, before that staff
22 meeting.  Do you know anything about what
23 was discussed or what was said in that

15  (Pages 57 to 60)

# FREEDOM COURT REPORTING

121

1  Easter Seals, says the Plaintiff informed
2  Defendant she was resigning in order to
3  start her own business.
4      Your understanding,
5  Ms. Cooper, was that Ms. Jackson was leaving
6  to start her own business; correct?
7      A.    She -- You said my
8  understanding that she was leaving Easter
9  Seals to start her own business; is that
10 what you're asking me?
11     Q.    Right.
12     A.    My understanding was that she
13 was leaving Easter Seals as a result of not,
14 you know -- My understanding was that her
15 leaving Easter Seals was a result of us not
16 having enough funding for another micro
17 enterprise specialist.  But as a result, she
18 decided to start her business as an
19 alternative.
20     Q.    But even when you learned that
21 the program was going to be extended, you
22 testified earlier that she was only
23 interested in working part-time because she

122

1  wanted to leave and start her own business;
2  correct?
3      A.    That's right.
4      Q.    She never indicated she wanted
5  to stay full time, even when she found out
6  the program was going to be extended, did
7  she?
8      A.    Well, I don't recall us having
9  a conversation about that.
10     Q.    I'm talking about in the
11 meeting with Ms. Lynn on September 12th, you
12 testified earlier -- tell me if I'm correct.
13 Ms. Jackson indicated in that meeting on
14 September 12, that she was only interested
15 in working part time, half days, because she
16 wanted to go ahead -- forward with starting
17 her own business; isn't that correct?
18     A.    I think so.
19     Q.    Okay.  Now, I'll take
20 Ms. Jackson's Exhibit 11, that it doesn't
21 have -- she's indicated it was attached to a
22 September 11 memo.  That would have been the
23 day before September 12, when y'all met with

123

1  Ms. Lynn; correct?
2      A.    Uh-huh.
3      Q.    On September 11, according to
4  Ms. Jackson, Easter Seals had sent in a
5  budget request for this extension, this
6  grant extension, six-month extension for
7  salaries for two people, or at least an
8  amount of salary that would cover two
9  people; correct?
10     A.    That's what she said, yeah.
11     Q.    And that would be contrary to
12 anybody testifying or saying the next day
13 that there was only salary for one person;
14 correct?
15     A.    I'm kind of sort of confused
16 to a certain degree because it's almost -- I
17 remember seeing budgets.  I had seen this
18 budget.  I'm trying to understand --
19     Q.    I'm not asking you about this
20 budget.  I'm just saying, if this was
21 submitted on September 11th, requesting a
22 salary as part of the grant extension,
23 salaries of over thirty-one thousand

124

1  dollars, that would be consistent with
2  approximately two micro enterprise salaries
3  for six months; correct?
4      A.    Right.
5      Q.    Does that refresh your memory
6  as to what Ms. Lynn said the next day, and
7  that Ms. Lynn did not that first meeting say
8  there was only a salary for one?
9      A.    No.  The first meeting she
10 didn't say that.
11     Q.    She didn't say it in that
12 meeting, did she?
13     A.    No.
14     Q.    That was later on when she got
15 more information; correct?
16     A.    Right.  And that was during
17 the time she mentioned during the staff
18 meeting.
19     Q.    So when Ms. -- On September
20 the 12th, when Ms. Jackson indicated she was
21 only interested in working part time, there
22 had never been any mention of there only
23 being one -- or enough funding for one

31 (Pages 121 to 124)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EMILY JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv315-MEF |
| | ) | |
| EASTER SEALS CENTRAL | ) | |
| ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DEBBIE LYNN

I, the undersigned, Debbie Lynn, hereby swear or affirm that the following is true and correct based on my personal knowledge:

1.     My name is Debbie Lynn.  I am over the age of twenty-one, I am of sound mind, and I am qualified to make this declaration.  I understand that this declaration is being submitted in connection with a lawsuit filed against Easter Seals of Central Alabama ("Defendant" or "Easter Seals") by one of its former employees, Emily C. Jackson.

2.     Easter Seals is a non-profit agency that provides assistance to individuals (and their families) with disabilities and special needs.  Specifically,

1

Easter Seals provides various services designed to meet the needs of such individuals in twelve central Alabama counties.

3.    Prior to March 2007, Easter Seals offered a Micro-Enterprises Program which was designed to assist individuals with disabilities in starting their own businesses. The funding for this Program was based entirely on grant monies provided by the Department of Labor ("DOL") and administered by the Alabama Department of Economic and Community Affairs ("ADECA").

4.    During the relevant time period, ADECA issued similar grants to three entities: (1) the Janice Capiluto Center for the Deaf; (2) the Alabama Department of Rehabilitation Services; and (3) Easter Seals Central Alabama. Each grant recipient handled and managed its own program, money and reporting responsibilities.

5.    On August 21, 2006, I assumed the position of Administrator for Easter Seals.

6.    On September 11, 2006, Ms. Jackson submitted a letter to me stating that she had received a memo dated August 11 from Mr. Larry Lewis, the previous administrator, explaining that September 29, 2006 would be the end of the Program and her employment with Easter Seals. (Exhibit A).

7.    The following day, September 12, I met with Ms. Jackson and Cassandra Cooper and informed them that a six-month no-cost grant extension had

2

been approved. During this meeting, Ms. Cooper confirmed that she wanted to stay with the Program in a full-time capacity during the six month extension period.

8.    At no time during the September 12 meeting did Ms. Jackson ever tell me that she was interested in remaining with the Program as a full-time employee for the six-month extension period.

9.    On September 25 (which was also Ms. Jackson's last day of work), Ms. Cooper formally resigned her position as Micro-Enterprise Specialist. After this abrupt resignation, Easter Seals had less than four days to either find a qualified Micro-Enterprise Specialist with immediate availability and ability to devote full-time attention, if necessary, to the Program and its clients or to forfeit the grant extension. At no time after Ms. Cooper's resignation did Ms. Jackson express any interest to me regarding the vacant full-time Micro-Enterprises position.

10.    Based on our previous conversations, I believed that Ms. Jackson was only interested in part-time work with the Program due to her desire to focus on her personal consulting business.

11.    As I was entirely unaware that Ms. Jackson had any interest in a full-time position for the six-month extension, I contacted Bill Haynes, with whom Easter Seals had previously contracted to provide Micro-Enterprise Specialist

3

services in the Talladega area, to see if he had an interest in and the availability to work with the Program for the six-month extension. Mr. Haynes responded that he was both willing and able to provide his services as an independent contractor to the Program through the end of March 2007. Thereafter, Mr. Haynes presented Easter Seals with a six-month contract for his services which Easter Seals accepted.

12.    Had I known, prior to contracting with Mr. Haynes, that Ms. Jackson was interested in the vacant six month, full-time Micro-Enterprise Specialist position, I would have definitely offered her that position – *i.e.,* she was qualified and experienced in that position and would have been the obvious solution to the staffing problem.

I declare under penalty of perjury the foregoing to be true and correct. Dated this 29th day of February, 2008.


_____
Debbie Lynn

4

services in the Talladega area, to see if he had an interest in and the availability to work with the Program for the six-month extension. Mr. Haynes responded that he was both willing and able to provide his services as an independent contractor to the Program through the end of March 2007. Thereafter, Mr. Haynes presented Easter Seals with a six-month contract for his services which Easter Seals accepted.

I declare under penalty of perjury the foregoing to be true and correct. Dated this 26th day of February, 2008.

Debbie Lynn

4

# EXHIBIT A

September 11, 2006


Mrs. Debbie Wallace-Lynn, Administrator
Easter Seals Central Alabama
2125 East South Boulevard
Montgomery, AL 36116-2454

Dear Mrs. Lynn:

On Monday, August 21, 2006, upon my return from funeral leave, a letter noted,
"Confidential," was left on my desk informing me that the ACE Micro Enterprise
Program was ending effective Friday, September 29, 2006, and that efforts to obtain a
"no-cost extension" were not granted.

First and foremost, I want to express my appreciation and gratitude to Easter Seals for
implementing the ACE Micro Enterprise Program and for hiring me as a Micro
Enterprise Specialist. During my two-year tenure, I was blessed and honored to help and
work with some extraordinary people. I also had the opportunity to build some
trustworthy relationships both on and off the job, and nothing could ever replace those
relationships.

What was most rewarding was the time that I had working with clients and helping them
achieve their self-employment goals. Despite their disabilities, they were willing to learn
and to take on the responsibilities of business ownership. The excitement in their eyes,
once their business plans were completed, gave me internal satisfaction that is priceless.

Since I have not been notified that there are any employment opportunities for me here at
Easter Seals, I will need time to transition to a new career. Therefore, my last day will be
Monday, September 25, 2006. I have enclosed a leave request slip for four hours of
annual leave to cover my time from September 26th through September 29th. Therefore,
my employment with Easter Seals will officially end, as noted in the letter that I received,
on September 29, 2006.

Congratulations on your new position as Easter Seals Central Alabama Administrator.
My prayers and thoughts will be with you as you take on new challenges ahead. Also, I
admire your courage and your autonomous leadership style, and I wish I could have had
the opportunity to work with you.

Take care and God Bless.

Sincerely,

*Emily C. Jackson*

Emily C. Jackson

Cc: Larry F. Lewis, Interim Administrator

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EMILY JACKSON,                          )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )   Civil Action No. 2:07cv315-MEF
                                        )
EASTER SEALS CENTRAL                    )
ALABAMA,                                )
                                        )
          Defendant.                    )

## DECLARATION OF SUSAN McKIM

I, the undersigned, Susan McKim, hereby swear or affirm that the following is true and correct based on my personal knowledge:

1.    My name is Susan McKim. I am over the age of twenty-one, I am of sound mind, and I am qualified to make this declaration. I understand that this declaration is being submitted in connection with a lawsuit filed against Easter Seals of Central Alabama ("Defendant" or "Easter Seals") by one of its former employees, Emily C. Jackson.

2.    The Easter Seals' Micro-Enterprise Program grant was originally a five-year grant and provided for one full-time Micro-Enterprise Specialist. In approximately March of 2003, Cassandra Cooper (Black, female) was hired as the Program's Micro-Enterprise Specialist. Prior to the 2004-2005 fiscal year, at

1

ADECA's request, Easter Seals broadened its Micro-Enterprises Program throughout the State and also intensified its emphasis in the Talladega area (home of the Alabama Deaf and Blind Institute). Consequently, on September 14, 2004, Ms. Jackson was hired as a full-time Micro-Enterprise Specialist.

3.      Easter Seals also contracted with William ("Bill") Haynes, an independent contractor located in the Talladega area, for Micro-Enterprise Specialist services in the Talladega area. Mr. Haynes was chosen for the position because of his extensive experience in working with deaf and blind persons and their unique business development needs.

4.      However, prior to the 2005 fiscal year, ADECA informed Easter Seals that it did not have enough grant money to continue to fund all of the newly extended Program. Since providing blind individuals with self-employment services was a very labor intensive endeavor, the Program, through Mr. Haynes, was not able to serve more than a few individuals at a time. Consequently, the Talladega specific component of the Program (primarily focused on serving the blind) was eliminated. Nonetheless, Ms. Cooper and Ms. Jackson retained their positions as full-time Micro-Enterprise Specialists.

5.      In April 2006, I received a letter from ADECA indicating that the Department of Labor had cut funding for the Micro-Enterprise grant. ADECA also advised Easter Seals that it was attempting to get a "no-cost" grant extension to

2

fund the Program. Under a "no-cost extension", a grant administrator, such as ADECA, does not receive additional grant money, but is allowed to use and redistribute any remaining, unused grant funds until those monies are exhausted.

6.    Upon receiving the April 2006 letter from ADECA, I shared the information with Ms. Jackson and Ms. Cooper. At that time, both ADECA and Easter Seals believed that, if the request for a no-cost extension was granted, the remaining funds would allow the Micro-Enterprise Program to continue for another year.

7.    On August 11, 2006, Larry Lewis, Easter Seals' Administrator, received another letter from ADECA, attached hereto as Exhibit A, indicating that the Micro-Enterprise grant extension had not been approved and that the Program would be ending on September 29, 2006.

8.    At the very end of August 2006, I was notified by ADECA that a no-cost extension had been approved, but only for a six-month period. ADECA instructed Easter Seals to design and prepare a proposed budget based on the anticipated amount of remaining grant funds. Accordingly, I initially prepared a proposed budget which reflected salaries for two full-time Micro-Enterprise Specialists (*i.e.*, Ms. Jackson and Ms. Cooper), attached hereto as Exhibit B.

I declare under penalty of perjury the foregoing to be true and correct. Dated this 27ᵗʰ day of February, 2008.

3

Susan McKim

# EXHIBIT A

OFFICE OF THE GOVERNOR

**BOB RILEY**
GOVERNOR



**STATE OF ALABAMA**

OFFICE OF WORKFORCE DEVELOPMENT

**DR. TIM ALFORD**
DIRECTOR

August 11, 2006

Mr. Larry Lewis, Administrator
Easter Seals Central Alabama
2125 East South Boulevard
Montgomery, Alabama 36116

Dear Mr. Lewis:

This is to inform you that the Customized Employment contract, which is funded through the Customized Employment Grant from US Department of Labor (US DOL), Office of Disability Employment Policy, will be ending at the close of business on September 29, 2006. Earlier this year, we requested a twelve-month extension from US DOL so that the grant could continue through September 2007; however, we have not received a response to our request for the grant extension. Therefore, we must close the customized employment demonstration programs and all participants will need to be transferred to other available programs and/or services or exited out of services completely. The case management files for these participants will need to be retained by your agency for a period of 6 years.

Final invoices will need to be submitted no later than October 31 so that we are able to closeout funds within ninety (90) days. Regular invoices should be submitted as soon as possible and if your agency is not current with their invoicing please ensure that your regular monthly invoices are brought up to date within thirty (30) days of this letter.

Property items purchased with customized employment funds should have been properly tagged and paperwork completed and will be retrieved within thirty (30) days of the end of the program. Should you wish to keep this equipment, you will need to send a written request to Dr. Ken Hollingsworth at 401 Adams Avenue, P O Box 5690, Montgomery, Alabama 36103-5690.

A final report will need to be submitted to Tammy Farmer no later than October 31 and include updated information on current and former participants, highlights of your demonstration program, lessons learned, accomplishments, partnerships that were developed, and any other information regarding your program.

I want to thank you and your staff on a job well done and for the dedication shown to this demonstration program and its participants over the past four years. The program has been a wonderful success because of your staff's involvement and commitment to these participants and their well-being. Should you have any questions regarding the program and its closure, please let me know.

Sincerely,

Steve Walkley, Division Director
Workforce Development Division

# EXHIBIT B

BUDGET SECTION
COVER SHEET

SUBRECIPIENT'S NAME AND ADDRESS:

**Easter Seals Central Alabama**

**2125 East South Blvd**

**Montgomery, Alabama 36116**

NAME/ADDRESS OF FISCAL AGENT (IF DIFFERENT)

AGREEMENT NO: _____

MODIFICATION NO: _____
(if applicable)

FEDERAL ID NO:     **63-0435761**

BEGINNING DATE:     **9/30/2006**

ENDING DATE:     **3/29/2007**

MOD. EFFECTIVE DATE: _____

| | Amount Approved | Adjustment Increase | Adjustment Decrease | Revised Amount |
|---|---|---|---|---|
| Administration | | | | $          - |
| Program | $89,752.82 | | | $     89,752.82 |
| Rapid Response | | | | $          - |
| Other: | | | | $          - |
| Other: | | | | $          - |
| Other: | | | | $          - |
| Other: | | | | $          - |
| **TOTAL CONTRACT** | $     89,752.82 | $       - | $       - | $     89,752.82 |

E-1

**Customized Employment Budget**
Subrecipient's Name/Address:

| | |
|---|---|
| Agreement/Project No: | |
| Modification No.: | |
| Federal ID No: | 63-0435761 |
| Contact Person: | Susan McKim |
| Telephone No.: | 334-288-0240 |
| Agreement Period: | 09/39/2006-03/31/2007 |
| Date: | |
| County Code(s) for this activity | 101 |
| House District(s) for this activity | 73 |
| Senate District(s) for this activity | 25 |

**B.**  **Program Costs (Items 1-14)**

| | | AMOUNT APPROVED | INCREASE | DECREASE | REVISED AMOUNT |
|---|---|---|---|---|---|
| B.1. | Staff Salaries (Itemize/Show %) | | | | |
| | Microenterprise Spec(2) | 31,720.56 | | | 31,720.56 |
| | Program Support Personel | 7,599.19 | | | 7,599.19 |
| | (See Breakdown) | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | **TOTAL SALARIES:** | $ 39,319.75 | $ - | $ - | 39,319.75 |
| B.2. | Total Staff Fringe Benefits | | | | - |
| | | $ 11,759.14 | $ | $ | 11,759.14 |
| | | | | | - |
| B.3. | Staff Travel (Itemize on backup) | | | | - |
| | In-State | 3,500.00 | - | | 3,500.00 |
| | Out-of-State | | - | | - |
| | **TOTAL TRAVEL** | $ 3,500.00 | $ - | $ - | 3,500.00 |
| B.4. | Facilities (Include rent, utilities, maint. for rental space and show cost per square ft. on backup) | $ 6,588.75 | $ | $ | 6,588.75 |
| | | | | | - |
| B.5. | Communications (telephone, internet,etc.) | $ 1,750.00 | $ | $ | 1,750.00 |
| | | | | | - |
| B.6. | Office Supplies (include postage, software, desktop supplies, etc.) | $ 4,300.00 | $ - | $ | 4,300.00 |
| | | | | | - |
| B.7. | Books & Training/Teaching Aids | $ 1,500.00 | $ - | $ | 1,500.00 |
| B.8. | Equipment (Itemize on backup) | $ | $ - | $ | - |
| | | | | | - |
| B.9. | Other: Specify | $ | $ | $ | |
| | Copier Service, Lease, Connection & Repairs | 2,000.00 | | | 2,000.00 |
| | Audit(Yellow Book and Single) | 3,385.18 | - | | 3,385.18 |
| | Evaluations | 7,500.00 | | | 7,500.00 |

| | | | | | |
|---|---|---|---|---|---|
| Area Meeting Expenses | 500.00 | | | | 500.00 |
| Professional Membership Dues | 750.00 | | | | 750.00 |
| Staff Development | 1,000.00 | | | | 1,000.00 |
| Business Insurance | 1,400.00 | | - | | 1,400.00 |
| Program Evaluation Assessment | 4,500.00 | | - | | 4,500.00 |
| | $ | | | # | - |
| | | $ | $ | | - |
| | | | - | | - |
| | | | | | - |
| | | $ | $ | | - |
| | | | | | - |
| **Total Other** | **21,035.18** | | - | - | # | **21,035.18** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| B.10. | Payment of ITA's | $ | $ | $ | | - |
| B.11. | | $ | $ | $ | | - |
| B.12. | | $ | $ | $ | | - |
| B.13. | | $ | $ | $ | | - |
| B.14. | | | | | | - |
| | | - | | | | - |
| | | $ | $ | $ | | - |
| | | $ | $ | $ | | - |
| | | $ | $ | $ | | - |
| | | $ | $ | $ | | - |
| | | $ | $ | $ | | - |
| | **Total** | $ | - | $ | - | $ | - | - |
| **TOTAL** | Program (1-14) | $ | **89,752.82** | # | - | # | - | # | **89,752.82** |
| | Rapid Response (1-14) | | | | | | |
| | Other (1-14) | | | | | | |

WDD 6/00

**BUDGET BACKUP**

Agreement/Project No: _____

Modification No.:   1 _____

COST CATEGORY:   Administration _____

       Program Costs   X

       Rapid Response _____

| Line Item No:   B1 | AMOUNT APPROVED | ADJUSTMENT INCREASE | DECREASE | REVISED AMOUNT |
|---|---|---|---|---|
| **Microenterprise Spec(2)** | | | | |
| 1,242.56X13X100%(Cassandra Cooper) | 16,153.36 | - | | 16,153.36 |
| 1,197.77X13X100%(Jackson) | 15,567.20 | | | 15,567.20 |
| | | | - | - |
| **Program Support** | | | | |
| McKim (2260.45X13X20%) | 5,877.17 | | - | 5,877.17 |
| Jarret (1655.79X13X.08) | 1,722.02 | | | 1,722.02 |
| | | | | - |
| | | | | - |
| | | | | - |
| **Total** | 39,319.75 | - | - | 39,319.75 |
| | - | | | - |
| | | | | - |
| | | | | |
| **Total** | 39,319.75 | - | - | 39,319.75 |

| Line Item No:   B2 | AMOUNT APPROVED | ADJUSTMENT INCREASE | DECREASE | REVISED AMOUNT |
|---|---|---|---|---|
| FICA(7.65%) | 3,236.51 | | - | 3,236.51 |
| | | | | - |
| Health Ins. Spec(Single 228.20MO, Family 414.00per mo) | 1,369.20 | | | 1,369.20 |
| | | | | - |
| SUI(1.5% of 8,000 ea person) | 353.99 | | - | 353.99 |
| Life Ins.-Micr. Ent Spec. | 140.00 | | - | 140.00 |
| Life Ins. Suppor Per | 50.00 | | | 50.00 |
| LTD Spec. | 120.00 | | - | 120.00 |
| LTD Support | 40.00 | | - | 40.00 |
| Retirement(7.50% of Salaries only) | 2,948.98 | | - | 2,948.98 |
| Cteria Plan | 100.00 | | | 100.00 |
| | | - | | - |
| Workers Comp(@1.05%) | 412.86 | | - | 412.86 |
| **Leave** | | | | - |

Jackson/ESCA
0015

| | | | | |
|---|---|---|---|---|
| Cooper( 100 hr @ 15.53per hr | 533.00 | | - | 533.00 |
| Jackson (60 hr. @ 14.96 per hr.) | 594.00 | | - | 594.00 |
| )ave Support Personnel | | | | - |
| McKim(60hr@28.26) | 1,695.60 | - | | 1,695.60 |
| Jarrett(7hr@23.58) | 165.00 | | - | 165.00 |
| | | | - | - |
| | | | - | - |
| | | - | | - |
| | | - | | - |
| **Total** | **11,759.14** | - | - | **11,759.14** |

**Budget Backup**

Agreement/Project No: _____

Modification No.: _____

**COST CATEGORY:** Administration _____

Program Costs    X _____

Rapid Response _____

| | AMOUNT | ADJUSTMENT | | REVISED |
|---|---|---|---|---|
| | **APPROVED** | **INCREASE** | **DECREASE** | **AMOUNT** |
| Line Item No:    B3 | | | | |
| In-State Travel and Conferences | 3,500.00 | | | 3,500.00 |
| | | - | | - |
| | - | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | - | | | - |
| **Total** | **3,500.00** | - | - | **3,500.00** |

| | AMOUNT | ADJUSTMENT | | REVISED |
|---|---|---|---|---|
| | **APPROVED** | **INCREASE** | **DECREASE** | **AMOUNT** |
| Line Item No:    B4 | | | | |
| Facilities | | | | |
| 1506Sq ft @ 8.75 | 6,588.75 | | | 6,588.75 |
| | | | | - |
| | - | | | - |
| **Total** | **6,588.75** | - | | **6,588.75** |

| | AMOUNT | ADJUSTMENT | | REVISED |
|---|---|---|---|---|
| | **APPROVED** | **INCREASE** | **DECREASE** | **AMOUNT** |
| Line Item  No:    B5 | | | | |
| Telephone | 1,000.00 | | | 1,000.00 |
| Network Support | 750.00 | | | 750.00 |
| | | | | - |
| | - | | | - |

| | AMOUNT | ADJUSTMENT | | REVISED |
|---|---|---|---|---|
| | | INCREASE | DECREASE | |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | - | | | - |
| | - | | | - |
| **Total** | **1,750.00** | - | - | **1,750.00** |

| Line Item No: B6 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|
| | | INCREASE | DECREASE | |
| Office Supplies | 1,800.00 | - | | 1,800.00 |
| | | | | - |
| Copying | 1,000.00 | | | 1,000.00 |
| Postage | 1,500.00 | | | 1,500.00 |
| | - | | | - |
| | - | | | - |
| | - | | | - |
| | - | | | - |
| | - | | | - |
| | - | | | - |
| **Totals** | **4,300.00** | - | - | **4,300.00** |

**Budget Backup**

Agreement/Project No: _____

Modification No.: _____

COST CATEGORY:  Administration _____

Program Costs  X _____

Rapid Response _____

| Line Item No: B7 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|
| | | INCREASE | DECREASE | |
| Books, Software, Training & Supplies | 1,500.00 | - | | 1,500.00 |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| **Total** | **1,500.00** | - | - | **1,500.00** |

**Equipment**

| Line Item No: B8 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|
| | | INCREASE | DECREASE | |

Jackson/ESCA
0017

| | | | |
|---|---|---|---|
| | - | - | - |
| | - | - | - |
| | - | | - |
| **Total** | - | - | - | - |

| Line Item No: | B9 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|---|
| | | | INCREASE | DECREASE | |
| Copier Service, Lease, Connection and Repairs | | 2,000.00 | | | 2,000.00 |
| Audit(Yellow Book and Single) | | 3,385.18 | | | 3,385.18 |
| Evaluations 15@500.00 | | 7,500.00 | | | 7,500.00 |
| Area Meeting Expense | | 500.00 | - | | 500.00 |
| Professional Membership Dues | | 750.00 | - | | 750.00 |
| Staff Development | | 1,000.00 | | | 1,000.00 |
| Business Insurance | | 1,400.00 | | | 1,400.00 |
| Program Evaluation Assessment | | 4,500.00 | | | 4,500.00 |
| | | | - | | - |
| | | | - | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| | | | | | - |
| **Total** | | 21,035.18 | - | - | 21,035.18 |

| Line Item No: | B12 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|---|
| | | | INCREASE | DECREASE | |
| | | | | | - |
| | | | | | - |
| | | | | | - |

**Budget Backup**

Agreement/Project No: _____

Modification No.: _____

**COST CATEGORY:**  Administration _____

Program Costs   X _____

Rapid Response _____

| Line Item No: | B13 | AMOUNT APPROVED | ADJUSTMENT | | REVISED AMOUNT |
|---|---|---|---|---|---|
| | | | INCREASE | DECREASE | |
| | | | | | |
| | | | | | - |

Jackson/ESCA 0018

| Line Item No:   B14 | AMOUNT APPROVED | ADJUSTMENT INCREASE | DECREASE | REVISED AMOUNT |
|---|---|---|---|---|
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| | | | | - |
| **Total Indirect** | - | | | |
| **Totals** | 89,752.82 | - | - | 89,752.82 - |

Jackson/ESCA
0019