## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **EMILY JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 2:07cv315-MEF** |
| | ) | |
| **EASTER SEALS CENTRAL** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION (AND SUPPLEMENTAL MOTION) FOR SUMMARY JUDGMENT

Defendant, Easter Seals Central Alabama ("Easter Seals" or "Defendant"), hereby submits the following Response in Opposition to Plaintiff's Motion and Supplemental Motion for Summary Judgment. For the reasons set forth herein, Plaintiff's Motions for Summary Judgment are, as a matter of law, due to be denied.[1]

## I.    INTRODUCTION

As a preliminary matter, it is important to be clear as to what this case is and is not about.  As confirmed by the Court at its January 14, 2008 hearing, the only

---

[1] Moreover, for many of the reasons stated herein and the reasons set forth in Easter Seal's previously filed Motion for Summary Judgment, Easter Seals is entitled to summary judgment on Plaintiff's sole remaining claim.

remaining claim in this case is her claim of "wrongful termination" in violation of Title VII[2] – *i.e.*, that Easter Seals discriminated against her on the basis of her race and sex by not offering her a six-month, full-time position that became available after Plaintiff's last day of work.[3] Contrary to Plaintiff's allegations and arguments contained in her Motion(s) for Summary Judgment, there are <u>no</u> claims for breach of implied covenant of good faith and fair dealing, "breach of a mission statement", denial of opportunity to bid as an independent contractor[4] or disparate

---

[2] At the January 14, 2008 hearing held on Plaintiff's Emergency Motion to Restate Charges, the Court denied Plaintiff's efforts to add additional claims of pay discrimination and fraud. *See also,* Court Doc. 15; *Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1569 (11th Cir. 1987); *Murray v. John D. Archibold Memorial Hospital,* 50 F.Supp.2d 1368, 1380 (M.D. Ga. 1999) ("Absent some allegation of fact sufficient to put the defendant on notice of the nature and scope of the claim against it, the plaintiff is barred from asserting other types of claims in subsequent judicial proceedings that may bear some connection, however distinct, to the bare claim asserted in the EEOC charge.").

[3] Plaintiff testified as follows:

Q:    And throughout the deposition we've talked about your claims of gender discrimination, race discrimination and wrongful termination, right?

A:    Correct.

Q:    And those are really—when you're listing each of those claims, you're talking about the same event? You're talking about your separation from Easter Seals and being replaced with Bill Haynes, right?

A:    Correct.

Q:    So each of those claims, though you separated them, is really about the same instance, right?

A:    Correct.

(Jackson Dep. at p. 412)(Excerpts from Jackson's deposition cited herein are attached as Exhibit 1).

[4] First and foremost, contrary to Plaintiff's new allegations in her motions for summary judgment, there is no denial of opportunity to bid as an independent contractor claim at issue in this case. Additionally, as explained in its motion for summary judgment and herein, Easter Seals only contacted Mr. Haynes for Micro-Enterprise Specialist services after Plaintiff indicated that, at most, her only interest in working with the Program for the six-month period, was on a very limited part-time basis. At the time Ms. Cooper resigned, it is undisputed that Easter Seals anticipated that the needs of the Program would require at least one full-time Specialist (as it had previously been staffed with at least two full-time Specialists). The fact the number of hours Mr. Haynes ultimately spent working with the Program was less than what Easter Seals anticipated would be needed is entirely irrelevant to Plaintiff's newly purported claim because

treatment[5] (other than her alleged wrongful termination) at issue in this case.[6] As such, any claims or arguments not strictly limited to whether Easter Seals' decision, after Ms. Cooper resigned, to contract with an independent contractor (as opposed to "re-hiring" Plaintiff) for the six-month extension period was motivated by Plaintiff's race or gender should be ignored entirely and dismissed as a matter of law.

## II.    STATEMENT OF FACTS

Prior to March 2007, one of the programs offered by Easter Seals was a Micro-Enterprises Program, which was designed to assist individuals with disabilities in starting their own businesses. (Supplemental Declaration of Debbie Lynn ("Lynn Supp. Decl.") at ¶ 3, attached hereto as Exhibit 2). The funding for

---

Easter Seals did not (and could not) have known this at the time it made the decision to fill Ms. Cooper's vacancy by contracting with Mr. Haynes.

Likewise, Plaintiff's newfound allegations that ADRS had credibility concerns about the Micro-Enterprises Program during Mr. Haynes' tenure are not only woefully inaccurate, but also entirely irrelevant. First, ADRS's complaints communicated to Mr. Haynes concerned the status of the Program under Plaintiff's watch (not Mr. Haynes). Second, even *if* the concerns had been about Mr. Haynes' performance (which they were not), those concerns could have occurred until *after* the decision at issue was made and, therefore, is totally irrelevant to the issues in this matter.

[5] Although Plaintiff claims that the Court previously granted her motion to amend her complaint to raise disparate treatment claims, that amended complaint dealt almost entirely with Plaintiff's alleged defamation claims. These claims were subsequently dismissed on August 22, 2007. The one paragraph in the "amended complaint" dealing with disparate treatment alleges only that Easter Seals (1) did not acknowledge her recommendations, (2) did not attend a family funeral on her behalf and (3) did not throw her a birthday party. As the Court is well aware, these allegations, even if true, could not form the basis of a disparate treatment claim because they are insufficient as a matter of law. *Doe v. DeKalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) ("Not everything that makes an employee unhappy is an actionable adverse action," otherwise "every trivial personnel action that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.").

[6] Clearly, Plaintiff is prohibited from seeking summary judgment on allegations, which have never even been articulated, much less sufficiently pled prior to seeking summary judgment.

the Program was based entirely on grant monies provided by the Department of Labor ("DOL") and administered by the Alabama Department of Economic and Community Affairs ("ADECA"). (*Id.*).

The Micro-Enterprises Program grant was originally staffed with one full-time Micro-Enterprise Specialist. (Declaration of Susan McKim ("McKim Decl.") at ¶ 2).[7] In approximately March of 2003, Cassandra Cooper (Black, female) was hired as the Program's Micro-Enterprise Specialist. (*Id.*). When the Micro-Enterprises Program was expanded throughout the State and intensified its emphasis in the Talladega area (home of the Alabama Deaf and Blind Institute), Plaintiff was hired as a second full-time Micro-Enterprise Specialist. (*Id.*; Deposition of Emily Jackson ("Jackson Dep.") at p. 144). Around this time, Easter Seals also began contracting with Bill Haynes, an independent contractor located in the Talladega area, for Micro-Enterprise Specialist services in the Talladega area.[8] (McKim Decl. ¶ 3). Mr. Haynes was chosen for the position because of his extensive experience in working with the deaf and blind and their unique business development needs. (*Id.*).

---

[7] Susan McKim's Declaration and Exhibits attached thereto have been previously filed with the Court in support of Easter Seals' Motion and Brief in Support of Summary Judgment.

[8] The following fiscal year, ADECA informed Easter Seals that it did not have enough grant money to continue to fund all of the newly extended Program. (McKim Decl. at ¶ 4). Since providing blind individuals with self-employment services was a very labor intensive endeavor, the Program, through Mr. Haynes, was not able to serve more than a few individuals at a time. (*Id.*). Consequently, the Talladega specific component of the Program (primarily focusing on serving the blind) was eliminated. (*Id.*). Nonetheless, Ms. Cooper and Plaintiff retained their positions as full-time Micro-Enterprise Specialists. (*Id.*).

In April 2006, Dr. Susan McKim, Easter Seals' Grants Developer, received a letter from ADECA indicating that the DOL had cut funding for the Micro-Enterprise grant. (McKim Decl. at ¶ 5). ADECA also told Easter Seals that it was attempting to get a "no-cost" grant extension to fund the Program. (*Id.*). Upon receiving ADECA's letter, Dr. McKim shared this information with Plaintiff and Ms. Cooper. (Jackson Dep. at pp. 302-303; McKim Decl. at ¶ 6). At that time, ADECA and Easter Seals believed that, if the request for a no-cost extension was granted, the remaining funds would allow the Micro-Enterprises Program to continue for another year. (*Id.*).

On August 11, 2006, Larry Lewis, Easter Seals' Administrator, received another letter from ADECA indicating that the Micro-Enterprise grant extension has not been approved and that the Program would be ending on September 29, 2006. (McKim Decl. at ¶ 7, Ex. A thereto). After receiving this letter, Mr. Lewis notified Plaintiff and Ms. Cooper that, despite its efforts, ADECA had apparently been unable to secure a no-cost extension and, therefore, the Micro-Enterprises Program and Plaintiff's and Ms. Cooper's employment with Easter Seals would officially end September 29, 2006. (Jackson Dep. at p. 312; Ex. 6 thereto).

At the very end of August 2006, Dr. McKim was notified by ADECA that a no-cost extension had been approved, but only for a six-month period. (McKim Decl. at ¶ 8). ADECA instructed Easter Seals to design and prepare a proposed

budget based on the anticipated amount of remaining grant funds. (*Id.*).
Accordingly, Dr. McKim initially prepared a proposed budget which reflected
salaries for two full-time Micro-Enterprise Specialists (*i.e.*, Plaintiff and Ms.
Cooper). (*Id.*, Ex. B thereto).[9]

On August 21, 2006, Debbie Lynn assumed the position of Administrator
for Easter Seals. (Lynn Supp. Decl. at ¶ 2). Although ADECA had recently notified
Easter Seals that it had been awarded a six-month, no-cost extension, at this time
Easter Seals was still uncertain what the final budget for the six-month extension
would look like. (Lynn Supp. Decl. at ¶ 5). Nonetheless, Easter Seals (including
Ms. Lynn) fully intended, if at all possible, to structure its grant funds so as to
retain both Plaintiff and Ms. Cooper as full-time Micro Enterprise Specialists for
the extension period, if they chose to stay with the Program. (*Id.*).

On September 11, 2006, Plaintiff submitted a letter to Ms. Lynn stating that
she had received the August 11 memo from Mr. Lewis explaining that September
29, 2006 would be the end of the Program and her employment with Easter Seals.[10]

---

[9] The budget was revised, amended and submitted to ADECA in draft form several times before it was
officially finalized and attached to the Sub-Recipient Grant Agreement executed on March 23, 2007.
(Lynn Supp. Decl. at ¶ ¶ 5, 12).

[10] During her deposition, Plaintiff explained the reason she wrote this letter:

Q:    Why did you write this letter to Ms. Lynn?

A:    I wrote this letter to Ms. Lynn to congratulate her on her new position. That was one of the
reasons. Probably the last reason why. I wanted to make sure I congratulated her on her position
at Easter Seals and to use annual leave for my last four days at Easter Seals and to let her know
that I received this letter stating that the program had ended and that that was August 15th. And

(Jackson Dep. at p. 323; Ex. 7 thereto; Lynn Supp. Decl. at ¶ 6).  In this letter, Plaintiff expressed her "appreciation and gratitude to Easter Seals for implementing the ACE Micro-Enterprises Program and for hiring [her] as a Micro-Enterprise Specialist." (Jackson Dep. at p. 323; Ex. 7 thereto).  Additionally, Plaintiff's letter explained that she needed "time to transition to a new career" and, therefore, was requesting leave from September 26-29 – making her last day at work September 25. (*Id.*)  Plaintiff also used this letter to praise and congratulate Ms. Lynn as follows:

> "Congratulations on your new position as Easter Seals Central Alabama Administrator.  My prayers and thoughts will be with you as you take on new challenges ahead.  Also, I admire your courage and your autonomous leadership style, and I wish I could have had the opportunity to work with you.  Take care and God Bless."

(*Id.*)

On September 12, Ms. Lynn met with Plaintiff and Ms. Cooper and informed them that a no-cost grant extension had been granted, but that it was only

---

so here it was September 11th and I hadn't been notified anything differently other than that the program was going to end.

And I wrote her that letter to let her know that I had this letter and that I, you know – I hadn't been given any other opportunities at Easter Seals to stay.  No one had told me that there's a job for me here.  So I asked to have some – instead of working the last four days of my employment, I wanted to use vacation time.

(Jackson Dep. at pp. 325-326).

Q:     So at the time you wrote this September 11th letter, you hadn't applied or expressed any interest in any other positions at Easter Seals; is that correct?

A:     I hadn't asked anybody about any positions at Easter Seals.

(*Id.* at p. 330).

for six-months (as opposed to the anticipated one-year extension). (Jackson Dep. at pp. 352-353; Lynn Supp. Decl. at ¶ 7). After sharing this news with them, Ms. Lynn asked whether or not they planned to stay with the Program for the six-month period. (Lynn Supp. Decl. at ¶ 7). Ms. Cooper stated that she wanted to remain with the Program. (*Id.*). Plaintiff, on the other hand, indicated that she would like the arrangement detailed in her September 11 letter to Ms. Lynn to stand – *i.e.,* she would not remain with the Program for the extension, her last day of work would be September 25, and she would take paid leave for the days September 26-29. (*Id.*). As a result, Ms. Lynn clearly understood that Plaintiff was "resigning" effective September 29. (*Id.*). At no time during this meeting (or at any other time) did Plaintiff ever suggest to Ms. Lynn that she was interested in remaining with the Program as a full-time employee for the six-month extension period. (Jackson Dep. at p. 354; Cassandra Cooper Dep. at p. 122[11]; Lynn Supp. Decl. at ¶¶ 7, 17).

Additionally, during this September 12 meeting, Ms. Cooper and Plaintiff informed Ms. Lynn that they had started their own independent consulting businesses. (*Id.* at ¶ 8). In response, Ms. Lynn expressed concerns regarding the potential for conflicts to arise because the services they were offering as

---

[11] Excerpts from Cassandra Cooper's deposition cited herein are attached as an Exhibit in support of Defendant's Brief in Support of its Motion for Summary Judgment previously filed with the Court.

independent consultants were the same services Easter Seals had hired them to perform for its clients for free.[12] (*Id.*)

At some point after the meeting, Plaintiff approached Ms. Lynn and expressed a possible interest in remaining with the Program on a part-time basis – ½ days, 2 days a week. (Lynn Supp. Decl. at ¶ 9). Ms. Lynn responded that she did not know whether that would work, but that she would look into it and let Plaintiff know. (*Id.*). After discussing Plaintiff's part-time proposal with Dr. McKim, Ms. Lynn determined that based on the anticipated schedule and needs of the Program (*e.g.,* full day workshops, need for timely responses to client questions/needs, etc.), Plaintiff's part-time proposal would not be effective or satisfactory for the Program as envisioned at that time. (*Id.* at ¶ 10). Consequently, based on their discussions in the September 12 meeting, Ms. Lynn drafted a letter to Plaintiff confirming her resignation of the full-time Micro-Enterprise Specialist position. (*Id.*).

On or about September 18, Ms. Lynn met with Plaintiff and informed her that her part-time proposal (½ days, 2 days a week) was not really workable/effective for the Program's six-month extension and gave her the letter confirming Easter Seals' acceptance of her resignation. (*Id.* at ¶ 11). After

---

[12] Furthermore, Easter Seals' employee policies prohibit any employee from accepting or engaging in outside employment without clearance and approval from his/her supervisor. (Lynn Supp. Decl. at ¶ 8, Ex. A thereto).

reviewing the letter, Plaintiff explained that, if the letter reflected that she had resigned her position, she would be ineligible to collect on an unemployment insurance policy that she had recently purchased.[13] (*Id.*).    Solely in an effort to assist Plaintiff,[14] Ms. Lynn re-wrote the letter to reflect that her position had been eliminated due to budget cuts – which was accurate to the extent that, prior to being awarded the grant extension, the entire Program was going to be ended due to the DOL's budget cuts, the Program was only extended on a limited basis and, if Plaintiff did not stay, her position would not be filled (*i.e.,* "eliminated"). (*Id.*).

At the September 18 staff meeting, Ms. Lynn informed the staff that the Micro-Enterprises Program would be extended for six-months, Ms. Cooper would remain with the Program for the extension period and that a going-away party had been scheduled for Plaintiff. (*Id.* at ¶ 12).    Easter Seals also amended its proposed budget to reflect only one full-time Micro-Enterprise Specialist–Cassandra Cooper. (*Id.*).

On September 25 (Plaintiff's last day of actual work), Ms. Cooper, without forewarning, resigned her full-time Micro-Enterprise Specialist position. (*Id.* at ¶ 13). Plaintiff conceded that, some time prior to September 25, Ms. Cooper told

---

[13] Contrary to Plaintiff's assertion in her motion that Easter Seals was somehow liable for benefits under this policy, this was a privately purchased unemployment insurance policy – not a claim for state unemployment benefits, which Plaintiff was ineligible for because she was already receiving Social Security Disability benefits. (Jackson Dep. at p. 414)

[14] Ms. Lynn had previously told both Plaintiff and Ms. Cooper that, if she could be of any help to them, they should let her know. (Jackson Dep. at p. 341).

Plaintiff that she had changed her mind and was going to resign the full-time Micro-Enterprise Specialist position with Easter Seals because of the potential conflict with the private consulting business she (like Plaintiff) had started. (Jackson Dep. at pp. 379, 381).

After Ms. Cooper's abrupt resignation, Easter Seals had less than four days to solve its staffing crisis before the grant extension was scheduled to begin. (Lynn Supp. Decl. at ¶ 14). The Micro-Enterprises Program needed a qualified individual who was familiar with the Program and the needs of its clients, available on four days notice to fill a full-time position, and interested in accepting a position for only six-months. (*Id.*). Based on Ms. Lynn's previous conversations with Plaintiff, she understood that Plaintiff was, at most, only interested in part-time work with the Program and, therefore, not a viable candidate for or interested in the new full-time vacancy. (*Id.*).

Moreover, Plaintiff never expressed any interest in the vacant full-time position at this time, even though she knew with certainty during (and even before) this time that the grant extension provided for at least one Micro-Enterprise Specialist and that Ms. Cooper had resigned that position:

> Q:    You knew prior to Ms. Cooper submitting her resignation that she was likely going to resign her position, right?
>
> A:    Correct.

Q:    And you don't know what time it happened on the 25th, but you know
      that she submitted her resignation on the 25th, right?

A:    Correct.

Q:    And that was your last day of work, right?

A:    Correct.

Q:    And so from the day she submitted it on the 25th, you knew that, <u>one</u>,
      the Program had been extended for six months?

A:    Correct.

Q:    <u>Two</u>, there was funding for at least one Micro-Enterprise position?

A:    Correct.

Q:    And, <u>three</u>, the person who had the position was no longer going to
      fill it, right?

A:    Correct.

(Jackson Dep. at pp. 385, 387-389)(emphasis added).

Plaintiff even returned to Easter Seals on September 29 requesting that Ms.

Lynn sign an unemployment insurance claim form for the policy that she had

recently purchased. (Jackson Dep. at pp. 389-390).  Per Plaintiff's request, Ms.

Lynn signed the form otherwise completed entirely by Plaintiff.[15] (*Id.* at p. 390).

---

[15] Plaintiff completely fails to mention that her attempts at collecting on this policy were ultimately unsuccessful due to her misrepresentations that she was eligible for coverage because she was "not receiving, nor [] eligible to receive, disability benefits." The truth is that both at the time of her application and the time of her claim for benefits, Plaintiff was receiving disability benefits from the Office of Personnel Management, Social Security Administration and pursuing disability benefits from the Veteran's Affairs Department. *See* Exhibits 7 and 8 to Plaintiff's Motion for Summary Judgment and Jackson Dep. pp. 100-104, 110-111, 114-119.

Despite being at the office, knowing that Ms. Cooper had resigned and knowing

that the extension provided for a full-time Micro-Enterprise Specialist position,

Plaintiff never expressed any interest to Ms. Lynn (or anyone in management)[16]

regarding the vacant position:

> Q:   Now, on the 25th forward, did you ever contact Debbie Lynn about
>      filling that position as a full-time Micro-Enterprise Specialist?

> A:   No.

> Q:   When you got to Easter Seals to pick up your paycheck on the 29th
>      and Eileen Bennett told you Cassandra Cooper resigned, you already
>      knew that, right?

> A:   Right.
>
> . . .

> Q:   Did you ever ask to talk to Ms. Lynn when you were there?

> A:   No.

(Jackson Dep. at pp. 388-389).

---

[16] Plaintiff alleges that during her September 29 visit to Easter Seals' office to get her unemployment insurance claim form signed by Ms. Lynn, she asked the office secretary, Eileen Bennett, if the Program would continue since Ms. Cooper resigned and the secretary (allegedly) told her that it would not. (Jackson Dep. at p. 388). Even *if* Plaintiff's allegations regarding this conversation were true, there is absolutely no evidence that the office secretary had any decision-making authority regarding the Micro-Enterprises Program. Additionally, Plaintiff's testimony is clear that, although she knew that Ms. Cooper had resigned and created a vacancy, the purpose of her visit on September 29 was to pick up her pay check and have Ms. Lynn sign her unemployment insurance claim form – not to get a job. (Jackson Dep. at pp. 388-390). Moreover, admittedly Plaintiff never once asked Ms. Lynn (or anyone else in management) about the vacancy. (*Id.*). In fact, the only question she (allegedly) asked the secretary was whether or not the Program would continue since Ms. Cooper had resigned – a clear indication that she knew that the Program could only continue if Easter Seals filled the Specialist vacancy created by Ms. Cooper's resignation.

Ms. Lynn, entirely unaware that Plaintiff had any interest in a full-time position for the six-month extension,[17] followed up on Dr. McKim's suggestion of contacting Mr. Haynes, who Easter Seals had previously contracted with for Micro-Enterprise Specialist services in the Talladega area, to see if he was interested and available to help. (Lynn Supp. Decl. at ¶ 14). When Easter Seals contacted Mr. Haynes and explained the immediate needs of the Program, he responded that he could provide the services needed through March 2007 (the extension period) as an independent contractor. (*Id.* at ¶ 15). Mr. Haynes then presented Easter Seals with a six-month contract for his services, which Easter Seals accepted. (*Id.*). After contracting with Mr. Haynes, Easter Seals, again, modified its proposed budget covering the Program's grant extension period. (*Id.*).

Again, it is entirely undisputed that had Ms. Lynn known, prior to contracting with Mr. Haynes, that Plaintiff was interested in the full-time position vacated by Ms. Cooper, Ms. Lynn would have offered Plaintiff the position. (*Id.* at ¶¶ 16, 17).

## III.    ARGUMENT

### A.    Genuine Disputes of Material Fact Prohibit Summary Judgment in Plaintiff's Favor

---

[17] Based on her conversations with Plaintiff, Ms. Lynn believed that Plaintiff was only interested in part-time work with the Program due to her desire to focus on her personal consulting business. (Lynn Supp. Decl. at ¶ 7, 17; Jackson Dep. at pp. 354, 368-369, 370, 372, 388). Plaintiff admits that she has no information or evidence as to what the decision-maker understood the facts to be when the decision was made to contract with Mr. Haynes, or what went into the decision. (Jackson Dep. at pp. 390-392, 394-395).

The genuine disputes of material fact, detailed (and highlighted) in Plaintiff's motions, clearly preclude a finding of summary judgment in her favor. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is only appropriate when there is no genuine issue of material fact supporting the moving party's argument(s) and the moving party is entitled to judgment in its favor as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-28 (1996).

The following are some examples of such genuine issues of material fact that Plaintiff relies on in support of her motions:[18]

- Plaintiff alleges that she was "wrongfully terminated." (Plft MSJ pp. 1, 2, 3, 8, 12, 13, 15, 16, 18, 19, 20). Easter Seals, on the other hand, denies that Plaintiff's separation from the full-time Micro-Enterprises Program was anything other than a voluntary resignation. (Lynn Suppl. Decl. at ¶7). More specifically, when Ms. Lynn asked Plaintiff in the September 12 meeting if she wanted to stay on full-time with the Program for the extension period, Plaintiff stated that she wanted the arrangements detailed in her September 11, 2006 letter to remain

---

[18] This is in no way meant to be an exhaustive list of all facts in dispute, but instead is limited to the highlighting some of the material disputes of fact which necessarily preclude a finding of summary judgment in Plaintiff's favor. Defendant reserves its rights to present all evidence supporting its defense if this matter proceeds to trial.

in effect – *i.e.,* she would not remain with the Program for the extension, her last day of work would be September 25, and she would take paid leave for the days of September 26-29. (*Id.*).

- Plaintiff alleges Ms. Lynn told her that the grant extension only allowed for one Micro-Enterprise Specialist. (Plft MSJ pp. 5, 6, 7). Ms. Lynn denies saying this. (Lynn Suppl. Decl. at ¶¶ 7-12). To the contrary, as of September 12, Easter Seals intended to retain both Ms. Cooper and Plaintiff on a full-time basis for the six-month period and the draft budget proposals prior to the September 12 meeting reflect Easter Seals' intentions in that regard. (*Id.* at ¶ 5; McKim Decl. at ¶ 8, Ex. B). It was only after Plaintiff indicated that she would not remain with the Program on a full-time basis that Easter Seals decided that it could continue the Program for six-months with only one Specialist and modified its budget accordingly. (*Id.* at ¶ 12).

- Plaintiff alleges that, after she reviewed Easter Seals' letter confirming her resignation, she told Ms. Lynn that she "did not resign" and Ms. Lynn responded "you are right." (Plft MSJ p. 7). Ms. Lynn denies that this exchange occurred and contends that she reworded Plaintiff's letter only after Plaintiff explained that, if the

16

letter reflected that she had resigned, she would be unable to collect on a private unemployment insurance policy that she had recently purchased. (Lynn Suppl. Decl. at ¶ 11). Therefore, Ms. Lynn re-wrote the letter solely in effort to assist Plaintiff in obtaining those benefits. (*Id.*). Moreover, had Plaintiff indicated an interest in filling the vacancy created by Ms. Cooper's subsequent resignation, she would have been offered the position. (*Id.* at ¶ 16).

- Plaintiff alleges that she was "replaced" by Mr. Haynes – a white, male. (Plft MSJ at pp. 2, 9, 13, 16, 20; *see generally,* Plft Suppl. MSJ). To the contrary, since Ms. Cooper said she would continue with the Program, Easter Seals never hired or contracted with anyone to fill Plaintiff's full-time Specialist position after she indicated she wanted the arrangements in her September 11 letter to stand. It was not until Ms. Cooper resigned that Easter Seals sought someone to fill that newly vacant full-time position. As such, it was Ms. Cooper's position, not Plaintiff's, which was filled by contracting with Mr. Haynes.


- Additionally, (although entirely irrelevant to the dispositive issues of her wrongful termination claim) Plaintiff appears to dispute that Mr.

Haynes' relationship with Easter Seals was that of an independent contractor. (Plft MSJ pp. 10, 11). Easter Seals adamantly denies Plaintiff's unfounded allegations based solely on her speculation and unsupported interpretations of Easter Seals' budgets submitted to ADECA and the tax documents reflecting monies paid to Mr. Haynes for his contractual services.

Since Plaintiff's motions for summary judgment are entirely premised on disputed facts, some of which are listed above, Plaintiff's request for summary judgment must be denied.

**B.    Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination[19]**

Even *if* the facts supporting Plaintiff's motions were free from disputes of material fact, Plaintiff would still not be entitled to summary judgment in her favor because she has failed to establish a *prima facie* case of discrimination applicable under these circumstances. Although Plaintiff attempts to (mis)characterize her claim as one for wrongful termination, her real complaint is that, once Ms. Cooper

---

[19] Obviously, Plaintiff's reliance on the Court's statement that "that Plaintiff has pled sufficient evidence to support her wrongful termination claim against defendant" is entirely irrelevant at the summary judgment stage. (Plft MSJ pp. 13, 18). The Court clearly made that finding in reference to Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

resigned, Mr. Haynes filled the newly created vacancy, not her. As such, Plaintiff's claim is entirely a "failure to select" claim.[20]

To establish a *prima facie* case of Title VII race or gender discrimination in a failure to select case, plaintiff must demonstrate that (1) she is a member of a protected minority; (2) she was qualified <u>and applied for the position</u>; and (3) she was rejected despite these qualifications. *Summerlin v. M&H Valve Co.,* 167 Fed. Appx. 93, 2006 WL 93131 (11th Cir. 2006); *Walker v. Mortham,* 158 F.3d 1177, 1185-87 (11th Cir. 1998). [21]

This case is a perfect illustration as to why the law absolutely requires that a plaintiff who knows of a vacant position "must make every reasonable attempt to convey his or her interest in the job to the employer before he or she may prevail in a discrimination claim." *Lockridge v. Board of Trustees of Univ. of Ark.,* 315 F.3d 1005, 1011 (8th Cir. 2003); *Smith v. J. Smith Lanier & Co.,* 352 F.3d 1342, 1345 (11th Cir. 2003)(per curiam)("a general interest in being rehired without submitting an application is not enough to establish a *prima facie* case of [] discrimination."). **"The 'application' requirement is designed to prevent imposition of civil rights liability on an employer for lacking sufficient clairvoyance and**

---

[20] Any allegation that Easter Seals discriminated against Plaintiff based on her race and sex by retaining Ms. Cooper on a full-time basis (and not Plaintiff) would be absurd and unfounded since both are African-American females.

[21] Again, Plaintiff's attempt to add new allegations and causes of action at the summary judgment stage is entirely inappropriate. Consequently, all claims, allegations and arguments contained in Plaintiff's Motions for Summary Judgment, other than her wrongful termination/failure to select claim, should be stricken.

**omniscience to divine an employee's unarticulated desire for a vacant job."** *Garrison v. Travel Centers of America,* 2005 U.S.Dist. LEXIS 41371, *45 (emphasis added) (S.D.Ala. July 20, 2005)(there is "no authority for the proposition that a civil rights plaintiff may sit on her hands and be excused from seeking out" a position of which she has notice). Title VII in no way requires an employer to approach or "attempt to persuade, wheedle or cajole" a plaintiff who is aware of a vacant position to apply for or otherwise express interest in being considered for said position. *Id.* at *48. Since Plaintiff has failed to establish (which she must) that she was interested in remaining full-time for the six-month extension and communicated this interest to the decision-maker, her motions are due to be denied.[22]

Here, Plaintiff had the opportunity to stay with the Program on a full-time basis for the six-month extension but declined that opportunity. (Lynn Supp. Decl. at ¶ 7). Moreover, Plaintiff was fully aware that Ms. Cooper (also a Black female) had initially decided to continue with the Program on a full-time basis. (Plft's Complaint at p. 2 of the EEOC Charge). However, Plaintiff, unlike Easter Seals, knew prior to Ms. Cooper's September 25 resignation that Ms. Cooper had changed her mind and was going to resign her full-time position. (Jackson Dep. at p. 385, 387-388) . Despite knowing that Ms. Cooper's position was going to be

---

[22] Moreover, Plaintiff's failure to establish a *prima facie* case entitles Easter Seals to summary judgment in its favor on Plaintiff's sole remaining claim.

vacant, Plaintiff never inquired with Ms. Lynn (or anyone in management) about the full-time vacancy resulting from Ms. Cooper's resignation. (*Id.* at 388-389; Lynn Supp. Decl. at ¶¶ 7, 16, 17). Not surprisingly, based on their discussion of September 12, Ms. Lynn had no idea Plaintiff was interested in remaining with the Program on a full-time basis. (Lynn Supp. Decl. at ¶¶ 7, 17). In fact, Ms. Lynn's undisputed testimony is that, if she had understood that Plaintiff was interested in filling the full-time position(s), Plaintiff would have been offered the position.[23] (*Id.* at ¶¶ 16, 17). Obviously, Plaintiff's initial decision not to remain with the Program on a full-time basis, plus, her later failure to apply for or otherwise express any interest in the newly vacant full-time Micro-Enterprise Specialist position precludes her, as a matter of law, from establishing a *prima facie* case of discrimination.

**B.    No Evidence Of Pretext**

Even assuming that Plaintiff could establish a *prima facie* case of discrimination (which she cannot), her claim still fails because she admits there is

---

[23] With no evidence that Plaintiff applied for or even expressed interest in the position, Easter Seals simply cannot be found liable under Title VII for its business decision to contract with Mr. Haynes for the services needed for the remainder of the Program. It is well established in the Eleventh Circuit that a Court's "role is to prevent unlawful [employment] practices, not to act as a super personnel department that second-guesses employers' business judgments." *Lee v. GTE Florida, Inc.,* 226 F.3d 1249, 1254 (11th Cir. 2000) citing *Simms v. Okla. Ex. rel. Dept. of Mental Health,* 165 F.3d 1321, 1330 (10th Cir. 1999); *see also Rowell v. BellSouth Corp.,* 433 F.3d 794, 798-99 (11th Cir. 2005)("[i]t by now is axiomatic that we cannot second-guess the business decisions of an employer"); *Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1361 (11th Cir. 199)(courts "are not in the business of adjudging whether unlawful discriminatory animus motivates a challenged employment decision."); *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)("Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.").

no evidence that Easter Seals' legitimate business reason for contracting with Mr. Haynes was pretext for unlawful race or sex discrimination.[24] Plaintiff testified as follows:

> Q:   But you don't have any evidence that [the decision to contract with Bill Haynes after Cassandra Cooper resigned] was motivated by race or sex? It's just what you were left with at the end of your analysis?
>
> A:   Correct.

(Jackson Dep. at p. 402).[25]

Easter Seals' legitimate business reason for contacting Mr. Haynes was Ms. Lynn's understanding and belief that Plaintiff was not interested in this full-time position. The fact that Plaintiff now claims to have wanted that position is entirely irrelevant, especially in light of her utter failure to make those desires known to Easter Seals once Ms. Cooper resigned.[26] As Easter Seals' previously noted in its'

---

[24] Further, "the heart of the pretext inquiry is not whether to employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332-33 (11th Cir. 1998).

[25] Further establishing the total lack of evidence supporting her claims, Plaintiff testified as follows:

> Q: As we sit here today, do you know why Easter Seals hired Bill Haynes to provide [services] to the Micro-Enterprise Program after Cassandra Cooper resigned?
> A: No, I don't.
> Q: Did you ever call or attempt to speak with anyone at Easter Seals at any time after you left regarding their decision to contract with Bill Haynes?
> A: No, I didn't.
> Q: Did you ever file a grievance with the personnel committee as provided for in the employee handbook with regard to your separation from Easter Seals?
> A: No, I didn't.

(Jackson Dep. at pp. 394-395; *see also* pp. 400-401).

[26] Additionally, it is undisputed that the decision-maker with regard to staffing the Micro-Enterprises Program for the six-month extension was Ms. Lynn. Consequently, the (unverified) racial makeup (for an

brief supporting its motion for summary judgment, the only relevant inquiry is the employer's understanding of the facts at the time the decision was made and, if the employer in good faith believed the reason(s) it relied on in making the challenged decision, then as a matter of law, the plaintiff's later attempts to refute the reason(s) are irrelevant. *See, e.g., footnote 19; see also, Roge v. NYP Holdings, Inc.*, 257 F. 3d 164, 169 (2nd Cir. 2001); *Valles-Hall v. Ctr. for Nonprofit Advancement*, 2007 U.S. Dist. LEXIS 22046 (Dist. Ct. D.C., March 12, 2007); *Droutman v. New York Blood Center*, 2005 U.S. Dist. LEXIS 42951 at * 27-*28 (E.D.N.Y. 2005); *Andy v. UPS,* 2003 U.S. Dist. LEXIS 25193 (E.D. Pa., Oct. 24, 2003).

In this case, it is entirely undisputed that, based on Plaintiff's previous expression of interest in part-time work only (and her admitted failure to express any interest in the position), Ms. Lynn did not believe (much less know) that Plaintiff was interested in the newly vacant <u>full-time</u> position at the time Ms. Lynn contacted Mr. Haynes.[27] Moreover, it is undisputed that, had Ms. Lynn known that Plaintiff was interested in the position, she would have definitely offered it to Plaintiff - thus solving the Program's staffing crisis and eliminating the need to

---

unknown period of time) of Easter Seals' staff and its Board of Directors (which had nothing whatsoever to do with the disputed decision) is entirely irrelevant to her sole remaining claim in this case.

[27] *See Elrod v. Sears Roebuck Company*, 939 F.2d 1466, 1470 (11th Cir. 1991)("no matter how mistaken the [] managers...our inquiry is limited to whether the employer gave an honest explanation of its behavior").

find someone else on short notice. (Lynn Supp. Decl. at ¶ 16). Since Easter Seals has presented undisputed evidence of its good faith belief that Plaintiff was not interested in the position and that it based its decision to contact Mr. Haynes on that belief, even assuming *arguendo* that that belief was mistaken, it cannot constitute pretext.

Finally, as explored in detail in Easter Seals' summary judgment motion, there is absolutely no evidence in this case that the decision-maker, Ms. Lynn, held any racial or gender-based animus towards Plaintiff (or any other employee).[28] In sum, there is absolutely no evidence suggesting that race or gender was a factor in filling the Micro-Enterprise Specialist position vacated by Ms. Cooper. The mere belief that, simply because Plaintiff is an African-American female, Ms. Lynn was in some way obligated to contact her about a vacancy (of which Plaintiff was fully aware and in which Ms. Lynn had no reason to believe Plaintiff was interested) is legally erroneous and entirely insufficient to demonstrate racial or gender animus.[29]

---

[28] For example, Plaintiff concedes that (1) she never heard Ms. Lynn or anyone at Easter Seals make any type of derogatory remark regarding African-Americans or females, (2) she has never seen any evidence of racial or gender bias on Ms. Lynn's part, (3) she has never had any type of concerns or complaints regarding Ms. Lynn and even wrote Ms. Lynn a letter complementing her leadership style, thanking her for the opportunities she had been given at Easter Seals, and wishing her the best. (Jackson Dep. at 323-324, 402-403, Ex. 7 thereto).

In addition to Plaintiff having no evidence of discrimination, her claims of race and gender discrimination are completely undermined by the fact that Ms. Cooper, the person initially remaining with the Program for the six-month period was, like Plaintiff, both African-American and female.

[29] Lacking any evidence that the decision to contract with an independent contractor for the purpose of allowing the Micro-Enterprises Program to continue for six months was in any way based on Plaintiff's

Since Plaintiff has entirely failed to demonstrate that Easter Seals' reasons for contracting with Mr. Haynes were pretexts for race or sex discrimination, her claims fail as a matter of law and her summary judgment motions are due to be denied.

## IV.    CONCLUSION

The only claim remaining in Plaintiff's Complaint is whether Easter Seals' decision to contract for the six-month extension with an independent contractor was motivated by Plaintiff's race or sex. For all of the reasons set forth above, Plaintiff's Motions for Summary Judgment must be denied and, Easter Seals previously filed Motion for Summary Judgment on Plaintiff's sole remaining claim should be granted.

Respectfully submitted,

*/s/ Robin A. Adams*
Stephen E. Brown
Robin A. Adams
Attorneys for Defendant

OF COUNSEL:
Maynard, Cooper & Gale, PC
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203

---

race or sex, Plaintiff is essentially asking this Court to <u>assume</u> that her race and/or sex were the reasons for the decision and to second-guess Easter Seals' employment and business decisions, which is not the Court's role or responsibility. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

(205) 254-1000
(205) 254-1999 (Fax)

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic filing and by U.S. Mail, postage prepaid and properly addressed, on this 19th day of March, 2008, to:

Emily C. Jackson
605 Wesley Drive
Montgomery, Al. 36111

/s/ Robin A. Adams
OF COUNSEL

# EXHIBIT  1

# American Court Reporting
## toll-free (877) 320-1050

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:07-cv315-MEF

EMILY JACKSON,
    Plaintiff,
vs.

EASTER SEALS CENTRAL ALABAMA,
    Defendant.


DEPOSITION TESTIMONY OF:
EMILY JACKSON


November 13, 2007
9:10 a.m.


COURT REPORTER:
Gwendolyn P. Timbie, CCR

**Page 3**

1  the parties may make objections and assign
2  grounds at the time of trial or at the
3  time said deposition is offered in
4  evidence, or prior thereto.
5     Please be advised that this is the
6  same and not retained by the Court
7  Reporter, nor filed with the Court.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 2**

S T I P U L A T I O N S

    IT IS STIPULATED AND AGREED by and
between the parties through their
respective counsel that the deposition of
EMILY JACKSON, may be taken before
Gwendolyn P. Timbie, Certified Court
Reporter and Notary Public, State at
Large, at the law offices of Maynard,
Cooper & Gale, Montgomery, Alabama, on
November 13, 2007, commencing at
approximately 9:10 a.m.
    IT IS FURTHER STIPULATED AND
AGREED that the signature to and the
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions.
    IT IS FURTHER STIPULATED AND
AGREED that it shall not be necessary for
any objections to be made by counsel to
any questions, except as to form or
leading questions, and that counsel for

**Page 4**

I N D E X

EXAMINATION BY:      PAGE NO:
Ms. Adams          7
Certificate        434

LIST OF EXHIBITS
EXHIBITS:        PAGE NO:
Defendant's 1     149
Defendant's 2     261
Defendant's 3     261
Defendant's 4     298
Defendant's 5     310
Defendant's 6     312
Defendant's 7     323
Defendant's 8     403

1 (Pages 1 to 4)

Page 97

1   the cancer center. Montgomery Cancer
2   Center.
3        Q.   And as long as you have your
4   treatments when your blood range is low --
5   platelet range is low, are there any
6   effects otherwise from either of these two
7   disorders?
8        A.   Well, they -- in order to give
9   me the treatment, they give me some type
10  of pain medication. I think it's called
11  Benadryl. It's to relax you before
12  they -- because the solution is thick. So
13  before they give it to you, they give you
14  an injection of Benadryl and some other
15  drug. I don't know the name of it.
16       Q.   Well, Benadryl is an
17  over-the-counter prescrip -- or
18  over-the-counter medication usually for
19  children or for allergies.
20       A.   No. This is for -- this is
21  intravenous. And it's two of them. And
22  they are to relax you.
23       Q.   So that's part of the process

Page 98

1   of getting the treatment, right?
2        A.   Right.
3        Q.   Is that you receive these two
4   drugs as part of the process for getting
5   the gamma globulin treatment. But when
6   your platelets are at their normal
7   count --
8        A.   They've never been at their
9   normal count since I had the bleeding
10  problem, but they're at a level where I
11  can function.
12       Q.   When they're at a level when
13  you can function, when you don't need this
14  intravenous treatment, do you have any
15  restrictions or limitations?
16  Doctor-prescribed restrictions or
17  limitations?
18       A.   No, ma'am. The treatments are
19  like six hours. So there are
20  restrictions, you know. When I go for the
21  treatment, they're -- they're four days
22  and they're six hours each. Six to eight
23  hours each. So I do have limitations.

Page 99

1   And when I was working, I would get a
2   doctor's statement whenever I had to have
3   those treatments.
4        Q.   But for day-to-day living
5   purposes, there's no restriction on --
6   your doctor has never given you a
7   restriction on how long you can stand or
8   how long you can sit; is that correct?
9        A.   Correct.
10       Q.   All right. We're talking
11  about the basis for your disability
12  benefits, and you told me about these two
13  blood disorders. Is there any other basis
14  for these disability benefits?
15       A.   I'm not sure. I know when I
16  was approved they didn't say we approved
17  you because of this particular one or the
18  other one. So I'm not sure what the basis
19  is.
20       Q.   Okay.
21       A.   I guess my medical records
22  would show that.
23       Q.   But you're not restricted from

Page 100

1   working by any doctor, right?
2        A.   Not anymore. Since April of
3   2004, I was released to return to work.
4        Q.   And even though you can work,
5   you still receive disability benefits?
6        A.   Yes. I'm able to receive --
7   with the postal service or the federal
8   retirement system?
9        Q.   Let's take them one step at a
10  time.
11       A.   Okay.
12       Q.   Because I think that you're --
13  you're receiving benefits from --
14  disability benefits from more than one
15  place, right?
16       A.   Correct.
17       Q.   Let's just stick with Social
18  Security for right now.
19       A.   Okay.
20       Q.   And then we'll pick up with
21  the office of personnel management.
22  Okay?
23       A.   All right.

25  (Pages 97 to 100)

# American Court Reporting
## toll-free (877) 320-1050

Page 101

1    Q.   So with Social Security, you
2  are able to work?  I mean, you're not
3  restricted from working from any doctor
4  right now, right?
5    A.   Correct.
6    Q.   And you haven't been since
7  April of 2004?
8    A.   Correct.
9    Q.   But you still receive these
10 benefits each month, right?
11   A.   That's correct.
12   Q.   How does that work?  Do you
13 report to the Social Security
14 Administration that you -- you're
15 employed?
16   A.   How it works -- initially,
17 I -- they told me that -- when I started
18 working at Easter Seals, they said that my
19 disability would be cut off after a
20 certain point.  And it would automatically
21 be cut off.  But I didn't know -- never
22 knew when that time was.
23       And then, when I had surgery and I

Page 102

1  was off for three months, I think that was
2  included in that -- in that time too.  But
3  I'm just not sure when they said that I
4  would -- I'm not sure the date that it was
5  going to stop.  But I did have a period of
6  time where I could work and receive Social
7  Security benefits.
8    Q.   During your employment with
9  Easter Seals, you had surgery, right?
10   A.   Correct.
11   Q.   And you had that for a
12 different reason.  You had that for a bone
13 degeneration issue?
14   A.   Correct.
15   Q.   And your understanding from
16 the Social Security Administration was,
17 when you went to work at Easter Seals, at
18 some point after accepting that
19 employment, your disability benefits were
20 going to end; is that correct?
21   A.   That's correct.  And that they
22 would notify me when that -- when that
23 would be.

Page 103

1    Q.   And did they end when you went
2  to go work for Easter Seals?
3    A.   No.
4    Q.   Do you know why they didn't
5  end?
6    A.   No.
7    Q.   Did you submit additional
8  paperwork or information to the Social
9  Security Administration regarding a claim
10 for disability benefits after you started
11 working at Easter Seals?
12   A.   Did I submit a claim?
13   Q.   Or any extra information --
14 additional information after you started
15 working at Easter Seals regarding
16 disability benefits from Social Security?
17   A.   When I came to Easter Seals, I
18 came under the Ticket to Work Program.  So
19 I had to notify them about -- I had to
20 send my medical records to them, and I had
21 to notify them whenever I was working or
22 if I had surgery or whatever.  So I
23 submitted that information to them.

Page 104

1    Q.   And was that the time -- at
2  that time when you were told that at some
3  point in the future your benefits -- your
4  Social Security benefits will end?
5    A.   No.  When I first started --
6  when I enrolled in the Ticket to Work
7  Program, they told me then.
8    Q.   But as I understand it, your
9  disability benefits never ended; is that
10 correct?
11   A.   That's correct.
12   Q.   And I guess what I was
13 interested in understanding is, when you
14 were diagnosed with a problem with your
15 hip -- or a bone disorder and a problem
16 with your hip and realized that you needed
17 surgery, did you submit additional
18 information to Social Security regarding
19 this?
20   A.   I may have, but I just
21 don't -- I don't remember whether I
22 submitted something to them or not.  I
23 don't remember.  But I did notify them

26  (Pages 101 to 104)

Page 109

1 was your enrollment, by the way? Do you
2 remember?
3     A. In the PASS?
4     Q. In the PASS program.
5     A. November 2006.
6     Q. You still get the same amount
7 of money that you would have received from
8 Social Security that you get at -- from
9 SSI instead of SSDI; is that correct?
10     A. I get both.
11     Q. You get both now because
12 you're under the PASS program. You get
13 SSI money with the check cut straight to
14 you to cover your living expenses, and you
15 get SSDI money which goes into an account
16 which you use for your personal business
17 like -- your independent business?
18     A. I get both of them directly --
19 direct deposited into my account, and I
20 have to transfer those funds into the
21 business account. So both of them come
22 into my personal account, and I have to
23 transfer the regular SSDI and the OPM

Page 110

1 retirement income into the business
2 account. So they still come to me in my
3 personal account, but I have to do a
4 transfer of those funds into the business
5 account.
6     Q. All right.
7     A. So they're not deposited
8 directly into the business account. I
9 have to make that transfer.
10     Q. And before signing up for the
11 PASS program, you weren't getting both
12 disability and Social Security income?
13 You were just getting disability from
14 Social Security, correct?
15     A. Before enrolling in the
16 program, I was not receiving SSI.
17     Q. Right. Okay. And probably,
18 for the record, we should go ahead and
19 talk about what OPM is right now. We've
20 been referencing it, and I know what
21 you're talking about. But just to keep us
22 straight, why don't you tell me what OPM
23 benefits are.

Page 111

1     A. That's the office of personnel
2 management. And when I was at the postal
3 service and I resigned, I filed for
4 disability income. I filed for disability
5 from the postal service, and that is my
6 income that I receive from OPM, the office
7 of personnel management.
8     Q. And are there some
9 restrictions on the work that you can do
10 while receiving disability retirement from
11 OPM?
12     A. The only restriction is that
13 when my income reaches an amount that's 80
14 percent of what I would currently be
15 making now. For example, if I was making
16 800 -- if I was making a thousand dollars
17 a year, once I -- my income reaches $800,
18 then I wouldn't qualify for OPM. If that
19 explains it.
20     So when I was at the postal service,
21 I was making $41,716 when I left. Right
22 now, currently, I probably would be making
23 $52,000. So 80 percent of 52,000, once my

Page 112

1 income reaches that amount, which is about
2 40-something thousand, then I would not
3 qualify for OPM.
4     Q. And that income would include
5 income from all sources, right? Not just
6 income from employment?
7     A. That income would be income
8 from -- they have restrictions on what
9 that income is. And I -- I gave you a
10 copy of that form, and it explained --
11 explains all -- what's covered under
12 there.
13     Q. You don't know any other
14 restrictions -- or you haven't had any
15 other conversations about what income is
16 to be offset against the 80 percent
17 threshold, have you? I mean, it's just --
18 it is what it is in that policy? You
19 don't know anything?
20     A. It's in that policy.
21     Q. You don't know anything
22 different?
23     A. I don't know anything

28 (Pages 109 to 112)

Page 113

1 different.
2    Q.    And based on some information
3 that you gave me, I understand that in
4 2006 you received $573 a month from 0PM
5 benefits; is that correct?
6    A.    That's correct.
7    Q.    And that changed in 2007. In
8 2007, you began receiving $587 a month
9 from OPM?
10    A.    I believe it changed. Every
11 year it either -- increases by a small
12 amount.
13    Q.    And you gave me your records
14 on what you're receiving for Social
15 Security disability income?
16    A.    Yes, I did.
17    Q.    Both in 2006 and in 2007,
18 right?
19    A.    Yes, I did. I believe you
20 have 2004, five, and six, my tax returns,
21 and you have my statements from 2007.
22    Q.    Earlier you made a reference
23 to a claim for benefits that you had filed

Page 114

1 with the Veterans Affairs department. Do
2 you remember that?
3    A.    I believe so.
4    Q.    You made a claim for
5 disability benefits with the department of
6 Veterans Affairs, correct?
7    A.    Yes, I did.
8    Q.    Do you remember when you first
9 made a claim with the Veterans Affairs
10 department for disability benefits?
11    A.    February of 2000.
12    Q.    And what was the basis for
13 your claim?
14    A.    The claim in February of 2000,
15 I believe it was bronchitis. There were
16 three: Bronchitis -- bronchitis, fibroid
17 tumors, and tuberculosis. I believe those
18 were the three claims.
19    Q.    And were you claiming that you
20 were disabled due to these conditions?
21    A.    I filed those claims in the
22 VA -- with the Veterans Affairs office.
23 If you've been in the military, you can --

Page 115

1 and you become ill, if that illness
2 occurred -- if the onset date was during
3 the time that you were in the military,
4 you can file that claim and be -- possibly
5 be eligible for VA benefits, because the
6 illness began during your active duty
7 time.
8    Q.    What kind of benefits would
9 you be eligible for?
10    A.    You would get compensation,
11 and you would get medical benefits. But
12 it would depend on the rating that you
13 would receive.
14    Q.    And you asked for a rating of
15 total disability, right?
16    A.    Not at that time.
17    Q.    When did you ask for a rating
18 of total disability?
19    A.    That was in -- I believe it
20 was 2002 or three. I'm not sure.
21    Q.    You initially filed your claim
22 in February of 2000, if I'm understanding
23 you correctly, and you had at least three

Page 116

1 things that you were alleging that you
2 were entitled to benefits for; is that
3 correct?
4    A.    That's correct.
5    Q.    And I think you told me
6 bronchitis, fibroid tumors, and my notes
7 say tuberculosis. Is that something you
8 just said?
9    A.    That's what I just said.
10    Q.    And then later you must have
11 amended your complaint in some way?
12    A.    Well, later that complaint
13 there went through some appeal processes,
14 and then I -- it was amended. Yes. I
15 believe there was -- not that it was
16 amended. But I went to my DAV officer,
17 and I was telling him the other problems
18 that I was having. And he got my military
19 medical records, and he saw that some of
20 the issues that I was having -- female
21 problems occurred when I was on active
22 duty. So he said, let's file these claims
23 and see if you qualify for disability

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1 income.
2    Q.   So you filed another claim?
3    A.   Yes.
4    Q.   And that one was for
5 disability based on individual
6 unemployability?
7    A.   Right.
8    Q.   And the things that you listed
9 included your hysterectomy, your
10 thrombocytopenia --
11   A.   And unemployability.
12   Q.   Did you also make a claim for
13 anxiety with depression?
14   A.   Yes.  That was one of them.
15   Q.   And then the Veterans Affairs
16 benefits board denied these claims,
17 correct?
18   A.   Correct.
19   Q.   Did you appeal their denial?
20   A.   They're still in appeal.
21   Q.   I couldn't tell that from the
22 information that you have, that you
23 provided me with.  So hopefully that will

Page 118

1 be in the information with the -- we
2 requested from the VA.
3       What about those -- what about the
4 denial are you appealing?
5    A.   It's in the -- the three are
6 in the appeals process, because my DAV
7 officer told me that the -- we were going
8 to continue the appeal and that, when the
9 answer came back, if they -- on the
10 unemployability.  That if -- if I was
11 approved, then at that point he would let
12 them know the period of time that I was
13 unemployed so that those benefits would
14 apply only to the period of time when I
15 wasn't working.
16   Q.   So if I'm understanding you
17 correctly, you're still appealing the
18 decision denying your benefits for total
19 disability due to individual
20 unemployability; is that correct?
21   A.   I believe that's still on
22 there, but I'm not sure if that's on
23 there.  If that's the one that's -- the

Page 119

1 latest one, I believe it had those three
2 things on there.
3    Q.   When you say "those three
4 things," do you mean the hysterectomy, the
5 thrombocytopenia, and the anxiety with
6 depression?
7    A.   Right.  I'm not sure if the
8 unemployability is on that appeal.  I'd
9 have to check and see.
10   Q.   But you know for certain
11 you're still seeking benefits and
12 compensation for hysterectomy, anxiety
13 with depression, and thrombocytopenia?
14   A.   Correct.
15   Q.   Why do you believe these
16 conditions are related to your service?
17   A.   Because when I was in the
18 military, that is when I started having
19 problems with the bleeding, and it's --
20 it's aggravated.  Okay.  When I was in the
21 military, I started having female
22 problems.  And when I got out, I started
23 getting treatment, and then I started

Page 120

1 having these surgeries on top of
2 surgeries.
3       So if the condition started in the
4 military and it progressed worse
5 afterwards -- after getting out, then I
6 would be eligible.
7    Q.   It doesn't have to actually be
8 related to your service?  It just has to
9 occur in the same time period as your
10 service?
11   A.   As active duty.
12   Q.   We talked about jobs you had
13 before Easter Seals.  Let's spend some time
14 talking about your job at Easter Seals.
15 How did you hear about the job at Easter
16 Seals?
17   A.   I heard about the job through
18 Social Security.  Was it Social Security?
19 I was on the ticket -- I wanted -- I
20 received the Ticket to Work information.
21 And it was Don Stephens.  Actually, he's a
22 counselor at Vocational -- Alabama
23 Department of Vocational -- Rehabilitation

30  (Pages 117 to 120)

# American Court Reporting
## toll-free (877) 320-1050

Page 125

1  Q. During your conversation with
2  Ed, did he explain to you or did you come
3  to understand that the micro enterprise
4  program was a grant-based program?
5  A. Mr. Johnson told me that it
6  was a grant program.
7  Q. Did he explain to you what a
8  grant program was, or did you just know
9  what that meant? A grant-based program.
10  A. Well, he just explained that
11  it was a grant program. Was funded by --
12  by a grant. So...
13  Q. Did you understand where the
14  grant money was coming from?
15  A. Yes, I did.
16  Q. Where was that?
17  A. It came from the office of
18  disability employment program, ODEP.
19  Q. Now, is that something you
20  came to understand through your employment
21  with Easter Seals, or was it something
22  that was discussed in your initial
23  learn-about-the-position meeting with Ed

Page 126

1  Collier?
2  A. Well, I don't believe that Ed
3  told me about ODEP. I believe Mr. Johnson
4  may have mentioned it. But it was in the
5  grant. I had a copy of the grant. And
6  that was explained in the grant, where it
7  came from.
8  Q. So prior to having this
9  meeting with Ed Collier and with
10  Mr. Johnson, you had a copy of the grant?
11  A. I have a copy of the grant.
12  Q. I know you have --
13  A. I had one and I have one now.
14  Q. So you already knew, prior to
15  meeting with anybody at Easter Seals, that
16  this micro enterprise program that had a
17  position open that you were interested in
18  discussing was a grant-based program, and
19  it received its funding from a grant -- a
20  government grant, right?
21  A. No, ma'am. Not prior to
22  meeting with him. I found out after. I
23  found out when I met with Mr. Johnson that

Page 127

1  it was a grant. But prior to meeting with
2  him, I didn't know.
3  Q. And then, after meeting with
4  him, did you locate a copy of the grant?
5  A. It was in the micro enterprise
6  office.
7  Q. So after getting the job --
8  A. After getting the job --
9  Q. -- you saw the grant itself,
10  but not prior to getting the position?
11  A. No, ma'am.
12  Q. Mr. Collier introduced you to
13  Mr. Johnson. Did he introduce you to
14  anyone else at Easter Seals?
15  A. He introduced me --
16  Mr. Johnson introduced me to Cassandra
17  Cooper.
18  Q. And who is Cassandra Cooper?
19  A. She was one of the micro
20  enterprise specialists at Easter Seals.
21  Q. So she was performing the job
22  that you were meeting with Mr. Collier to
23  learn more about and to possibly apply

Page 128

1  for?
2  A. She was one of the micro
3  enterprise specialists in the program.
4  Q. Were there others other than
5  Cassandra Cooper?
6  A. Just Cassandra.
7  Q. So she was the micro
8  enterprise specialist at the time?
9  A. Absolutely.
10  Q. And Ms. Cooper, she's a black
11  female, correct?
12  A. Correct.
13  Q. Mr. Johnson is a male,
14  obviously. Is he white or black?
15  A. He's white.
16  Q. Mr. Collier is a male. Is he
17  white or black?
18  A. He's white.
19  Q. Before Mr. Johnson introduced
20  you to Ms. Cooper, had you ever met her
21  before?
22  A. No, I hadn't.
23  Q. Did you and Ms. Cooper discuss

## www.AmericanCourtReporting.com
## November 13, 2007

Page 141

1  there when you came to meet with him?
2  Anyone else in your meeting?
3      A.   No one else was in the
4  meeting.
5      Q.   And Mr. Johnson offered you
6  the job?
7      A.   Yes, he did.
8      Q.   What did he say when he
9  offered you the job?
10     A.   I don't know his -- remember
11  his exact words, but he told me that I --
12  that I -- that he made a decision, and he
13  selected me for the job. But I'm not sure
14  if those were his exact words.
15     Q.   And what was your response?
16     A.   And I thanked him for hiring
17  me -- for accepting me at Easter Seals.
18  And I just don't remember what -- what
19  else I said.
20     Q.   Do you remember anything else
21  said in this meeting?
22     A.   Nothing other than I got the
23  job and that I would need to do a -- take

Page 142

1  a physical and that Eileen would give me
2  the forms to fill out. And I went to
3  Eileen's desk, and she gave me the forms.
4      Q.   You say "forms to fill out."
5  Was this both for the physical and for the
6  employee kind of paperwork?
7      A.   Yes, ma'am. And then I know I
8  declined the health insurance because I
9  already had health insurance through OPM
10  and through Social Security. So I filled
11  out a waiver.
12     Q.   So in the packet of
13  information that Eileen gave you, there
14  was information about the different
15  benefits that were available to Easter
16  Seals' employees, correct?
17     A.   Correct.
18     Q.   One of those benefits that was
19  available was health insurance, but you
20  didn't need that because you already had
21  that, correct?
22     A.   Correct.
23     Q.   So you told Easter Seals that

Page 143

1  you declined that benefit?
2      A.   I declined it.
3      Q.   But you were eligible for and
4  did receive other benefits through your
5  employment with Easter Seals, right?
6      A.   I believe it was annual leave,
7  sick leave. Is that what you're talking
8  about?
9      Q.   Right. You got annual -- you
10  got paid annual leave and paid sick
11  leave?
12     A.   Correct.
13     Q.   Paid vacation leave? You got
14  long-term disability coverage, right?
15  Insurance coverage.
16     A.   I don't know if I got that.
17     Q.   Do you have any information
18  one way or the other -- Easter Seals'
19  employee records show that you got LTD
20  coverage. Do you have anything to dispute
21  that?
22     A.   No, I don't.
23     Q.   And you got life insurance; is

Page 144

1  that correct?
2      A.   I believe I did.
3      Q.   And Easter Seals made
4  contributions to your retirement fund; is
5  that correct?
6      A.   I believe they did.
7      Q.   And as an Easter Seals
8  employee, you'd be covered by their
9  workers' compensation insurance; is that
10  correct?
11     A.   I think so.
12     Q.   I have your start date at
13  Easter Seals as September 14, 2004. Does
14  that sound correct to you?
15     A.   That's correct.
16     Q.   And as a micro enterprise
17  specialist -- that was the position you
18  were hired for, right?
19     A.   Yes, ma'am.
20     Q.   As a micro enterprise
21  specialist, where did you work each day?
22     A.   I worked in the micro
23  enterprise office.

36 (Pages 141 to 144)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 261

1  of what has been filed as your complaint
2  in this case and see if you recognize it
3  as the same.
4       A.   Okay.  This is my original
5  complaint.
6       Q.   And this original complaint
7  consists of your application under Section
8  706 with the Civil Rights Act for the
9  appointment of attorney and to file an
10  action without the prepayment of fees and
11  costs.
12       A.   That's correct.
13       Q.   It also contains a March 30,
14  2007 letter to the judge and a copy of
15  your charge of discrimination that you
16  filed with the EEOC on November 10, 2006;
17  is that correct?
18       A.   That's correct.
19       MS. ADAMS:  Let's mark that as
20  Defendant's Exhibit Number 2.
21       (WHEREUPON, documents were
22  marked as Defendant's Exhibit Numbers 2
23  and 3 and are attached to the original

Page 262

1  transcript.)
2       Q.   All right.  Now I'm going to
3  hand you what I'm going to mark as
4  Defendant's Exhibit Number 3, which is a
5  pleading that you filed with the court
6  titled Motion to Amend Complaint.
7       Do you recognize that pleading?
8       A.   Yes, I do.
9       Q.   Is that a copy of the pleading
10  that you filed with the court amending
11  your complaint in this action?
12       A.   It appears to be.  Yes.
13       Q.   Did you -- we're looking at
14  Defendant's Exhibit Number 2, which is the
15  original complaint.  Did you prepare this
16  complaint, Ms. Jackson?
17       A.   Yes, I did.
18       Q.   And did you review it before
19  you filed it?
20       A.   I prepared it.
21       Q.   I understand that.  But before
22  you submitted it, did you review it and
23  make sure that everything contained in the

Page 263

1  complaint was accurate and correct to the
2  best of your understanding?
3       A.   I believe I did.
4       Q.   Is there anything that's
5  contained in your complaint that you need
6  to amend or change as we sit here today?
7  Anything that's not accurate or correct as
8  far as you know?
9       A.   Well, here, after I had filed
10  it, I realized that I put, I am filing a
11  racial and discrimination claim, and I
12  meant to write, I am filing a racial and
13  gender discrimination claim.
14       Q.   And you're talking about the
15  bottom of -- the bottom of page --
16       A.   It's no page number at the
17  bottom.
18       Q.   Bottom of page four, under
19  Nature of Alleged Discrimination?
20       A.   Yes.
21       Q.   So that should say racial and
22  gender discrimination claim?
23       A.   Yes.

Page 264

1       Q.   Is that your change?
2       A.   Yes.
3       Q.   Anything else that's
4  inaccurate about this complaint?
5       A.   No.  I don't see anything that
6  needs to be corrected.
7       Q.   Same question goes for what we
8  marked as Defendant's Exhibit 3.  Did you
9  prepare this motion to amend complaint?
10       A.   Yes, I did.
11       Q.   And did you check it to make
12  sure that everything in here was accurate
13  and correct?
14       A.   Yes, I did.
15       Q.   Does this accurately and
16  correctly state your allegations in this
17  case, accepting the ones that have been
18  dismissed by the court?
19       A.   Yes.
20       Q.   And this is your signature on
21  the back of the service -- certificate of
22  service, right?
23       A.   Yes, it is.

66  (Pages 261 to 264)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 265

1  Q.  Ms. Jackson, please tell me
2  what is the basis of your complaint that
3  you've been discriminated against on the
4  basis of your race.
5  A.  Well, Easter Seals — I was
6  working for Easter Seals when they were
7  notified that the grant was ending.  And
8  instead of Easter Seals offering a
9  position to retain me after Cassandra
10  Cooper resigned, they hired a white male.
11  And the only reason why the program was
12  continued was because of my performance --
13  my performance and Cassandra Cooper's
14  performance of the program.  And they gave
15  Mr. Hanes the position based on my
16  performance, and I feel that they should
17  have offered it to me.
18  Q.  Any other event or incident
19  that you're claiming in this lawsuit
20  that's related to your race?
21  A.  I'm claiming discrimination
22  because he's a white male and I'm a black
23  female.

Page 266

1  Q.  And that has to do with your
2  employment in that position as micro
3  enterprise specialist, right?
4  A.  My what?
5  Q.  The fact that you weren't
6  retained in that position as micro
7  enterprise specialist.  That's your claim,
8  right?
9  A.  My claim is racial and gender
10  discrimination.
11  Q.  And my question is, for race
12  discrimination, are we talking about
13  anything other than the fact that your
14  employment with the micro enterprise
15  program at Easter Seals ended?  Is that
16  all we're talking about?  Is that all that
17  your claim is?
18  A.  We're talking about my
19  position — my employment ending with
20  Easter Seals.  That's what we're talking
21  about.
22  Q.  Other than that, is there
23  anything else you're claiming in this

Page 267

1  lawsuit with regard to race
2  discrimination?
3  A.  I don't understand what you
4  mean.  Other than they hired a white male
5  in my place.  That's race.
6  Q.  We've got that.
7  A.  Okay.
8  Q.  We've got that.
9  A.  Okay.
10  Q.  Other than that, are we going
11  to be talking about anything else?
12  A.  Gender discrimination.
13  Q.  Just focus on race for me
14  right now.  I just want to talk about what
15  your claim is regarding how you were
16  discriminated against on the basis of your
17  race.  And I understand that your claim --
18  part of your claim is that Mr. Hanes got a
19  job because he was a white male and you
20  feel like you should have been retained in
21  that job.  I got that down.
22  A.  Okay.
23  Q.  Are we going to be talking

Page 268

1  about -- are you claiming anything about
2  anything other than that in this lawsuit?
3  A.  Other than --
4  Q.  For race --
5  A.  For race?
6  Q.  -- discrimination.
7  A.  I believe that's all I'm
8  claiming, is discrimination based on race.
9  Q.  Was that decision -- that
10  employment decision, right?
11  A.  That employment decision.
12  Q.  Nothing else?
13  A.  No.
14  Q.  We've also got a claim in here
15  for gender discrimination.  Are we going
16  to be talking about that same employment
17  decision, that micro enterprise specialist
18  position, that you had?  Your employment
19  came to an end and, ultimately, Mr. Hanes
20  fills the position.  Are we talking about
21  anything else other than that event?
22  A.  No.
23  Q.  So your race and your gender

67  (Pages 265 to 268)

# American Court Reporting
## toll-free (877) 320-1050

Page 301

1   A.   This is my full response to
2  question Number 4.
3   Q.   And did you prepare this
4  document?
5   A.   Yes, I did.
6   Q.   And did you review this
7  document carefully?
8   A.   Yes, I did.
9   Q.   And did you sign this
10 document?
11  A.   Yes, I did.
12  Q.   And in signing this document,
13 you were swearing that the answers and
14 information contained herein were
15 accurate?
16  A.   Correct. To my understanding
17 and to my ability.
18      I need to take a washroom break.
19  Q.   Absolutely.
20          3:16 p.m.
21      (Recess taken.)
22          3:23 p.m.
23  Q.   Previously we were discussing

Page 302

1  something else which — you made reference
2  to a meeting on April 26, 2006 that you
3  had with Mr. Lewis regarding the micro
4  enterprise's program.
5      Do you remember referencing that?
6   A.   Yes.
7   Q.   And there was a meeting on
8  April 26th where this was discussed,
9  correct?
10  A.   Correct. On or approximately
11 April 26th.
12  Q.   Who was in that meeting other
13 than you and Mr. Lewis?
14  A.   Dr. McKim, as I have here on
15 the report, and Cassandra Cooper.
16  Q.   So it was you, Cassandra
17 Cooper, Susan McKim, Larry Lewis.
18      Anyone else?
19  A.   No.
20  Q.   And what was discussed during
21 that meeting?
22  A.   That the ACE micro enterprise
23 program would be ending on September 29th.

Page 303

1   Q.   And did they discuss why the
2  program was coming to an end?
3   A.   All I know is that Mr. Lewis
4  was saying that due to budget cuts that
5  the program was going to end on September
6  29, 2006.
7   Q.   And was there discussion about
8  the fact that an extension had been
9  applied for?
10  A.   That -- yes. That they were
11 seeking a no-cost extension.
12  Q.   And they were seeking a
13 no-cost extension for one year?
14  A.   Well, I don't know how long it
15 was. It may have been one year, but I'm
16 not sure how long the extension was going
17 to be.
18  Q.   Do you remember what was
19 discussed in that meeting?
20  A.   Yes. Dr. McKim was in the
21 meeting, and I believe it was Dr. McKim
22 that stated that there would be a
23 no-cost -- that they would be seeking a

Page 304

1  no-cost extension to sustain the grant.
2  And, yes, I do believe it was for a year.
3   Q.   I'm looking at your complaint,
4  which is marked as Defendant's Exhibit
5  Number 2. And in paragraph three, you
6  stated --
7   A.   What page?
8   Q.   It's page four of ten.  I
9  don't know if it's labeled at the top of
10 yours.  Paragraph three.
11  A.   All right.
12  Q.   This was the complaint that
13 you initiated the lawsuit with and
14 submitted to the court, right?
15  A.   Yes.
16  Q.   In paragraph three, the last
17 sentence says that they would be seeking a
18 no-cost extension to sustain the program
19 for one year.
20      Is that what that says?
21  A.   Yes.
22  Q.   So I'm just trying to figure
23 out what was said -- what your testimony

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 305

1  is that was said at that meeting, whether
2  it was one year or six months or what.
3      A.   It was one year. I forgot.
4  It was one year.
5      Q.   So on Exhibit 4, which are
6  your responses to the interrogatories, on
7  page one where you're talking about that
8  same meeting, the part where it says they
9  were going to seek a no-cost extension to
10  keep the program going until March 2007,
11  that's incorrect, right?
12      A.   Yes. That would be
13  incorrect.
14      Q.   So that part of your statement
15  is wrong for Exhibit Number 4?
16      A.   Yeah. That should be -- it
17  was a year. Now that I remember, it was
18  for a year. They would be seeking it for
19  a year.
20      And what I got that confused with,
21  it was extended until March of '07. But
22  it -- when we had the meeting, they
23  requested a year.

Page 306

1      Q.   But they didn't know whether
2  or not they'd get it --
3      A.   Right.
4      Q.   -- on April 26, 2006, right?
5      A.   Right.
6      Q.   So the end of the meeting on
7  April 26, 2006, you and Cassandra Cooper
8  knew that there was -- the program was
9  going to end at the end of September
10  unless an extension was granted, correct?
11      A.   Correct.
12      Q.   And a no-cost extension means
13  they're not getting additional money, but
14  they're using leftover money from other
15  resources to extend the program?
16      A.   Using leftover money from the
17  grant.
18      Q.   From the grant?
19      A.   Not from other resources, but
20  specifically from the grant.
21      Q.   And you understand that Easter
22  Seals is one of three grant recipients for
23  the same grant, correct?

Page 307

1      A.   Correct.
2      Q.   And so leftover grant money
3  wouldn't necessarily just have been what
4  was left over from the Easter Seals
5  program, but could have been left over
6  from one of the other two programs as
7  well, correct? Or do you know one way or
8  the other?
9      A.   I'm not sure about that.
10      Q.   You just don't know?
11      A.   No.
12      Q.   What did you say in response
13  to learning that the program could come to
14  an end at the end of September?
15      A.   I didn't say anything.
16      Q.   What did Cassandra say?
17      A.   I don't remember her saying
18  anything either. Other than -- Cassandra
19  may have asked a question, but I can't
20  remember what it was that she asked, what
21  she said. I do believe that she asked a
22  question, but I don't remember what.
23      Q.   So you believe she might have

Page 308

1  said something, but you don't remember
2  what it was?
3      A.   I can't remember what it was.
4      Q.   Why do you believe she asked a
5  question?
6      A.   I remember at that meeting her
7  asking me something, but I don't remember
8  what it was that she asked.
9      Q.   Have you and Cassandra
10  discussed that meeting since you filed the
11  lawsuit?
12      A.   Yes. Because I asked her for
13  a copy of the letter.
14      Q.   Did you discuss, when you
15  asked her for a copy of the letter, what
16  had gone on -- her memories of what had
17  gone on during this meeting?
18      A.   No.
19      Q.   Prior to this meeting on April
20  26, 2006, had you ever heard anything
21  about possibilities that the funding --
22  the grant could be short cut or the
23  funding could be limited going forward?

77 (Pages 305 to 308)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 309

1    A.   No.
2    Q.   So this was the first you had
3  ever heard of it; is that correct?
4    A.   This is the first. Well,
5  there was rumor, but — you know, there
6  was, like, rumor around the workplace that
7  they were — well, actually, they were
8  shutting down programs. So that was
9  evident that programs were being shut
10  down.
11    Q.   Grant-based programs?
12    A.   No. The cafeteria, their
13  physical therapy. I don't know if that
14  was grant based or not.
15    Q.   But you knew that your program
16  was strictly funded by a grant, right?
17    A.   Correct.
18    Q.   And so other programs might
19  have been ending for other reasons, but
20  they weren't funded through the same grant
21  that your program was funded through,
22  right?
23    A.   Correct.

Page 310

1        (WHEREUPON, a document was
2  marked as Defendant's Exhibit Number 5 and
3  is attached to the original transcript.)
4    Q.   I'm going to mark Defendant's
5  Number 5, a letter from the State of
6  Alabama dated August 11, 2006.
7        Have you seen that letter before?
8    A.   I don't remember seeing this
9  letter. I remember seeing the August 15th
10  letter from Mr. Lewis I believe he gave
11  me. I don't remember seeing this one. I
12  may have, but I don't remember seeing it.
13  I don't -- I don't remember reading this.
14  Huh-uh.
15    Q.   Is it your testimony that
16  you've never seen it before or you didn't
17  see it on or about the day it was offered?
18    A.   I don't ever remember seeing
19  this letter.
20    Q.   Well --
21    A.   The letter I received was
22  August 15th, because I — I would remember
23  that date.

Page 311

1    Q.   If I told you that this letter
2  has most recently been produced to you as
3  an exhibit to defendant's answer and
4  motion to dismiss, which was filed on May
5  8, 2007, would that jog your memory as to
6  whether you've ever seen the letter
7  before?
8    A.   What I would have to do is go
9  to -- and get my documents and see if
10  that's attached in there. Maybe I
11  overlooked it. But I don't recall seeing
12  that letter. I'd have to go in my file
13  and get that -- what did you say? May
14  8th?
15    Q.   Yes.
16    A.   And see if that's attached to
17  it, because I don't remember seeing that
18  letter.
19    Q.   Now, you said that there was a
20  letter you saw dated August 15, 2006; is
21  that correct?
22    A.   Correct.
23        (WHEREUPON, a document was

Page 312

1  marked as Defendant's Exhibit Number 6 and
2  is attached to the original transcript.)
3    Q.   I'm going to mark as
4  Defendant's Exhibit 6 a letter to Emily
5  Jackson from Larry Lewis, dated August 15,
6  2006. Tell me if that's the letter you
7  were referencing earlier.
8    A.   This is the letter that I
9  received.
10    Q.   And in this letter, Mr. Lewis
11  is notifying you that he's received word
12  from ADECA that the grant which funded the
13  micro enterprise's program would be ending
14  at the end of September; is that correct?
15    A.   That's correct.
16    Q.   And that to date their efforts
17  to get an extension had not been
18  successful, correct?
19    A.   Correct.
20    Q.   Now, tell me how you received
21  this letter.
22    A.   The letter was on my desk. I
23  went on funeral leave. My uncle passed.

78 (Pages 309 to 312)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 321

1  the program would end if an extension
2  wasn't granted?
3      A.  I'm not sure if I told my mom
4  about it, because I didn't want to worry
5  her about -- I didn't want to worry her
6  about that.  So I don't remember telling
7  her.  Sometimes things that I know are
8  going to upset her I may not tell her the
9  time I find out about it, but eventually I
10 do tell her.  I don't remember whether I
11 told her about the April 26th letter, but
12 I believe -- I know I told her about this
13 letter.
14     Q.  And whether you told your
15 mother or not, you knew that it was a real
16 possibility, ever since April 26th, that
17 the extension wouldn't be granted; that
18 the program would come to an end at the
19 end of September, right?
20     A.  I knew that there was a
21 possibility, and that's why I started
22 applying for jobs other places.
23     Q.  But you had already started

Page 322

1  your business prior to understanding that
2  there was a possibility that the program
3  would be ending, right?  Because you
4  started that at the beginning of April?
5      A.  It was April 19th.
6      Q.  Right.  Which was prior to
7  April 26th, correct?
8      A.  Correct.
9      Q.  After you received that August
10 15th letter, prior to giving any written
11 notification to Easter Seals, were there
12 any conversations about what would happen
13 with the micro enterprise's program between
14 you and Cassandra Cooper?
15     A.  Prior to this letter?
16     Q.  You get that letter, that
17 April -- pardon me -- the August 15th
18 letter.  After that, after you got the
19 letter and you talked about the letter, do
20 you and Cassandra Cooper, after that, talk
21 about what will happen to the program?
22     A.  Yes.  After that letter, we
23 found out that they extended the program.

Page 323

1      Q.  And we're getting there.
2          (WHEREUPON, a document was
3  marked as Defendant's Exhibit Number 7 and
4  is attached to the original transcript.)
5      Q.  What I'm going to mark as
6  Defendant's Exhibit 7 is a letter dated
7  September 11, 2006 from you to Ms. Lynn.
8  Do you recognize that letter?
9      A.  I recognize it.
10     Q.  Did you author that letter?
11     A.  I wrote this letter and
12 submitted this letter to Ms. Lynn.
13     Q.  And did you do that on
14 September the 11th of 2006?
15     A.  Yes, I did.
16     Q.  How did you submit the letter
17 to Ms. Lynn?
18     A.  I believe I either put it
19 under her door or in her box -- in her
20 mailbox.  Because I'm not sure if she was
21 in the office at the time when I walked
22 around to give it to her.  So I either put
23 it in the mailbox or might have put it up

Page 324

1  under the door.  One of the two.
2      Q.  But you didn't hand it to her
3  personally; is that correct?
4      A.  That's correct.
5      Q.  And you didn't have a
6  discussion with her when you submitted it;
7  is that correct?
8      A.  I had a discussion with her
9  after submitting it.
10     Q.  My question is, at the time
11 you submitted it, you didn't have a
12 discussion with her; is that correct?
13     A.  I didn't see her.  No.
14     Q.  Did you tell Cassandra Cooper
15 that you were going to be submitting this
16 letter prior to doing it?
17     A.  No, I didn't.
18     Q.  Did you discuss your plans
19 with Ms. Cooper prior to submitting this
20 letter?
21     A.  No.
22     Q.  Well, why not?  Y'all were
23 friends.

81  (Pages 321 to 324)

**www.AmericanCourtReporting.com**
**November 13, 2007**

# American Court Reporting
## toll-free (877) 320-1050

Page 325

1  A.  Yes, we were friends, but I
2  did not discuss this letter.  I don't
3  discuss everything with Cassandra Cooper.
4  Q.  I understand that.  It just
5  seems like that y'all were in the same
6  boat, and I wanted to know whether or not
7  there was any discussion as to what y'all
8  would be doing and whether or not you
9  talked to her about certain things.
10  A.  No.  I said that I did not
11  discuss it with her before I submitted it.
12  Q.  Did you discuss it with anyone
13  else?
14  A.  No.
15  Q.  Why did you write this letter
16  to Ms. Lynn?
17  A.  I wrote this letter to
18  Ms. Lynn to congratulate her on her new
19  position.  That was one of the reasons.
20  Probably the last reason why.  I wanted to
21  make sure I congratulated her on her
22  position at Easter Seals and to ask to use
23  annual leave for my last four days at

Page 326

1  Easter Seals and to let her know that I
2  had received this letter stating that the
3  program had ended and that that was August
4  15th.  And so here it was September 11th,
5  and I hadn't been notified anything
6  differently other than that the program
7  was going to end.
8  And I wrote her the letter to let
9  her know that I had this letter and that
10  I, you know -- I hadn't been given any
11  other opportunities at Easter Seals to
12  stay.  No one had told me that there's a
13  job for me here.  So I asked to have some
14  -- instead of working the last four days
15  of my employment, I wanted to use vacation
16  time.
17  Q.  Okay.
18  A.  And that's why I wrote it.
19  Q.  And there is a form -- a leave
20  request form that you fill out when you
21  wanted to request leave, correct?
22  A.  Correct.
23  Q.  And you could have just filled

Page 327

1  out that form, that you wanted to use
2  leave, without submitting a letter?  Or do
3  all forms require a cover letter as well?
4  A.  No, all forms don't require a
5  cover letter.  But in this case, the
6  program was ending.  So this was my way of
7  letting her know that I had gotten this
8  because -- maybe I got this before she
9  came.  It's possible.  Because I was
10  letting her know that when I returned I
11  got this letter.  So had she been there --
12  maybe I wouldn't have.  So maybe she
13  wasn't there when I got this letter.  So I
14  was officially --
15  Q.  Ms. Jackson, let me stop you
16  for a second.
17  A.  Okay.
18  Q.  I don't want you to tell me
19  why you think you might have written the
20  letter.
21  A.  You asked me why I gave it to
22  her.
23  Q.  Right.  I just want to know,

Page 328

1  as we sit here today, why you wrote the
2  letter.  I don't want you to go back and
3  guess why you would have done it.  If you
4  know -- if you know things, I want to hear
5  them.  Tell me.  But I don't want you to
6  --
7  A.  I'm not guessing.
8  Q.  Okay.
9  A.  I'm telling you why.
10  Q.  Okay.
11  A.  And that's why.
12  Q.  So you told her you wrote this
13  letter because you wanted to congratulate
14  her for her new position?
15  A.  Yes.
16  Q.  You wanted to ask to use
17  annual leave?
18  A.  Yes.
19  Q.  And you were letting her know
20  that you had received correspondence from
21  Larry Lewis prior to her arrival about the
22  end of the program?
23  A.  Correct.

82  (Pages 325 to 328)

# American Court Reporting
## toll-free (877) 320-1050

Page 329

1  Q.  And you thought she might not
2  have seen that letter because that was
3  before she arrived at Easter Seals?
4      A.  It's possible.  It's
5  possible.  Because -- the reason why I'm
6  saying that is that now I'm looking at the
7  date because -- you're right.  She may not
8  have seen this letter.  It's possible that
9  she didn't see this letter.
10     Q.  And that was your thought
11 process when you were writing it?  It's
12 possible that she doesn't know that I got
13 this letter from Larry Lewis.  I'm going
14 to tell her I got this letter from Larry
15 Lewis.  Is that what your testimony is?
16     A.  Yes.
17     Q.  How are positions and openings
18 at Easter Seals -- how are people made
19 aware of openings at Easter Seals?
20     A.  Sometimes Easter Seals will
21 send e-mails -- an e-mail message for
22 in-house, and then sometimes they'll post
23 it on the bulletin board.

Page 330

1      Q.  So it's either e-mail or
2  posted, right?
3      A.  Correct.
4      Q.  Had there been any positions
5  during your tenure at Easter Seals which
6  had come open?
7      A.  Yes.
8      Q.  And so you know that they were
9  either posted or e-mailed because you had
10 worked there and you had seen positions
11 get posted or get e-mailed about, right?
12     A.  Correct.
13     Q.  Had you ever applied for any
14 other positions at Easter Seals?
15     A.  No.
16     Q.  So at the time that you wrote
17 this September 11th letter, you hadn't
18 applied or expressed any interest in any
19 other position at Easter Seals; is that
20 correct?
21     A.  I hadn't asked anybody about
22 any positions at Easter Seals.
23     Q.  And your statement here, the

Page 331

1  first sentence of the fourth paragraph
2  down, second line, I will need time to
3  transition into a new career -- and you're
4  talking about the leave that you're
5  taking; is that correct?  While you're
6  taking those last four days off?
7      A.  Since I have not been notified
8  that there are any employment
9  opportunities for me here at Easter Seals,
10 I will need time to transition to a new
11 career.  Correct.  The four days.
12     And there is an error on here.
13     Q.  What's the error?
14     A.  The error -- and I think she
15 understood it.  It says, I enclosed a
16 leave request for four hours.  That should
17 have been four days, from the 26th through
18 the 29th.
19     Q.  Because you got paid for four
20 days, right?
21     A.  Correct.
22     Q.  At the time you wrote this
23 letter, what was your new career going to

Page 332

1  be?
2      A.  Well, I had already started a
3  home-based business, and it was brand
4  new.  I had, you know -- I had not
5  accumulated any -- a lot of clients by
6  this time.
7      Q.  It was six months old, but --
8      A.  It was six months old, but I
9  didn't have a lot of --
10     Q.  You were still in the
11 beginning of the business development?
12     A.  Still in the infancy stage of
13 the business.  So I was going to work and
14 do the business because the business was
15 at home.  I had the business at home.  So
16 in my spare time at home, I would operate
17 the business and then I was going to work
18 also.
19     Q.  Where were you going to work?
20     A.  Well, I don't know.  I had
21 applied to other jobs.  So I was just
22 submitting applications.  When I found out
23 the program was ending, I just started

83  (Pages 329 to 332)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 341

1  I also handed her a copy of my resume, and
2  I gave her one of my business cards. And
3  she said, if there's anything else that I
4  can do for you, that I can do to help, I
5  will. I will help.
6      Q.   Did you say anything else
7  during that meeting?
8      A.   I asked her -- I said, will
9  the program allow me to work part time?
10  If I can't work full time, will it allow
11  me to work part time? And if so, I would
12  like to work Monday, Wednesday, and
13  Friday, four hours a day. And she said
14  she'd have to check with Susan McKim to
15  see if the grant would allow that.
16      Q.   Anything else said during that
17  meeting?
18      A.   I believe that was it.
19      Q.   Did Cassandra Cooper say
20  anything during that meeting?
21      A.   And then she asked Cassandra
22  what was she going to do. And Cassandra
23  said, similar to Ms. Jackson. I'm going

Page 342

1  to -- or I've started -- or I'm going to
2  start a management consulting business.
3  I'm going to do management consulting.
4      Q.   Did Cassandra Cooper say
5  anything else?
6      A.   Not that I remember.
7      Q.   Did Cassandra Cooper ask about
8  working part time?
9      A.   No, she didn't.
10      Q.   So it's your testimony that
11  during the September 12th meeting Ms. Lynn
12  did not tell you that there would be a
13  no-cost extension period for the micro
14  enterprise's program?
15      A.   No, she did not.
16      Q.   And you're certain about that?
17      A.   She -- it was still up in the
18  air. That's what she told us. She may
19  not have used those words. But a final
20  decision hadn't been made. In fact, I do
21  remember her saying all she had received
22  were e-mail messages.
23      Q.   And what -- do you remember

Page 343

1  her saying what the e-mail messages were
2  about?
3      A.   She didn't say. She just said
4  --
5      Q.   She didn't give you any
6  indication what the e-mail messages were
7  about?
8      A.   All she said was that she
9  didn't have anything official; that she
10  had only received e-mail messages. And I
11  think they were from Tammy Farmer. I
12  believe she said that.
13      Q.   And why would -- I mean,
14  e-mail messages from Tammy Farmer, what
15  importance was that? What did that mean
16  to you?
17      A.   About the program. About the
18  micro enterprise program. So she didn't
19  have to just come out and say the e-mail
20  messages were about -- that's the
21  conversation we were talking about. So
22  that's what she was referring to, the ACE
23  micro enterprise program, which ADECA

Page 344

1  administered.
2      So every -- all the decisions came
3  from ADECA. That's who would let us know
4  whether it was going to continue and
5  whether they would allow two micro
6  enterprise specialists to stay or -- and
7  that's what she had stated. She had to
8  check with Susan to see if it will allow
9  for two micro enterprise specialists, but
10  she didn't have anything final.
11      Q.   If what would allow for two
12  enterprise specialists?
13      A.   The grant.
14      Q.   The grant extension that you
15  just told me she hadn't told you that
16  she'd received yet?
17      A.   No. She said if the grant
18  would allow -- we were talking about the
19  program -- what if the program continued
20  and what if it did not. What are you
21  going to do? So she said, if it
22  continues, then she'll have to check with
23  Susan to see. Because at that point, we

86 (Pages 341 to 344)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 349

1  A.  Okay.
2  Q.  I want to get something
3  straight.
4  A.  Okay.
5  Q.  When you filed your
6  complaint -- well, first of all, this was
7  -- your complaint was the same thing as
8  your charge to the EEOC.  You filed that
9  charge on November 10, 2006, right?
10  A.  Right.
11  Q.  And we already went over
12  that.  You saw -- at the time you saw this
13  that -- everything was accurate and
14  complete, right?
15  A.  Right.
16  Q.  And then later you filed it
17  with the court, on April 30, 2007.  And we
18  went over that.
19  A.  Correct.
20  Q.  You thought that was accurate
21  at the time and complete, right?
22  A.  Right.
23  Q.  We also talked about your

Page 350

1  interrogatory responses which were served
2  on September 18, 2007, correct?
3  A.  Correct.
4  Q.  And the responses that you
5  provided in here, you told me at the time
6  you believed they were accurate and
7  complete, right?
8  A.  Right.
9  Q.  And as we're sitting here
10  today, under oath, you're giving me
11  answers to the best of your ability that
12  are accurate and complete, right?
13  A.  But I made an error.  I
14  made --
15  Q.  You made several errors,
16  right?
17  A.  I made an error on the meeting
18  because this refreshed my memory.  Because
19  so many things happened, you know, about
20  them saying that the program was going to
21  keep going and extending and it was going
22  to -- they were going to seek a no-cost
23  extension.  But I can make a correction,

Page 351

1  and I did make an error today about that.
2  I thought I was sure about it.
3  But when I made this statement, it's
4  refreshing my memory now that I see that
5  Debbie Lynn did say she did not have
6  anything in writing, but she did say that
7  the program was going to be extended for
8  six months.  So that is true.  So I
9  correct what I just previously said about
10  she -- saying that she didn't know whether
11  it was going to be.  Because with the
12  program, it was, like, up and down, you
13  know.  I went through four different
14  administrators and received information
15  from different ones about the program
16  ending and --
17  Q.  All we're talking about is
18  this one meeting.
19  A.  This meeting.  Okay.
20  Q.  I want to be very clear on
21  that.
22  A.  Okay.  Well --
23  Q.  And your testimony is here,

Page 352

1  under oath --
2  A.  Yes.
3  Q.  -- that even though you've
4  given one, two, and a minute ago three
5  different responses as to what happened in
6  the September 12th meeting --
7  A.  Yes.
8  Q.  -- your final response is that
9  on September 12th Ms. Lynn did tell you
10  that the program would be extended for a
11  six-month period, right?
12  A.  Yes, that is correct.
13  Q.  Now, I understand that there
14  were other parts.  She also told you that
15  the details of the program hadn't been
16  sorted out yet, right?
17  A.  Correct.
18  Q.  Did Ms. Lynn also tell you
19  that the money was for -- they got less
20  money for the extension budget than they
21  had expected to get?
22  A.  She may have.  She did talk
23  about the money, but I don't remember

88  (Pages 349 to 352)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 353

1  exactly how much it was. But she may have
2  mentioned that it was less. It is
3  possible that she mentioned that.
4  Q.   And Ms. Lynn never said
5  anything about whether or not there would
6  be one or two positions definitively going
7  forward, correct, for micro enterprise
8  specialist?
9  A.   During this meeting --
10  Q.   During the September 12th
11  meeting, Ms. Lynn never said definitively
12  whether there would be one or two micro
13  enterprise specialists going forward; is
14  that correct?
15  A.   Right. That's correct.
16  Q.   And during this meeting, you
17  told Ms. Lynn that you would be interested
18  in working part time if the program was
19  extended -- since the program was being
20  extended, right?
21  A.   Right.
22  Q.   And you suggested at this
23  meeting possibly a schedule of Wednesday,

Page 354

1  Thursday, Friday, half days?
2  A.   Monday, Wednesday, Friday.
3  Q.   Pardon me. Monday, Wednesday,
4  Friday?
5  A.   Four hours a day.
6  Q.   Four hours a day?
7  A.   Correct.
8  Q.   And that was the proposal you
9  put to her; is that correct?
10  A.   That's what I asked, if I
11  could work part time.
12  Q.   Did you ask anything about
13  working full time?
14  A.   No.
15  Q.   Did Ms. Cooper -- you already
16  told me Ms. Cooper didn't say anything
17  about working part time, right?
18  A.   Right.
19  Q.   All right.
20  A.   But I do remember her saying
21  she does not know if the program would
22  allow two full-time micro enterprise
23  specialists; that she would have to check

Page 355

1  with Dr. McKim and see.
2  And so I apologize for getting those
3  confused. I'm not trying to deceive
4  anyone.
5  Q.   I understand.
6  A.   It's just -- but I want to --
7  I don't want to tell any lies on
8  Ms. Lynn --
9  Q.   I understand.
10  A.   -- about what she said. So
11  I'm not making things up. It's just that
12  with so much information that happened,
13  it's -- sometimes, you know, what was
14  said, what time gets confusing.
15  Q.   So sometimes you get confused
16  about --
17  A.   Sometimes.
18  Q.   -- what was said and the
19  chronology of how it happened, right?
20  A.   Sometimes. Sometimes I know
21  exactly what was said, and then with --
22  sometimes, you know, with the timing and
23  what time it was, you know, I --

Page 356

1  Q.   But you were certain when we
2  started that you were correct on both of
3  these things, right?
4  A.   Right.
5  Q.   It wasn't until I pointed it
6  out that you realized you were confused?
7  A.   I realized that I made an
8  error.
9  Q.   So it isn't until somebody can
10  show you otherwise that you realize you're
11  confused, right?
12  A.   No. If I -- if I realize I
13  make a mistake, I'll admit to that.
14       4:14 p.m.
15       (Recess taken.)
16       4:22 p.m.
17  Q.   Ms. Jackson, before we took a
18  quick break, we were talking about the
19  September 12th meeting. Have you told me
20  everything now that you can clearly
21  remember about the September 12th meeting?
22  A.   Yes. And for the record, I
23  was getting the meeting I had with Susan

89 (Pages 353 to 356)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 361

1 yes, it's going to.
2    Q.   And your memory of this
3 meeting has been clearer at some times
4 than at others, right?
5    A.   Well, it's -- of course, when
6 it occurred, it was very clear. All
7 right. But when there -- there was more
8 than one meeting. So I had gotten
9 confused about which meeting we're talking
10 about or what occurred at which meeting.
11    Q.   Do you think that a fair
12 interpretation of what Ms. Lynn was asking
13 you at the September 12th meeting when she
14 said -- after she told you the program was
15 going to be extended and then she said
16 what are you going to do to you and -- and
17 then said -- Ms. Lynn first said -- let's
18 just stop that question and start over.
19    Do you think it would be a fair
20 understanding of what Ms. Lynn said after
21 she told you that there was going to be
22 extension money for the program, but that
23 some of the details they were still

Page 362

1 waiting on from ADECA, and then asked you
2 what you were going to do -- do you think
3 it's fair to believe that she meant what
4 you were going to do if the program was
5 extended?
6    A.   No.  What was I going to do if
7 the program was going to end. I believe
8 she meant that because -- I think what she
9 meant was that --
10    Q.   Did she say it, or do you
11 believe that she meant that?
12    A.   No.  She said it. She said
13 it, what are you going to do? Because she
14 asked both of us.
15    Q.   Those were her exact words,
16 what are you going to do? Period?
17    A.   If the program does not
18 continue or if the program is -- if the
19 program ended.
20    Q.   So that's your testimony that
21 she said what are you going to do if the
22 program ends, right after she told you
23 that the program had been extended and she

Page 363

1 had notice from ADECA that it had been?
2    A.   Right.
3    Q.   Okay.
4    A.   She said that she had received
5 e-mail messages from -- I believe it was
6 Tammy Farmer that they were going to
7 continue, but she still didn't have
8 anything official.
9    Q.   All right. So after this
10 meeting on September 12th, what's the next
11 conversation you have with Debbie Lynn?
12    A.   And that was on September
13 18th.
14    Q.   And when do you have a
15 conversation with Debbie Lynn on September
16 18th?
17    A.   September 18th -- I'm not sure
18 if I asked to meet with her or if she
19 called me in. I believe she called me in
20 to the meeting.
21    Q.   Was that in the morning or in
22 the afternoon?
23    A.   I believe we met in the

Page 364

1 afternoon, but I'm not sure whether it was
2 late morning or afternoon. I think it was
3 afternoon.
4    Q.   Was anyone else in this
5 meeting?
6    A.   No.  Just Ms. Lynn and I.
7    Q.   And what did Ms. Lynn tell you
8 in this meeting?
9    A.   Ms. Lynn said while the
10 program was going to be extended that it
11 only allowed for one full-time micro
12 enterprise specialist, and that my
13 position would end on September 29th.
14    Q.   Did she say anything else?
15    A.   And then she had an envelope,
16 and she said -- and she handed me the
17 envelope. She said, and we've accepted
18 your resignation. And I said, I did not
19 resign. I said, my position was
20 eliminated. She said, oh, that's right.
21 And she went and got Eileen Bennett.
22    Q.   I want to slow you down.
23    A.   Okay.

91  (Pages 361 to 364)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 365

1    Q.    Is that all that was said?
2    A.    During that meeting?
3    Q.    Yes.
4    A.    I believe that was all that
5  was said.
6    Q.    You didn't take this
7  opportunity to explain to Ms. Lynn that if
8  your position had been -- if you resign
9  from your position that you wouldn't be
10  eligible for certain unemployment
11  insurance?
12    A.    Yes, yes, yes. I forgot about
13  that. I said -- right. I said, I have --
14  thanks for reminding me. I said, I have
15  insurance with City Financial. I have a
16  loan with them, and they're going to -- I
17  have -- I purchased unemployment insurance
18  or something like that with them in the
19  event that I lost my job and it wasn't my
20  fault. I said, if you put on my records
21  that I resigned, I said, they're not going
22  to pay for that.
23        And she went and got Eileen Bennett

Page 366

1  and said, Eileen, retype this letter.
2  Emily didn't resign. Her position was
3  eliminated. And then Eileen got to the
4  typewriter, and she was kind of fumbling a
5  little. And so Debbie helped her.
6  Ms. Lynn assisted her. I don't know if
7  she sat down. I think she may have sat
8  down in her seat and assisted her with
9  typing it correctly.
10    Q.    And Ms. Lynn helped make sure
11  that letter was properly worded at your
12  request to make sure that you would be
13  entitled to any benefits that you could
14  get under an insurance policy you had on
15  one of your loans?
16    A.    Ms. Lynn made sure it was
17  typed correctly, not just so that I could
18  get that. Because I had not resigned.
19  She made sure that it was worded correctly
20  because ADECA had cut -- my position was
21  eliminated. So she had her write that
22  letter to ensure that it said that my
23  position was eliminated due to ADECA's

Page 367

1  budget cuts, because that's what -- why my
2  position was eliminated.
3    Q.    Anything else at all said
4  during that meeting?
5    A.    Not that I remember. I'd have
6  to look at some notes.
7    Q.    What notes do you have that
8  talk about this meeting?
9    A.    Other than what I wrote about
10  what happened in the meeting.
11    Q.    I want to know your memory, as
12  you sit here today, as to what happened in
13  that meeting.
14    A.    Well, that's all I remember.
15  And then I had the absent forms. I don't
16  know if I submitted them in that meeting
17  or not or at a later time. I don't
18  remember whether I gave them to her at
19  that time or at the end of that day. I
20  think it was the end of that day. We had
21  a staff meeting, and I believe I submitted
22  those forms that day.
23    Q.    So the staff meeting was after

Page 368

1  your one-on-one meeting with Ms. Lynn?
2    A.    Correct.
3    Q.    During the meeting with just
4  you and Ms. Lynn on September 18th, when
5  she told you allegedly that there would
6  only be one micro enterprise specialist,
7  did you ask why you weren't selected?
8    A.    No.
9    Q.    Did you ask whether or not the
10  position would allow for part-time work?
11    A.    No.
12    Q.    Or the program would allow for
13  part-time work?
14    A.    I asked about part-time work
15  in a previous meeting, and I believe in
16  that meeting she said that -- I may have
17  mentioned -- did I mention part time? I
18  don't think I mentioned it, but I had
19  mentioned it at the September 12th
20  meeting. And she said --
21    Q.    At the September 18th
22  meeting -- that's all we're talking about
23  right now -- you didn't say a thing about

92  (Pages 365 to 368)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 369

1  working part time, right?
2      A.   Well --
3      Q.   At the September 18th
4  meeting --
5      A.   At the September 18th meeting
6  --
7      Q.   -- you didn't say anything to
8  Ms. Lynn about whether or not you could
9  work part time, right?
10     A.   She said something to me about
11 it. She said --
12     Q.   What did she say?
13     A.   -- the grant would not allow
14 part time as you wanted -- as you had
15 requested. It won't allow you to work
16 part time, and it won't allow -- it only
17 allowed for one micro enterprise
18 specialist. And then she said it wouldn't
19 even allow for you to work part time
20 because the grant called for a full-time
21 micro enterprise specialist. So I think
22 she was just making a comment on my
23 request at the previous meeting in that

Page 370

1  meeting.
2      Q.   Did you ever try to talk to
3  Debbie Lynn or anyone at Easter Seals
4  about why you weren't chosen as the
5  full-time micro enterprise specialist?
6      A.   No.
7      Q.   Why is that?
8      A.   Well, I didn't ask because
9  Cassandra had more seniority, and I
10 understand seniority. If anyone would be
11 leaving, it would be the junior. I
12 understand that from work experience. So
13 I wouldn't ask that question, why they
14 chose her over me.
15     Q.   Do you have any information as
16 to why Cassandra was chosen for the
17 position, other than your belief that it
18 was seniority?
19     A.   I believe that it was
20 seniority.
21     Q.   But do you have any
22 information or evidence as to why
23 Cassandra was chosen for that position?

Page 371

1      A.   Nothing except I know that she
2  had seniority. She worked there longer
3  than I did.
4      Q.   And do you have any
5  information or knowledge as to who made
6  the decision to keep Cassandra Cooper
7  versus you for the alleged one full-time
8  position?
9      A.   I don't know who made the
10 decision.
11     Q.   Do you have any information or
12 evidence as to what process was used for
13 making this decision?
14     A.   No.
15     Q.   Did you ever ask anyone?
16     A.   No.
17     Q.   So as far as you know,
18 Cassandra could have been chosen as the
19 full-time specialist because the decision
20 maker at Easter Seals believed that she
21 was the only one of the two of you that
22 were willing to work full time?
23     A.   No. I believe that the

Page 372

1  decision was made to keep Cassandra
2  Cooper -- you asked me what did I believe.
3      Q.   No, I did not. I asked you --
4      A.   What did you ask me?
5      Q.   -- what did you know, not what
6  did you believe.
7      A.   All I --
8      Q.   As far as you know.
9      A.   As far as I know, they kept
10 Cassandra Cooper in the position. She
11 kept the senior person.
12     Q.   As far as you know, the
13 decision maker could have chosen Cassandra
14 Cooper because they believed she was the
15 only micro enterprise specialist that was
16 willing to work full time for the
17 six-month extension period, right?
18     A.   I don't know what their
19 decision was, why they kept her. I don't
20 know.
21     Q.   Okay.
22     A.   And there was something else
23 that I remember that happened on that

93  (Pages 369 to 372)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 373

1  September 12th meeting, but we'll have to
2  go back to that, I guess, when you --
3        Q.   You can tell me that. What
4  else happened?
5        A.   Cassandra had mentioned being
6  a management consultant, would she still
7  be able to work -- the subject was about
8  her working at Easter Seals and running
9  her micro -- and her management consulting
10  business. And Debbie Lynn had said that
11  she could not do both, because if they
12  conflicted -- if she was doing the same --
13  providing the same services that we were
14  providing at Easter Seals to people with
15  disabilities, that she couldn't do both.
16  And they had to --
17        Q.   And that's in line with the
18  policy, right?
19        A.   That was in -- that was in
20  that conversation. That's in line with
21  the policy only because of people with
22  disabilities. So she had said if you are
23  servicing the same clients. That's people

Page 374

1  with disabilities. Okay?
2        Q.   And that's what Debbie Lynn
3  said?
4        A.   Yeah, that's what she said.
5        Q.   And that's in line with the
6  policy, right?
7        A.   That's in line with the
8  policy.
9        Q.   Okay.
10        A.   And I want to make one other
11  comment.
12        Q.   Does it have to do with the
13  September 12th meeting?
14        A.   It has something to do with
15  what she said about the policy.
16        Q.   Was it said during the
17  September 12th meeting? Whatever your
18  comment is going to be.
19        A.   It was said to Cassandra
20  Cooper, but it refers to me. But we can
21  talk about that later, if you will allow
22  me to.
23        Q.   All I want to know is what

Page 375

1  happened in the September 12th meeting for
2  right now.
3        A.   September 12th? Okay.
4        Q.   You went back and told me
5  something else that you remember that
6  Cassandra Cooper had said and that
7  Ms. Lynn had responded to, right?
8        A.   Correct.
9        Q.   We were talking about the
10  September 18th meeting with you and Debbie
11  Lynn. Have we discussed everything that
12  you remember about that meeting and
13  everything that was said at that meeting?
14        A.   I believe we have discussed
15  everything that I can remember at that
16  meeting.
17        Q.   At the September 12th meeting,
18  did you ask about working full time?
19        A.   At the September 12th meeting,
20  I asked if I could work part time if I
21  couldn't work full time.
22        Q.   And you said there was a staff
23  meeting on the afternoon of September

Page 376

1  18th?
2        A.   Correct.
3        Q.   What was discussed regarding
4  the micro enterprise program at the staff
5  meeting?
6        A.   Well, one of the things that
7  was discussed was the micro enterprise
8  program.
9        Q.   What was said about it?
10        A.   Debbie Lynn told the employees
11  that the program was going to continue for
12  six months and that they were keeping
13  Cassandra Cooper and that I would be
14  leaving.
15        Q.   Anything else?
16        A.   I'm not sure, unless she
17  explained -- let's see. I believe she --
18  if I remember, she said the grant only
19  allowed for one micro enterprise
20  specialist and that Cassandra Cooper would
21  be staying.
22        Q.   Do you know, as we sit here
23  today, for certain whether Ms. Lynn said

94  (Pages 373 to 376)

Page 377

1  that or not?
2      A.  Yes, she said that.  I had to
3  think about what happened.  And that's
4  what she said.
5      Q.  And if there's testimony to
6  the contrary, do you have any evidence to
7  support your belief that she said that?
8      A.  Well, I have -- Cassandra
9  Cooper was there.  I'll have her testimony
10  about what was said.
11      Q.  And did you speak with
12  Cassandra Cooper and talk about what was
13  said at that September 18th meeting in
14  preparation for your case?
15      A.  I asked her to testify for me,
16  but I haven't questioned her about it yet.
17      Q.  Was anything else said about
18  either Cassandra Cooper staying, you
19  leaving, or the micro enterprise program
20  during the September 18th staff meeting?
21      A.  I believe that was it.
22      Q.  Didn't Ms. Lynn also announce
23  that there would be a going away party for

Page 378

1  you --
2      A.  Yes.
3      Q.  -- the next week?
4      A.  Yes.
5      Q.  Did y'all always have going
6  away parties for people?
7      A.  When people left we did.
8      Q.  And you had one too, right?
9      A.  I did.
10      Q.  Did you say anything at the
11  staff meeting?
12      A.  Did I say anything to anybody
13  at the staff meeting?  I don't remember
14  what I said.  I may have said I enjoyed
15  working with everyone.  I believe I did
16  say that.  I enjoyed working with everyone
17  at Easter Seals.
18      Q.  Anything else?
19      A.  That's all I can remember
20  right now.
21      Q.  Did anybody say anything to
22  you at the staff meeting?
23      A.  Not directly.

Page 379

1      Q.  Other than --
2      A.  Not that I recall.
3      Q.  Other than the things that
4  Ms. Lynn announced at the staff meeting.
5      A.  Right.
6      Q.  No one else said anything to
7  you?
8      A.  I don't recall anyone saying
9  anything during the meeting.  Afterwards
10  I --
11      Q.  On September 25th -- that was
12  your last day of work, right?
13      A.  Correct.
14      Q.  And that was a Monday, right?
15      A.  Right.
16      Q.  It was also the day that
17  Cassandra Cooper turned in her
18  resignation, right?
19      A.  Right.
20      Q.  Did you know Cassandra Cooper
21  was going to resign before she resigned?
22      A.  She had talked to me about it.
23      Q.  When did she talk to you about

Page 380

1  it?
2      A.  I believe after -- I can't
3  remember.  I believe it was after we met
4  with Debbie Lynn, and Debbie Lynn told us
5  she couldn't work both her job and -- her
6  business and at Easter Seals.
7      Q.  And that was on the 8th -- I
8  mean, that was on the 12th, right?
9  September 12th?
10      A.  That was the 12th, yes.
11      Q.  So how soon after that meeting
12  did Cassandra Cooper tell you that she was
13  going to resign?
14      A.  It was after the meeting.  I
15  don't remember.  It was between -- that
16  time between the 12th and that.  So
17  maybe -- I don't remember exactly.
18      Q.  Was it a day or a week?
19      A.  I don't remember.
20      Q.  Well, was it before your
21  meeting with Debbie Lynn on the 18th?
22      A.  No.
23      Q.  So it was sometime between the

95  (Pages 377 to 380)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 381

1  18th and the 25th?
2      A.  Correct.
3      Q.  Do you remember how many days
4  it was before Ms. Cooper actually turned
5  in her resignation?
6      A.  I don't remember when she
7  turned it in. I think she turned it in
8  that Monday -- that same day, I believe it
9  was.
10     Q.  I know -- I realize that,
11  but --
12     A.  I don't know for sure when she
13  turned it in. No. I don't know when she
14  turned it in.
15     Q.  When Cassandra told you she
16  was thinking about resigning because of
17  the potential that her personal business
18  might conflict with Easter Seals' clients
19  that they were -- that the program was
20  serving, what did you say in response to
21  that?
22     A.  I don't remember.
23     Q.  I mean, this was the same --

Page 382

1  you were in the same boat, right? You had
2  a personal business set up.
3      A.  Right. But I don't
4  remember -- I don't remember what my
5  response was. I remember her telling me
6  that, but I don't remember what my
7  response was.
8      Q.  Did you encourage her to stay
9  with Easter Seals?
10     A.  I don't remember encouraging
11  her to stay.
12     Q.  Did you encourage her to go
13  out and start her business?
14     A.  No.
15     Q.  You just didn't say anything
16  one way or the other?
17     A.  No.
18     Q.  Did she say anything else to
19  you about her resignation?
20     A.  She had told me that she was
21  going to resign because she wanted -- she
22  didn't want -- she didn't want to not be
23  able to work her business. And so she

Page 383

1  said she was going to resign.
2      Q.  And she did resign, right?
3      A.  She did.
4      Q.  You knew she was going to
5  resign and she did resign?
6      A.  Well, she told me that she was
7  going to resign and then she resigned.
8  She submitted her letter to, I guess,
9  Ms. Lynn.
10     Q.  So at that point, you knew
11  that there was a full-time micro
12  enterprise position available, right?
13     A.  Well, I was gone then. But
14  that was my last day.
15     Q.  You knew that she was going to
16  resign before she did it, right, and there
17  would be a full-time micro enterprise
18  position, right?
19     A.  Well, she had said she was
20  going to resign, but I didn't know that
21  she was going to do it until after she did
22  it.
23     Q.  And then she did it on --

Page 384

1      A.  And then she did it.
2      Q.  -- the same day that was your
3  last day, right?
4      A.  Right.
5      Q.  So you were there when she
6  submitted her resignation, right?
7      A.  I don't know when she
8  submitted it. I mean, Monday was my last
9  day in -- at Easter Seals.
10     Q.  Right.
11     A.  So what time she submitted it
12  during that day before -- I don't know
13  when she submitted it.
14     Q.  All right.
15     A.  So I couldn't say.
16     Q.  But you know she submitted it
17  on the 25th?
18     A.  Right.
19     Q.  Which was your last day?
20     A.  Right.
21     Q.  After she submitted it, did
22  you ask anyone at Easter Seals -- like
23  Debbie Lynn. Go in and say, I know

96 (Pages 381 to 384)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 385

1  there's a full-time position open, I'd
2  like to be considered for it?
3      A.   When I came to pick my check
4  up that Friday --
5      Q.   Right.
6      A.   -- I went into the office, and
7  Eileen Bennett was in there. And
8  Eileen -- I asked -- Eileen asked me
9  did -- Eileen said that Cassandra was
10 resigning or had resigned.
11     Q.   You didn't know that prior to
12 Eileen telling you?
13     A.   I knew it prior to.
14     Q.   So Eileen telling you that
15 wasn't any big deal? You already knew
16 that, right?
17     A.   No. I knew. I knew. Because
18 Cassandra had told me that she was going
19 to resign. So when she told me, I said,
20 well, you know, I knew that. That wasn't
21 news to me.
22     Q.   So you knew prior to going in
23 to pick up your last check on the 29th

Page 386

1  that Easter Seals had a full-time micro
2  enterprise position available, right?
3      A.   I knew that Cassandra had
4  resigned, and I knew that Debbie had --
5  Ms. Lynn had told us that the program was
6  going to be extended until --
7      Q.   And you knew --
8      A.   -- until that Friday. I
9  picked me check up, and I saw Eileen. And
10 I said, well, Eileen --
11     Q.   Ms. Jackson, this will go so
12 much faster, I promise, if you'll let me
13 ask you the question. I'll ask you
14 another one to follow up on it. I
15 promise. But if you'll let me ask you the
16 question and then you answer it, I'll ask
17 you another question. And what -- we can
18 walk through it that way.
19     A.   Well, what I was trying to do
20 was answer the question of did I know that
21 there was a full-time position. And the
22 answer would be no, based on what Eileen
23 told me.

Page 387

1      Q.   Stop for a second.
2      A.   Okay.
3      Q.   You knew prior to Ms. Cooper
4  submitting her resignation that she was
5  likely going to resign her position,
6  right?
7      A.   Correct.
8      Q.   And you don't know what time
9  it happened on the 25th, but you know that
10 she submitted her resignation on the 25th,
11 right?
12     A.   Correct.
13     Q.   And that was your last day at
14 work, right?
15     A.   Correct.
16     Q.   And so from the day she
17 submitted it on the 25th, you knew that,
18 one, the program had been extended for six
19 months?
20     A.   Correct.
21     Q.   Two, there was funding for at
22 least one micro-enterprise position?
23     A.   Correct.

Page 388

1      Q.   And, three, the person who had
2  the position was no longer going to fill
3  it, right?
4      A.   Correct.
5      Q.   Now, on the 25th forward, did
6  you ever contact Debbie Lynn about filling
7  that position as the full-time micro
8  enterprise specialist?
9      A.   No.
10     Q.   When you got to Easter Seals
11 to pick up your paycheck on the 29th and
12 Eileen Bennett told you that Cassandra
13 Cooper had resigned, you already knew
14 that, right?
15     A.   Right.
16     Q.   And Eileen Bennett is the
17 secretary, right?
18     A.   Right.
19     Q.   And you asked her a question
20 about the program continuing, right?
21     A.   Right.
22     Q.   Did you ever ask to talk to
23 Ms. Lynn when you were there?

97  (Pages 385 to 388)

# American Court Reporting
## toll-free (877) 320-1050

Page 389

1    A.    No.
2    Q.    But you were there, and you
3 needed Ms. Lynn to sign something for you,
4 right?
5    A.    Correct.
6    Q.    Was Ms. Lynn there that day?
7    A.    I'm not sure.
8    Q.    Well, did you get your
9 paperwork signed that day?
10    A.    I'm not -- I think I -- I
11 don't know if I left it and came back and
12 picked it up or if I got it that day.  Let
13 me think.  I think Ms. Lynn was in a
14 meeting that day.  Yes, she was there.
15 And Eileen Bennett took it -- took it in
16 the meeting, and I believe she signed it
17 in the meeting and then Eileen gave it to
18 me.  That's what I recall.
19    Q.    So Ms. Lynn was busy when you
20 got there?
21    A.    Right.
22    Q.    And she signed paperwork that
23 you had filled out for her to sign?

Page 390

1    A.    Correct.
2    Q.    And signed it at your request
3 and gave it back to you, but she was still
4 in the meeting while this was all going
5 on, based on your understanding?
6    A.    She gave it to Eileen.  Eileen
7 gave it to me.
8    Q.    Did you ever ask to talk to
9 Debbie Lynn about the micro enterprise
10 position --
11    A.    No.
12    Q.    -- after -- at any time after
13 September 25th?
14    A.    No.
15    Q.    Do you have any information or
16 knowledge about the process by which
17 Easter Seals decided to contract with Bill
18 Hanes to provide services as a micro
19 enterprise specialist for the remaining
20 six months of the extension?
21    A.    No, I don't.
22    Q.    Do you have any information or
23 knowledge as to who made the decision to

Page 391

1 contract with Bill Hanes for this period?
2    A.    No, I don't.  Oh, I do have
3 information based on what you gave me.
4    Q.    Okay.
5    A.    The contract that was signed
6 by Bill Hanes, and I believe Ms. Lynn's
7 signature is on there.
8    Q.    So you had a contract that was
9 executed, because you don't have any
10 information or knowledge as to how the
11 decision was made to execute -- or to
12 enter into that agreement, correct?
13    A.    No, I don't.
14    Q.    Do you have any knowledge of
15 the decision maker's understanding of the
16 facts at the time the decision was made to
17 contract with Bill Hanes?
18    A.    Do I have knowledge of who?
19    Q.    Of the decision maker's
20 understanding of the facts.
21    A.    I don't know who you're
22 referring to as the decision maker.
23    Q.    So you couldn't possibly know

Page 392

1 what facts the decision maker had in front
2 of them because you don't even know who
3 the decision maker was; is that correct?
4    A.    Correct.
5    Q.    When did you learn that Easter
6 Seals had contracted with Bill Hanes for
7 the extension period?
8    A.    I believe it was in October.
9 I called Easter Seals.
10    Q.    What did you call Easter Seals
11 for?
12    A.    I called -- I believe I may
13 have called to speak to Cassandra Gray.
14 No.  I called to speak to Danita Rivers,
15 just to say hi and see how she was doing.
16 And Cassandra Gray, who was the
17 receptionist, answered the phone, and she
18 told me that Bill Hanes was working in the
19 micro enterprise office.
20    Q.    What else?
21    A.    That was it.
22    Q.    Did you say anything in
23 response to that?

98  (Pages 389 to 392)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 393

1    A.   I said, what? And she said,
2  yes. He's working in the micro enterprise
3  office.
4    Q.   Did she say anything else?
5    A.   That was it.
6    Q.   Did you ask her any follow-up
7  questions?
8    A.   No, I didn't.
9    Q.   What did you do after you
10 found out that Bill Hanes was working in
11 the micro enterprise office?
12   A.   When I found out he was
13 working in the micro enterprise office --
14 you said what did I do?
15   Q.   Uh-huh.
16   A.   I didn't do anything at
17 first. I didn't do anything. But I was
18 hurt and I was disappointed, but I didn't
19 do anything at that -- when I first found
20 out.
21   Q.   And then what did you do?
22   A.   Then I filed an EEOC
23 complaint.

Page 394

1    Q.   And in that complaint, one of
2  your allegations was that Mr. Hanes was
3  less qualified than you.
4       I think we've already covered this.
5  But other than your assessment of his two
6  business plans for his blind clients in
7  Talladega while he was working with Easter
8  Seals, did you base your assessment of his
9  qualifications on anything else?
10   A.   Just on how he prepared his
11 business plans.
12   Q.   So that and nothing else,
13 right?
14   A.   That's it.
15   Q.   As we sit here today, do you
16 know why Easter Seals hired Bill Hanes to
17 provide -- to the micro enterprise program
18 after Cassandra Cooper resigned?
19   A.   No, I don't.
20   Q.   Did you ever call or attempt
21 to speak with anyone at Easter Seals at
22 any time after you left regarding their
23 decision to contract with Bill Hanes?

Page 395

1    A.   No, I didn't.
2    Q.   Did you ever file a grievance
3  with the personnel committee as provided
4  for in the employee handbook with regard
5  to your separation from Easter Seals?
6    A.   No, I didn't.
7    Q.   Why didn't you do that?
8    A.   I didn't know -- I didn't know
9  about that.
10   Q.   But if it was a provision
11 provided for in the handbook -- we've
12 already gone over the fact that you had a
13 copy of the handbook, right?
14   A.   I did. I had a copy of it.
15   Q.   Other than Cassandra Cooper,
16 who have you discussed this case with?
17   A.   My mother.
18   Q.   What have you and your mother
19 discussed?
20   A.   We've discussed the case,
21 about me filing a case against Easter
22 Seals for them discriminating against me.
23   Q.   Anything else?

Page 396

1    A.   Just the decisions -- after I
2  get the decisions, I tell her about it. I
3  didn't really give her all the details
4  because a lot of things upset her. So I
5  just -- so I would tell her, well, today
6  the judge made this decision. So whatever
7  the decisions were from the judge, I would
8  let her know about them.
9    Q.   Does your mom have any
10 evidence or information supporting your
11 claims in this lawsuit?
12   A.   She doesn't have any of my
13 paperwork or anything like that.
14   Q.   Does she have any information
15 or knowledge or evidence regarding why
16 Bill Hanes was hired to provide services
17 for the micro enterprise program after
18 Cassandra Cooper resigned?
19   A.   No, she doesn't.
20      I need to get some water.
21   Q.   Sure.
22      (Brief recess taken.)
23   Q.   Other than Cassandra Cooper

99  (Pages 393 to 396)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 397

1  and your mother and the one conversation
2  you told me between you and Cassandra
3  Gray, have you spoken with anyone else
4  regarding your case?
5      A.   Yes.
6      Q.   Who?
7      A.   Danita Rivers.
8      Q.   When did you speak with Danita
9  Rivers?
10     A.   I don't remember the date, but
11 I believe Danita -- Danita called me
12 because I hadn't told -- given her any
13 details.  She called me about that
14 meeting -- that board meeting.
15     But prior to that, I believe she
16 called me.  She called me after Easter
17 Seals had received -- or after the judge
18 had made the order that -- denying Easter
19 Seals' motion to dismiss my claim against
20 -- rumor came on the job, and she called
21 me and told me.
22     Q.   And who had she heard that
23 from?

Page 398

1      A.   I don't remember who she said
2  she heard it from.
3      Q.   What did she say about it to
4  you?
5      A.   She said that she heard that I
6  had proven my case against Easter Seals or
7  something like that.  I had proven my case
8  of wrongful termination against Easter
9  Seals.
10     Q.   Anything else?
11     A.   That was it.
12     Q.   Does Danita Rivers have any
13 information supporting your claims?
14     A.   No.
15     Q.   Who else besides Danita Rivers
16 have you talked to regarding this case?
17     A.   My sister.
18     Q.   Who is your sister?
19     A.   Connie Jackson.
20     Q.   Where does Connie Jackson
21 live?
22     A.   In Southfield, Michigan.
23     Q.   What have you told Connie

Page 399

1  Jackson about this case?
2      A.   I just told her I filed a
3  claim against Easter Seals for
4  discrimination -- for racial and gender
5  discrimination, and that was it.  I
6  haven't gone into any details with her,
7  other than what has happened at the end of
8  a motion or what the judge has decided on
9  a motion.
10     Q.   Does Connie Jackson have any
11 information or evidence regarding your
12 claims in this case?
13     A.   No, she doesn't.
14     Q.   Who else have you spoken with
15 regarding your claims in this case?
16     A.   Okay.  Who did I say?  My mom,
17 Danita, Cassandra Cooper, and Cassandra
18 Gray, and my therapist.
19     Q.   What therapist is that?
20     A.   Dr. Voncile Smith.
21     Q.   Have you told me every piece
22 of evidence that you have to support your
23 allegation that the decision to contract

Page 400

1  with Bill Hanes after Cassandra Cooper
2  resigned was based on race and sex?
3      A.   That was it.
4      Q.   So we've talked here today
5  about any and all evidence that you have
6  that that particular decision was made
7  based on your race and sex?
8      A.   Correct.  Other than -- I
9  don't know if I mentioned this in my
10 filing, but that I eliminated all other
11 reasons why I felt that I didn't get the
12 job, like if I wasn't qualified or if my
13 performance wasn't good or if I was
14 disciplined for any reason.  So I
15 eliminated all the reasons why a person
16 would be terminated.
17     Q.   You personally --
18     A.   I personally.
19     Q.   Your personal assessment, and
20 you decided that none of these other
21 reasons could have been a reason?
22     A.   Correct.
23     Q.   So it must have only been race

100  (Pages 397 to 400)

**www.AmericanCourtReporting.com**
**November 13, 2007**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 401

1  or sex?
2      A.  Correct.
3      Q.  But you don't have any
4  evidence that it was motivated by race or
5  sex? It's just what you were left with at
6  the end of your analysis?
7      A.  Correct.
8      Q.  So there could be other
9  information out there that you didn't have
10 while you were making your analysis that
11 would have changed your decision as to
12 whether -- why the decision was made to
13 contract with Bill Hanes?
14     A.  I don't know.
15     Q.  But there could be, right?
16     A.  I don't know.
17     Q.  I realize you don't know
18 whether there is.  My question is, there
19 could be other information, right?
20     A.  I don't know.
21     Q.  And you don't know one way or
22 the other because you don't know what the
23 information that the people at Easter

Page 402

1  Seals made their decision based on, right?
2      A.  I don't know.
3      Q.  Have you ever heard Debbie
4  Lynn make any derogatory remarks regarding
5  females?
6      A.  No.
7      Q.  Have you ever heard Debbie
8  Lynn make any derogatory remarks regarding
9  African-Americans?
10     A.  No.
11     Q.  Have you ever heard anyone at
12 Easter Seals make any derogatory remarks
13 regarding females?
14     A.  No.
15     Q.  Have you ever heard anyone at
16 Easter Seals make any derogatory remarks
17 regarding African-Americans?
18     A.  No.
19     Q.  Prior to learning that Easter
20 Seals had contracted with Bill Hanes for
21 the period of the extension, did you have
22 any complaints or concerns with Debbie
23 Lynn?

Page 403

1      A.  No.  I've never had any
2  complaints with Debbie Lynn.
3      Q.  And we've gone over your
4  complaints or concerns with Susan McKim
5  and Larry Lewis today, right?
6      A.  Correct.
7      Q.  And neither one of -- none of
8  your complaints against any of your
9  supervisors in the past have been based on
10 your gender, right?
11     A.  Not that I know of.
12     Q.  Certainly not that you told
13 them, right?
14     A.  Right.
15     Q.  And none of your complaints in
16 the past have been based on your race,
17 right?
18     A.  Right.
19         (WHEREUPON, a document was
20 marked as Defendant's Exhibit Number 8 and
21 is attached to the original transcript.)
22     Q.  What I'm going to mark as
23 Defendant's Exhibit 8 is a response to

Page 404

1  Interrogatory Number 5 regarding medical
2  providers, office locations, and
3  conditions.
4      Did you prepare that response?
5      A.  Yes, I did.
6      Q.  And it's one-page long; is
7  that correct?
8      A.  That's correct.
9      Q.  And are these all the medical
10 providers that treated you for any
11 condition within the last eight years?
12     A.  There is one -- Dr. Roland
13 Hester.  After I had the hip replacement,
14 I went to therapy at HealthSouth
15 Rehabilitation Hospital.  And I omitted
16 that one.
17     Q.  So you went to physical
18 therapy --
19     A.  Physical therapy.
20     Q.  -- for strengthening of your
21 hip?
22     A.  Right.
23     Q.  And then --

101 (Pages 401 to 404)

# American Court Reporting
## toll-free (877) 320-1050

Page 409

1  medication?
2      A.   No.
3      Q.   You're alleging damages for
4  pain and suffering. What evidence do you
5  have supporting these damages?
6      A.   Which day -- what are you
7  referring to?
8      Q.   In this case, are you alleging
9  damages for pain and suffering?
10     A.   Yes, I am.
11     Q.   And what evidence do you have
12 supporting your request for those damages?
13     A.   Well, since I started the
14 case, I have -- prior to that, I have been
15 treated for stress and depression and
16 anxiety. And since I filed the case and
17 since going through with the case, I
18 started feeling depressed. So that's why
19 I went to her -- went back to -- I
20 hadn't -- I think I hadn't been there
21 since December of '03 because I started
22 working after that, I believe. I started
23 working at Easter Seals in '04. So I

Page 410

1  believe December '03 was my last time at
2  the therapist.
3      Q.   The last time you were
4  unemployed you suffered from stress and
5  depression?
6      A.   Yes.
7      Q.   And then you didn't have
8  treatment for that. Were you suffering
9  from stress and depression while you
10 worked at Easter Seals?
11     A.   I don't think I was. I think
12 I was -- had been doing better because I
13 had started working. And that's what
14 it -- when I left the postal service,
15 that's when it started. So once I started
16 back working at Easter Seals, in the work
17 environment --
18     Q.   And so a year after stopping
19 work again, you were feeling the effects
20 of stress and anxiety; is that correct?
21     A.   Since I filed this case.
22     Q.   Since you filed a case?
23     A.   Yeah. And just after filing

Page 411

1  the case and going through everything with
2  filing and --
3      Q.   So is your stress and anxiety
4  related to the day-to-day ins and outs of
5  handling your own lawsuit unrepresented?
6      A.   That's part of it.
7      Q.   What's the other part of it?
8      A.   Financial stress.
9      Q.   What else?
10     A.   And that's it.
11     Q.   So the day-to-day stress of
12 representing yourself?
13     A.   It's very stressful.
14     Q.   And the financial stress that
15 you're under, that's what's causing your
16 stress and anxiety?
17     A.   Yes.
18     Q.   Anything else?
19     A.   I guess that's it.
20     Q.   And some of the information
21 that you presented regarding your damages,
22 you had your claims listed as race
23 discrimination, sex discrimination, pay

Page 412

1  discrimination, and wrongful termination,
2  right?
3      A.   Correct.
4      Q.   And throughout the deposition,
5  we've talked about your claims of gender
6  discrimination, race discrimination, and
7  wrongful termination, right?
8      A.   Correct.
9      Q.   And those are really -- when
10 you're listing each one of those claims,
11 you're talking about the same event?
12 You're talking about your separation from
13 Easter Seals and being replaced with Bill
14 Hanes, right?
15     A.   Correct.
16     Q.   So each one of those claims,
17 though you separated them, is really about
18 the same instance, right?
19     A.   Correct.
20     Q.   And you also have a claim in
21 there for pay discrimination, right?
22     A.   Right.
23     Q.   And we've talked about that.

103  (Pages 409 to 412)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 413

1  That's really about that same instance of
2  you being replaced with Bill Hanes, who
3  you believe was paid more, correct?
4      A.   Correct.
5      Q.   Do you know anything about --
6  other than the information you received
7  from Easter Seals in this case, about
8  whether or not Bill Hanes receives any
9  health insurance benefits?
10     A.   In talking to you. You told
11 me that he didn't.
12     Q.   Separate and apart from
13 conversations you and I have had. Do you
14 have any information or evidence as to
15 whether or not Bill Hanes received health
16 insurance benefits through Easter Seals?
17     A.   No, I don't.
18     Q.   And you don't know whether he
19 was eligible for life insurance or for
20 retirement benefits or for paid holiday
21 leave or for any kind of paid leave or for
22 long-term disability insurance or any of
23 the other insurance or benefits that you

Page 414

1  received while you were at Easter Seals?
2      A.   I don't have any facts on
3  that; but I understand what an independent
4  contractor is.
5      Q.   Because you've been an
6  independent contractor before, right?
7      A.   I am one now.
8      Q.   And you are one now. And you
9  don't receive any of those type
10 benefits --
11     A.   Right.
12     Q.   -- from clients that you work
13 with, right?
14     A.   Correct.
15     Q.   Ms. Jackson, have you applied
16 for state unemployment insurance?
17     A.   No, I haven't.
18     Q.   Are you eligible for that?
19     A.   No, I'm not.
20     Q.   If I've asked you this before,
21 I apologize. Do you keep a diary or a
22 journal?
23     A.   No, I don't.

Page 415

1      Q.   Did you at any time you worked
2  at Easter Seals?
3      A.   I just kept appointments on a
4  calendar. I would write on a calendar.
5  And then we had a daily activity log at
6  Easter Seals.
7      Q.   But when you left Easter
8  Seals, you left those things there?
9      A.   I left those there.
10     Q.   Other than the information
11 that you provided to me throughout the
12 lawsuit, do you have any other notes or
13 logs or information that you've written
14 down or collected about your claims in
15 this case?
16     A.   No.
17     Q.   I want to make sure that we've
18 talked about each and every event or
19 instance of discrimination that you're
20 making a claim about in this case. Have
21 we done that today?
22     A.   I believe we have.
23     Q.   And you've told me every fact

Page 416

1  that you believe supports your claims,
2  right?
3      A.   I believe so.
4      Q.   I'm going to take a break for
5  just a second. Let me review my notes and
6  see if we can be done.
7          5:16 p.m.
8          (Recess taken.)
9          5:23 p.m.
10     Q.   Ms. Jackson, I know that we
11 discussed earlier that there are still
12 some outstanding records, and we might
13 have some questions or information that we
14 need from you to make those records make
15 sense.
16     A.   Yes.
17     Q.   And so if those records come
18 in and that becomes the case, I'll give
19 you a call and talk to you about it like
20 we've been doing in the past. And if we
21 need to, we'll come back and flush out
22 some of those -- some of that information
23 that we need.

104  (Pages 413 to 416)

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **EMILY JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:07cv315-MEF** |
| | ) | |
| **EASTER SEALS CENTRAL** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## SUPPLEMENTAL DECLARATION OF DEBBIE LYNN

I, the undersigned, Debbie Lynn, hereby swear or affirm that the following is true and correct based on my personal knowledge:

1.    My name is Debbie Lynn.  I am over the age of twenty-one, I am of sound mind, and I am qualified to make this declaration.  I understand that this declaration is being submitted in connection with a lawsuit filed against Easter Seals of Central Alabama ("Defendant" or "Easter Seals") by one of its former employees, Emily C. Jackson.

2.    I assumed the position of Administrator for Easter Seals in late August, 2006.

3.    Prior to March 2007, Easter Seals offered a Micro-Enterprises Program (the "Program"), which was designed to assist individuals with disabilities in starting their own businesses. The funding for this Program was based entirely on grant monies provided by the Department of Labor ("DOL") and administered by the Alabama Department of Economic and Community Affairs ("ADECA").

4.    It is my understanding that, prior to my employment with Easter Seals, ADECA had notified Easter Seals that the DOL had recently cut funding for the Micro-Enterprise grant, and that ADECA's attempts to get a "no-cost" grant extension to continue to fund the Program had not been successful. I further understood that this information had been communicated to the two Micro-Enterprise Specialists - Ms. Jackson and Ms. Cooper- by the previous administrator, Larry Lewis.

5.    At the very end of August, ADECA notified Dr. Susan McKim, Easter Seals' Grants Developer, that a no-cost extension had been approved for a six-month period. However, at this time, Easter Seals was still uncertain as to what the final budget would be. Nonetheless, Easter Seals fully intended, if at all possible, to structure its grant funds to allow it to retain both Ms. Jackson and Ms. Cooper as full-time Micro-Enterprise Specialists for the six-month extension, if they choose to stay with the Program. In fact, our initial budget proposal of September 11, 2006

included salaries for two full-time Specialists. It was only after Ms. Jackson declined to stay with the Program that the budget was revised to have only one Specialist position.

6.    On September 11, 2006, Ms. Jackson, apparently unaware of the recently obtained extension, submitted a letter to me stating that she had received a memo dated August 11 from Mr. Larry Lewis, the previous administrator, explaining that September 29, 2006 would be the end of the Program and her employment with Easter Seals. In this letter Ms. Jackson requested that September 25 be her last actual day of work and that September 26-29 be treated as paid leave so that she could "transition into a new career."

7.    On September 12, I met with Ms. Jackson and Cassandra Cooper and informed them that the Program had received a no-cost grant extension, but only for a six-month period (as opposed to the anticipated one-year extension). After sharing this news with them, I asked them whether or not they planned to stay with the Program for the six-month period. Ms. Cooper stated that she wanted to remain with the Program. Ms. Jackson, on the other hand, indicated that she would like the arrangement detailed in her September 11 letter to stand – *i.e.,* she would not remain with the Program for the extension, her last day of work would be September 25, and she would take paid leave for the days of September 26-29. As a result, I clearly understood that Ms. Jackson was "resigning" effective September

29.  At no time during this meeting or thereafter did Ms. Jackson ever indicate that she was interested in remaining with the Program as a full-time employee for the six-month extension period.

8.  Additionally, during the September 12 meeting, both Ms. Cooper and Ms. Jackson informed me that they had started their own independent consulting business.  In response, I expressed my concerns regarding the potential for conflicts to arise because the services they offered as independent consultants were the same services Easter Seals had hired them to perform for its clients for free. Furthermore, Easter Seals' employee policies prohibit any employee from accepting or engaging in outside employment without clearance and approval from his/her supervisor. (See Easter Seals' Employee Handbook, p. 9, attached hereto as Exhibit A).

9.  At some point after the September 12 meeting, Ms. Jackson approached me and expressed a possible interest in remaining with the Program on a part-time basis – ½ days, two days a week.  I responded that I did not know whether that would work, but that I would look into it and let her know.

10.  After discussing Ms. Jackson's part-time proposal with Dr. McKim, I determined that, based on the anticipated schedule and needs of the Program (*e.g.*, full day workshops, need for timely responses to client questions/needs, etc.), Ms. Jackson's part-time proposal would not be effective or satisfactory for the Program

as envisioned at that time. Consequently, based on our discussions in the September 12 meeting, I drafted a letter to Ms. Jackson confirming her resignation of the full-time Micro-Enterprise Specialist position.

11. On or about September 18, I met with Ms. Jackson and informed her that her part-time proposal (½ days, 2 days a week) was not really workable/effective for the Program's six month extension and gave her the letter confirming Easter Seals' acceptance of her resignation. After reviewing the letter, Ms. Jackson explained that, if the letter reflected that she had resigned her position, she would be ineligible to collect on a private unemployment insurance policy that she had recently purchased. Solely in an effort to assist Ms. Jackson in obtaining these benefits, I re-wrote the letter to reflect that her position had been eliminated due to budget cuts – which was accurate to the extent that, prior to being awarded the grant extension, the entire Program was going to end due to the DOL's budget cuts, the Program was only extended on a limited basis and, if Ms. Jackson did not stay, her position would not be filled.

12. At the September 18 staff meeting, I informed the staff that the Micro-Enterprises Program would be extended for six-months, Ms. Cooper would remain with the Program for the extension period and that a going-away party had been scheduled for Ms. Jackson. Easter Seals then modified its proposed budget for the

Program to reflect only one full-time Micro-Enterprise Specialist – Cassandra Cooper.

13.    On September 25, four days before the grant extension was scheduled to begin, Ms. Cooper, without forewarning, resigned her full-time Micro-Enterprise Specialist position.

14.    At the time of Ms. Cooper's resignation, Easter Seals and the Micro-Enterprises Program faced a staffing crisis.  We needed a qualified individual who was familiar with the Program and the needs of its clients, available on four days notice to fill a full-time position, and interested in accepting a position for only six-months.  Based on our previous conversations, I understood that Ms. Jackson was only interested in very limited part-time work (at most) with the Program and, therefore, not a viable candidate for or interested in the new full-time vacancy. Dr. McKim suggested the possibility of contacting Bill Haynes, an independent contractor with whom Easter Seals had previously contracted to provide Micro-Enterprise Specialist services in the Talladega area.

15.    When Easter Seals contacted Mr. Haynes and explained the immediate needs of the Program, he responded that he could provide the services needed through March 2007 (the extension period) as an independent contractor. Mr. Haynes then presented Easter Seals with a six-month contract for his services, which Easter Seals accepted. After contracting with Mr. Haynes, Easter Seals,

again, modified its proposed budget for the Program's grant extension period. The budget for the extension period and the Sub-recipient Grant Agreement were ultimately finalized and executed on March 23, 2007.

16.     Had I known, prior to contracting with Mr. Haynes, that Ms. Jackson was interested in the full-time position vacated by Ms. Cooper, I would definitely have offered her the position.

17.     Again, at the time in question, it was my clear understanding that Ms. Jackson had started her own consulting business, that she was only interested in remaining with the Micro-Enterprises Program on (at most) a very limited part-time basis (2 half days a week) and that she was not interested in remaining in a full-time position.  Moreover, after Ms. Jackson learned of Ms. Cooper's decision to resign the full-time Micro-Enterprise position, she never notified me or anyone else in management of any interest in that newly vacant position.

I declare under penalty of perjury the foregoing to be true and correct. Dated this 18th day of March, 2008.


_Debbie Lynn_
Debbie Lynn

7

# EXHIBIT A

EMPLOYEE HANDBOOK

EASTER SEALS CENTRAL ALABAMA

REHABILITATION AND CAREER CENTER

MONTGOMERY, ALABAMA

This is a handbook for information purposes only and subject to be changed at any time. This is not intended to be an employment contract.



DEFENDANT'S
EXHIBIT

1    Emily Jackson

9/20/2006

administrative and supervisory personnel having need for access will be permitted to see your personnel records, and no information contained in your personnel records will be divulged to others without your specific authorization in <u>writing</u>. Personnel files are maintained in compliance with standards set forth in the Privacy Act of 1974. You may review your personnel file by sending a request in writing to the administrator who will make the necessary arrangements for your request to be honored. Personnel files are not at any time to be taken from the administrative assistant's office unless approved by the administrator.

## Channels of Communication

The administrator strives to provide an environment conductive to free flow information from administration to all employees and, equally important, from employees to the administrator. In order for us to conduct an effective program, it is necessary for employees to be aware of administrative policies and problems, and that the administrator be aware of the situation of employees. In other words, we must all know "what's going on" so that we can work toward mutual goals.

Communication includes information concerning programmatic and personnel changes, special events, and other relevant information. In order to facilitate interdepartmental communications, regular administrative meetings will be held, in addition to the use of memorandums, in-house e-mails, bulletin boards, and other staff meetings.

## Disclosure of Outside Employment

Employees shall not engage in or accept outside employment or render services with a person, firm, or corporation when such service or employment:

1. is incompatible with proper discharge of the duties and responsibilities of employment with this organization, or would impair independence of judgment or actions in such employment; or
2. involves such hours or work or physical effort that it would or could reasonably be expected to reduce the employee's quality or quantity of services to the Center.

Any employee who is engaged in or is planning to engage in outside employment shall request clearance from his/her immediate supervisor as to whether such current and planned activities are prohibited. If they are not prohibited, the employee shall then complete an Outside Employment Request form. The immediate supervisor may require the staff member to furnish such other information as may be appropriate in considering the clearance request. The immediate supervisor may grant clearance only when he/she believes such activities would be consistent with this regulation. If clearance is not granted, the employee shall not commence or continue the outside employment or activity. If the immediate supervisor elects to grant a clearance, it shall be issued in writing and forwarded to the administrator for final approval.

## Lines of Authority

The Center places great value on the team approach to managing the day-to-day activities of the Center. The Management Team consists of the various department heads in the Center and all have their responsibilities and authority to make decisions that effect their department. Major